UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

HONORABLE MAAME EWUSI-MENSAH FRIMPRONG, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,

Plaintiff,

vs. Case No. LACR 25-705

ISAIAS LOPEZ,

Defendants.

/

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
TRIAL DAY 1
Wednesday, November 12, 2025
8:30 a.m.
LOS ANGELES, CALIFORNIA

TERRI A. HOURIGAN, CSR NO. 3838, CCRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, ROOM 4311
LOS ANGELES, CALIFORNIA 90012
(213) 894-2849

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

UNITED STATES ATTORNEY'S OFFICE
United States Attorney
BY: RAHUL R.A. HARI
ERIC MACKIE
Assistant United States Attorneys
United States Courthouse
312 North Spring Street
Los Angeles, California 90012

**FOR THE DEFENDANT:**

FEDERAL PUBLIC DEFENDER'S OFFICE
BY: REBECCA M. ABEL
KYRA KRISTINE NICKELL
Deputy Federal Public Defenders
Central District of California
321 East Second Street
Los Angeles, California 90012

**WITNESS INDEX**

* * *

| WITNESS: | Page |
|---|---|
| (None called.) | |

**EXHIBIT INDEX**

* * *

| **EXHIBIT NO.** | **Page** |
|---|---|

**(None received.)**

**LOS ANGELES, CALIFORNIA; WEDNESDAY, NOVEMBER 12, 2025**

**8:30 A.M.**

**--oOo--**

THE COURTROOM DEPUTY: All rise. You may be seated.

Calling Item No. 1, LACR 25-705, *United States of America versus Isaias Lopez*.

Counsel, please stand and state your appearances.

MR. HARI: AUSA Rahul Hari and AUSA Eric Mackie, on behalf of the United States.

With us at counsel table is Special Agent Thomas Smith, with Federal Protective Service.

MS. ABEL: Good morning, Your Honor.

Rebecca Abel, Deputy Federal Public Defender, and Kyra Nickell, Federal Public Defender for Mr. Isaias Lopez, who is present on bond.

THE COURT: Good morning, everybody. Good morning to all counsel.

Good morning, Special Agent Smith, and good morning, Mr. Lopez. Good to see you.

THE DEFENDANT: Good morning, Your Honor.

THE COURT: So we are here to start the trial in this matter.

There are a few things we should talk about before we start our jury selection.

I imagine we will start to get our jurors somewhere between 9:00 and 9:30, so we have a little bit of time.

As I indicated, I did request 60 jurors. I will let you know how many we're going to get.

It does mean they are going to take up most of the courtroom, so only the last two rows will be open for any observers.

Okay. I am -- bless you, I am in receipt of the parties' jury instructions and the defense's motion for reconsideration.

Obviously, all of that came in very late yesterday, and early today, so the Court is not prepared to rule on that.

I will just say, counsel, I set deadlines for a reason, to allow the Court to have time to rule on things properly.

So, the fact that the jury instructions did not come when I ordered them, didn't allow the Court to review them and consider them over the weekend, so, I will look at them at lunch.

Hopefully, this afternoon, I will be able to address the disputes that remain as well as the motion for reconsideration.

I don't know if we're going to get to openings today, but if we do get to openings, just to be clear, the First Amendment is not to be mentioned unless and until I rule on the jury instructions, and determine whether it's even relevant to bring it up.

Okay. So the parties received the Court's voir dire questions.

Any objections to the questions or additional questions, you want to make one last pitch for me to add?

MR. HARI: Not from the government, Your Honor.

MS. ABEL: None from the defense.

THE COURT: Okay. Thank you.

I did rule on the defense's motion to dismiss. It probably has not hit the docket yet.

I denied the motion in its entirety, so at some point you will get that if you have not gotten it already.

I see that the parties did stipulate to the admission of some of the exhibits.

Namely, Exhibits 1 through 5, and can we treat these as -- I see that the stipulation is that they are admissible.

Any objection for 1 through 5, that whatever party is offering the exhibit, you don't need to go through asking that it be admitted.

If you prefer to do that that way, that is fine. But if you already stipulated to this, I'm fine for whoever is bringing up the exhibit can just say, "I ask the witness to turn to Exhibit No. 2, Your Honor, the parties have already stipulated to its admission," and then you just proceed from there.

Does that work for the parties?

MR. MACKIE: Works for the government.

MS. ABEL: Yes, Your Honor. Can we put the stipulation on the record.

I'm happy to read it aloud at the beginning of trial, or just to have it docketed.

THE COURT: For the jury?

MS. ABEL: Just for the purposes of during the substantive portion of court so that it's clear for the record that those were admitted by the Court.

THE COURT: We will add it to today's minute order, that the Court accepted the stipulation.

MS. ABEL: Thank you.

THE COURT: Okay. And then there are some objections. Maybe I can handle these quickly now.

What is the objection to Exhibit 6?

MS. ABEL: Your Honor, I believe -- I'm going to double-check that before I speak, I believe in the -- we received a revised set of exhibits last night, and that was corrected.

THE COURT: Okay.

MS. ABEL: I believe Exhibit 6 objection is withdrawn.

THE COURT: Thank you.

Exhibit 7, and so the objection is that these are photographs of the camera and they don't show the camera as it

looked on the day in question.

MS. ABEL: Yes, Your Honor. The camera will be -- it's a stipulated exhibit now, although not in the version the Court received, because that was before the government added it to its exhibit list last night.

But, we stipulate to admission of the physical evidence.

THE COURT: Okay. So -- is that Exhibit 20?

MS. ABEL: I believe that is now with the updated list, yes.

THE COURT: Okay. So is the government still seeking to introduce 7?

MR. HARI: No, Your Honor.

THE COURT: So Exhibit 7, government is not going to seek to admit that.

Okay. Exhibit 9. And let's start with 9.

Nine and 13, what is the government's response?

MR. MACKIE: Your Honor, the government's response is that the objections that are raised by defense really doesn't go to authenticity. It doesn't go to admissibility, it goes to the weight of the photograph.

The witnesses will testify that the sign that is in the picture other than the perimeter that had been added since August 8, looks exactly the way that it did August 8.

The only difference is there is now a gate around the perimeter, what weight to give to the photograph --

THE COURT: But when asked if this is a true and correct representation of what the building looked like on that day, they are not going to be able to answer yes to that, correct?

MR. MACKIE: The question is not about the building, Your Honor, it's about the sign. The question will be --

THE COURT: Hold on a moment, Mr. Mackie. Where are the exhibits?

Here?

What is Exhibit 9 intended to show?

MR. MACKIE: If the Court would turn to the second page, there is a clearer picture of the directory that is outside of Roybal.

And it's intended to show that this is a federal building and there was a directory outside of it that identified the building as a federal building.

THE COURT: So you don't need the fencing?

MR. MACKIE: No, Your Honor.

THE COURT: You could give the jury a cropped photo that just shows the fencing, without the fencing?

MR. MACKIE: Yeah, I think that is a middle ground, Your Honor, that the government would be fine with.

We could cut the photograph to cut the fencing out.

THE COURT: Okay. And then what about the first page?

MR. MACKIE: The first page is just a zoomed-out photograph of that same sign. We don't need the first page.

THE COURT: Okay. So with those changes, and I think just to be on the safe side, let's have this be Exhibit 21, that is the next in line.

MR. MACKIE: Yes, Your Honor.

THE COURT: So Exhibit 21 will be the cropped photo of the Roybal sign.

You will need to show it to defense counsel for them to indicate if they have any other objections, but any objections at this time?

MS. ABEL: Not based on the Court's description, but reserve as the Court suggested.

THE COURT: Okay. Then Exhibit 11, let's look at that one. Where is the sign?

I see. This is intended to show what?

MR. MACKIE: The sign is intended to show, again, that the Roybal is federal property, and that it was identified as such to the public.

THE COURT: But where is this relative to where Mr. Lopez was allegedly. I thought they were closer to the street?

MR. MACKIE: So if the Court would turn to Exhibit No. -- Exhibit No. 12.

THE COURT: Okay.

MR. MACKIE: This is Alameda Street. If the Court looks at that sort of opening, that is the garage entrance.

THE COURT: Okay.

MR. MACKIE: Those two signs are posted right to the left of that, right to the left of the entrance into the garage.

THE COURT: So, to the left of the -- I see, this is a better picture.

Everything that happened -- I'm looking at page 2 Exhibit 12.

MR. MACKIE: Page 2 of Exhibit 12.

THE COURT: So I see the two signs on the pillars in the center, right?

MR. MACKIE: Yes.

THE COURT: Okay. Where did the interaction with Mr. Lopez occur?

MR. MACKIE: If the Court would look to the right, there is that same directory that we had just discussed a moment ago.

THE COURT: It's the same one.

MR. MACKIE: Yes.

THE COURT: It looks to be a different size, but okay.

MR. MACKIE: I think it is because of the way the picture is sort of stretched out across the page.

THE COURT: Okay.

MR. MACKIE: But that is where the incident occurred.

THE COURT: Okay. So one of the concerns is that -- are you going to suggest that Mr. Lopez could read the sign?

MR. MACKIE: Not at all, Your Honor.

The purpose of that particular exhibit is to show, again, that the building was identified to the public as a federal building.

That sign also has the regulation establishing that the public was not allowed on the federal property during non-business hours.

THE COURT: I guess I don't know what relevance that has if that is not something he could see, or the people could see.

MR. MACKIE: We believe that that is relevant to the fact that the officer was carrying out his official duties.

Again, the sign establishes the regulations that says that the federal property is closed to the public during non-working hours.

And so the government isn't using the photograph to suggest that the defendant actually saw it, just that it was federal property, that the regulation is posted, and that the officer was enforcing the regulation that is on the sign.

THE COURT: Okay. Let me hear from defense counsel.

MS. ABEL: Thank you, Your Honor.

Your Honor, as the Court indicated in its objection, page 1 of Exhibit 11 is a list of statutory codes and regulations. They are law.

I believe just introduction of that description and the specific law sections to which it cites is directly confusing to the jury as they may reasonably think that they should consider whether he did or did not do the things listed there.

Mr. Lopez is not charged with any of the things on that sign. I believe inclusion of those code sections is misleading and confusing.

As the Court notes, Mr. Lopez, nor any person that he was standing with, which in fact was based on the -- we were looking at page 2 of Exhibit 12, in fact where Mr. Lopez was standing, is not even visible on this image at all.

It is to the right of and outside of the frame of that photo.

And not only could he not have read any of the specifics on that sign, but that sign itself is literally a statement of law.

It's as if we included the Constitution as Exhibit 12.

I would request that to the extent anything be included at all, that it eliminate the specific elements, conduct that is prohibited on under various CFR regulations.

For example, page 2 of that same exhibit of Exhibit 11,

the code sections are not legible, to the extent the government wants to represent that those are signs saying that it is GSA property.

That might be a narrower request, but the specific contents of that sign, I believe, are misleading, confusing and statements of law.

THE COURT: What about if they were to just redact everything?

There is two horizontal -- I'm looking at page 1 of Exhibit 11 -- it has two horizontal lines if they redact everything -- well, they don't even need to redact -- if she crops the photo, so it's just the top, they crop the photo at underneath the second horizontal line.

So all that the jury will see is the GSA logo and rules and regulations governing conduct on federal property, November 2005, and they won't see anything else.

MR. MACKIE: Your Honor, the government would request to redact everything on the page except for a subsection A, which establishes that the agent was required to not permit anyone from the public on the property during normal -- after normal working hours.

THE COURT: I just think that is a separate issue.

The sign is -- this sign is not specific to this location, if I understand it correctly.

This is a sign saying these are the rules and

regulations that generally govern conduct on federal property, correct?

MR. MACKIE: Correct.

THE COURT: So what you are trying to establish -- there are two things you are trying to establish.

One, that it's federal property.

MR. MACKIE: Correct.

THE COURT: And two, what the agent was required to do because it was federal property.

MR. MACKIE: Yes, Your Honor.

THE COURT: That second part doesn't need the sign.

I would tend to agree with her that the sign is confusing because it suggests that because the sign is there, that somebody should have read it or understood it.

Where as it's not because this is written on this sign that this regulation would apply to the officer, correct?

MR. MACKIE: I'm sorry, could you restate that, Your Honor?

THE COURT: Yes, it's not because this is written on this sign that it applies to this officer.

MR. MACKIE: Well, these are the regulations that the officer was required to enforce on the --

THE COURT: That is a separate issue from it being on the sign.

Do you see what I'm saying?

You don't see what I'm saying.

MR. MACKIE: Not quite, I'm sorry.

THE COURT: We will address it with the jury instructions.

For now, I'm going to sustain the defense's objection and order you to crop the photo, so at the second horizontal line on page 1.

So let's have you do a new exhibit, Exhibit 22. Page 1 is going to be cropped, page 2 can remain, and page 3 can remain.

MR. MACKIE: Thank you, Your Honor.

THE COURT: Frankly, I feel like some of this could be addressed with the stipulation between the parties that this is federal property and that whatever this section is, applies to the officer, but we can get to that later.

Okay. And Exhibit 13.

Okay. The problem with Exhibit 13 is the defense, again --

MS. ABEL: Yes, Your Honor.

THE COURT: Okay. So I'm going to order the government to crop 13 and add that as Exhibit 23.

I'm assuming Exhibit 14 is for identification only, that's what it says.

And any objections by the defense to -- well, first of all, did you need to be heard on the new Exhibits 22 or 23?

MS. ABEL: Your Honor, those were the two you just created?

THE COURT: Yes.

MS. ABEL: Only subject to seeing the revised versions.

THE COURT: Any objections to 18, 19 or 20?

MS. ABEL: Only, I believe -- so 18, Your Honor, and this is subject to reviewing the Court's ruling that Your Honor mentioned, but the parties have not had the opportunity to review.

In that motion that the defense filed the concern was the multiplicity of assaults alleged. This exhibit was added yesterday.

It identifies alleged physical contact between Mr. Lopez and the officer.

This is not any of the two times previously alleged.

This is a new third time. We're now at duplicity No. 3.

I think the defense would have multiple concerns.

First, this was added yesterday, and at the very least we would renew our duplicity arguments, although again, I reserve that pending the reading the Court's ruling.

But separately, even if permitted to discuss for a limiting instruction, this event was separated by one minute. Mr. Lopez was literally -- had an intervening arrest in that time.

If the government wanted to allege this as an assault, they needed to supercede. We are now on day one of trial.

THE COURT: I will hear your objection, but given what you have asserted, let me hear from the government as to what their offer of proof is as to when this happened and what they are using it for.

MR. HARI: We have no disagreement with the timing of defense counsel's description here on when this occurred.

THE COURT: It occurred after the arrest?

MR. HARI: That is correct. We are not using this to allege an assault.

We're expecting discussions with defense counsel, that defense counsel is going to describe an event where moments after this picture was taken or when this still was taken, Inspector Ranjo moved defendant's face out of his own.

And that they will use that again, the incident after the arrest, more than a minute after the arrest, to suggest that prior to the arrest, defendant was acting in self-defense.

So this still is not to allege another assault, it's to provide context for that movement when Inspector Ranjo, moved defendant's face out of his own.

THE COURT: That happened after this photograph.

MR. HARI: That is exactly right.

THE COURT: In light of that, let me hear from you Ms. Abel.

MS. ABEL: We would have raised this sooner. We were not aware until last night.

Defense would offer to keep out both things so that we don't have that issue at all.

We would not offer the slapped by Officer Ranjo as long as the government agrees not to further confuse the issue with regard to this photo and the relevant portion.

The arrest occurs a moment before this. We can all amend our videos slightly so that neither event comes in.

That would be a proposal of a stipulation.

In not agreed to, obviously, I would want to respond substantively to a limiting instruction that I would request.

THE COURT: What is -- before I hear from the government, what is page 2? Is that a different view of what happened on page 1?

MR. HARI: If I may respond, Your Honor?

THE COURT: Yes.

MR. HARI: This is a screenshot from earlier in the same video, and the purpose of this is just to show the sign. Both of these come from Exhibit 5, which is by stipulation already agreed to by both parties.

THE COURT: Okay.

So, let me have you respond to defense counsel's proposed stipulation.

MR. HARI: Your Honor, we would be in agreement with

that stipulation.

THE COURT: Okay.

MS. ABEL: Your Honor, if we may meet and confer regarding the specific timestamp, in case there is any issue with regard to that, Only because we all need to amend our videos.

THE COURT: I gather you have no objection to Exhibit 18?

MS. ABEL: Hold on one moment.

THE COURT: Sorry, page 2 of Exhibit 18.

MS. ABEL: No, Your Honor. That occurred well before the moment in page 1.

THE COURT: So defense counsel's objection to page 1 is -- give me just one moment.

Okay. I think it might be best to make this a new exhibit. Exhibit 24 with just page 2.

So, they are not wondering what was on page 1 of 2.

Anything further on that?

MS. ABEL: No, Your Honor, only subject to our meet and confer.

THE COURT: Of course.

Okay. That brings us to Exhibit 19. Any objection?

MS. ABEL: Just, Your Honor, it's cumulative of 8.

THE COURT: The objection is overruled. There is only four photos total.

Then Exhibit 20, we're all good. And we have our new exhibits which defense counsel needs to look at which are 21 through 24.

Any other objections to exhibits?

MS. ABEL: Not at this time.

THE COURT: Okay. Anything further from the government on the exhibits?

MR. HARI: Not at this time, Your Honor.

THE COURT: Okay. Will you be able to provide the new exhibits to defense counsel by lunchtime so she can review them over the lunch hour?

MR. HARI: Yes, Your Honor.

THE COURT: Okay. Then Ms. Abel, I'm going to leave it to you to raise with the Court after lunch if you have any objections.

If I don't hear from you, I'm going to assume you don't have any.

MS. ABEL: Understood, thank you.

THE COURT: Okay. I understand our jurors are coming up, so Mr. Berry will be stepping out in a few minutes to organize them.

The person who is in the gallery, welcome, we appreciate you being here.

I don't know if you are associated with one of the parties, but we will need to you move to the back row. We're

going to be taking up all of the other rows with our jurors, but we appreciate your presence.

Let us turn to -- the request for video testimony, I understand that is for a potential defense witness, correct?

MS. ABEL: Yes, Your Honor, it's a government agent subpoenaed by the defense.

THE COURT: So I will tell the parties, I don't think we have a stipulation on this, we just have the email.

MS. ABEL: Yes, Your Honor, we have proposed, we have already agreed to language. We're reserving it because it's not clear to the defense if we will need that witness and we won't know until the government closes.

THE COURT: I will advise the parties so you can plan accordingly, I have found that remote witnesses are often a problem, because, although we are all used to having zoom calls, and I frequently have Zoom hearings, especially on my civil cases, for some reason when it's somebody testifying we really struggle and the court reporters really struggle.

The sound is going in and out, the sound is muffled, all kinds of problems.

And sometimes it just cuts out altogether.

So, I'm extremely reluctant to have somebody testify remotely.

If I understand correctly, however, this is a witness that the defense would like to testify and the government, as I

understand it -- this is the witness that the government advised his wife is going through chemotherapy or something like that?

MR. HARI: Yes, Your Honor, if I could just clarify one thing I said on the record at the pretrial conference. I had incorrectly identified the witness at that time as Anthony Sermons.

As soon as we walked out it was Mr. Seemore who is the witness.

THE COURT: Got it.

MR. HARI: It is Mr. Seemore whose wife's sister is undergoing chemotherapy. So she is with her sister, leaving Mr. Seemore to care for the children.

THE COURT: I want to be sympathetic to the situation. I appreciate the parties have tried to work cooperatively to come up with a reasonable solution.

I have certain requirements when somebody is testifying remotely which I will -- I can just advise the parties of them orally.

I understand you are not going to be making the stipulation until it's clear that the defense needs the witness, but this is what I'm going to order so you can plan around it or determine it's not possible or whatever it is you want to do.

First of all, we need -- this is going to be the

government's responsibility, because as I understand it, it's an accommodation of not a government witness in that it's somebody the government is planning on calling, but it's your witness you are responsible for.

I need you to schedule time with this witness and the court reporter that you are going to pay for, in a remote location to do a test, to make sure that it works and that court reporter can hear and can transcribe.

Secondly, we will need to make sure that the witness has somebody that is nearby to them physically, but not in the same room with them who can address any IT issues that come up.

And third, we will need to make sure that any exhibits that the witness is expected to testify -- this is a defense issue.

Everybody needs to have physical copies of whatever the defense exhibit is because we often cannot display on zoom and display evidence on the screen.

So, where as the rest of the exhibits, I assume you are going to use the A/V system to display them to the jury. With any exhibits you are going to use with this witness, you are going to need to have a physical copy.

MS. ABEL: My only concern with that is a lot of the evidence in this case is videos.

THE COURT: Well, it is what it is.

MS. ABEL: Understood.

THE COURT: You can speak with the clerk at the end of the day, if there is a way to accommodate both the zoom and video at the same time.

I'm not sure there is.

Okay. Everybody is clear what the requirements are?

MR. HARI: Yes, Your Honor.

THE COURT: Any concerns with being able to meet those requirements?

MR. HARI: No, Your Honor.

THE COURT: Ms. Abel, besides the video issue?

MS. ABEL: No, Your Honor.

THE COURT: Thank you.

Then there was the parties filed -- the defense filed a status report regarding the meet and confer and the government filed a response to it.

I'm not sure that this needs a ruling except for, let me say the following, and the parties can let me know if they need further clarification.

The motion in limine order stands, the government says they don't intend to violate it. Of course, that will change if the defense opens the door.

If the government believes that the defense has opened the door, then you need to raise it with the Court at a sidebar before introducing the excluded evidence.

Any questions from the government?

MR. MACKIE: No, Your Honor.

THE COURT: From the defense?

MS. ABEL: Your Honor, I do believe we have -- I guess I don't want to unintentionally open the door, so a little clarification would be quite helpful.

My understanding, and I am happy to have the government describe its position further, is that if the defense describes what the officers are wearing, that they have a helmet, they carry a firearm, that they carry a taser, et cetera, that that would then therefore open the door to evidence of other bad acts by other protestors on other dates.

I think perhaps if the Court could give its tentative or an indication of where it might fall on that question, I do think it would help avoid any unnecessary sidebars.

THE COURT: Okay. Well, let me ask the government to address what their position is on opening the door.

MR. MACKIE: Sure, Your Honor. First of all, as the government explained in its papers, and at the meet and confer, the government does not intend to offer any evidence whatsoever about bad acts on other dates.

The government's position is that if the defendant -- if defense counsel gets into -- if defense counsel asks questions to elicit testimony to suggest that the officers were in riot gear and somehow they were over-policed by what they were wearing and what they had, then the witnesses would offer very

little testimony about what happened on August 8th, 2025, that demonstrated that some of the gear they had on was necessary, such as the fact that earlier that same day, individuals were throwing things, such as water bottles requiring the officers to be in certain protective gear.

THE COURT: Okay. So there are two separate issues.

One is eliciting testimony about what the officers were wearing.

The separate issue is arguing that what they were wearing, or the way they were behaving was excessive.

So with respect to simply eliciting testimony about what they were wearing, I don't think that is opening the door -- I mean, I think the videos and photos are going to show that already.

With respect to questions which would suggest that it was too much or unnecessary, I take your point, I guess I'm not quite sure how that would -- I think that would be the defense's question.

So, let me turn back to Ms. Abel.

Is it your intention to argue that the -- what they were wearing was excessive and not necessary for the protest?

MS. ABEL: No, Your Honor. No.

However, I just want to caveat, obviously, we are arguing that the actions that they took were excessive, but so long as I hear your question to be narrowly tailored to what --

the clothing, gear, that they have on, no.

THE COURT: Right. To the extent that you are arguing that they act -- they used excessive force, it's with respect to Mr. Lopez, not in general, correct?

MS. ABEL: It is during the event in question only.

THE COURT: Against Mr. Lopez?

MS. ABEL: Yes, Your Honor.

THE COURT: With that, Mr. Mackie, anything further?

MR. MACKIE: Your Honor, if I could offer one example.

I suspect a question that defense counsel may ask the officers is the fact they were wearing helmets that have face shields.

What the government is proposing -- the government would then be able to ask the officer whether the face shield protected them from objects.

THE COURT: You think she's going to ask the officers why they were wearing face shields?

MR. MACKIE: Or the fact they were wearing helmets that had face shields.

THE COURT: We need to be very precise, Mr. Mackie, because the fact they were wearing helmets with face shields is already going to be in evidence because of the videos and the photos, correct?

MR. MACKIE: Correct, Your Honor.

THE COURT: She may ask them what they were wearing.

MR. MACKIE: Yes.

THE COURT: The issue it seems is why they were wearing what they were wearing.

MR. MACKIE: Correct. We would like to ask a question about why they were wearing helmets that day.

THE COURT: That's what I'm trying to figure out. Why is that relevant?

If she's not going to argue their gear was inappropriate for the situation, and she's not going to ask them why they were wearing the gear that they were wearing, why do you need to elicit why they were wearing the gear they were wearing?

MR. MACKIE: Your Honor, that is the implicit argument in asking the officers why they had a tank, why they had helmets, why they had --

THE COURT: We just talked about that. She's not going to ask them why they had those things.

MR. MACKIE: The fact they had those things she's going to go through all of those things that were present to suggest that the officers were in riot gear.

The fact that what the officers were wearing is already in the videos, already in the pictures, and cumulatively she's going to ask a bunch of questions about each individual weapon, each individual item of clothing they had, that is all to imply to the jury that these officers were prepared for riot.

THE COURT: I guess I would disagree.

I mean, it could just as easily show they were in that gear because there was a dangerous situation. They were in that gear, so everybody that was there knew, listened, you better not mess around.

I don't see it that way.

I think I have been clear. I think defense counsel doesn't want to open the door, so I think she's going to be careful with respect to how she asks the questions.

I think it's fair to elicit questions about what was happening and what everyone saw in terms of what they were wearing, because, like I said, it's already in the videos.

So the fact that it's cumulative, that objection is overruled.

To the extent that it's irrelevant, I would agree it's irrelevant and/or excluded by 403, why they were wearing what they were wearing and why there was a tank and all of that.

So those questions are not permitted.

If they are asked, we can address at sidebar where you are able to provide some context.

MR. MACKIE: Can I ask you one additional question?

THE COURT: Yes, yes.

MR. MACKIE: You mentioned that perhaps one conclusion was that it was a very dangerous situation.

Is the government prohibited from asking whether the

officers thought it was a very dangerous situation?

THE COURT: Yes, I mean, we just talked about that. My point is that -- the simple point I'm making is that I understand your objection to be twofold with respect to any questions eliciting a description of what was there.

One of them is that it's irrelevant.

Two, it's that if it is relevant, it's cumulative of the photos; and three, if it's relevant and even if it is not cumulative, it's prejudicial.

My point is, it's not prejudicial, because there is multiple different readings the jury could give to it and it's not clear to me that the reading they are going to give to it is the reading you think she's trying to imply.

So if she doesn't imply explicitly and she's careful with her questions, we don't have an issue.

MR. MACKIE: Thank you, Your Honor.

THE COURT: Okay. Anything further on this, Ms. Abel?

MS. ABEL: No, Your Honor. Not on this one.

THE COURT: Thank you.

Okay. So, is there anything else that the government needs to raise before we start our voir dire?

MR. HARI: I have a general question on how the Court prefers us to raise objections.

Is it objection and then grounds, or do you want us to

state "objection."

THE COURT: When the trial starts?

MR. HARI: Yes, Your Honor.

THE COURT: You can state the grounds, but it should be very brief. I don't want a long argument.

If it's hearsay objection, hearsay, I will let defense counsel have a brief response.

Again, not a whole argument, just excited utterance, whatever, or request a sidebar, and then we will address it that way.

MR. HARI: Understood, Your Honor. Thank you.

THE COURT: Ms. Abel, anything further with you?

MS. ABEL: You answered my question. Thank you, Your Honor.

THE COURT: So the Court will be in recess. Mr. Berry will let us know when our jurors are lined up and ready to come into the courtroom, and in the meanwhile, I will have a look at some of what is still pending that I need to address.

Court stands in recess.

Don't go too far. Thank you.

I think we will -- the parties -- I think you have probably at least ten minutes.

So if you need a bathroom break, this is a good time to do it.

Make sure you are back in the courtroom in ten minutes. Court stands in recess.

(Recess.)

THE COURT: We're back on the record. Our jurors are ready to go. We will have them come in. I trust that there is nothing we need to do before we bring in the jurors?

MR. HARI: Not from the government, Your Honor.

MS. ABEL: Not from the defense.

THE COURT: With that, I think I mentioned this at the final pretrial conference, but my practice is to stand whenever the jurors are coming in and leaving.

If anybody obviously has a physical difficulty with that, then we will all remain seated so let me know if that is the case. If not, we will all stand. Thank you.

THE COURTROOM DEPUTY: All rise.

(Jury panel entered the courtroom at 9:41 a.m.)

THE COURT: Everyone may be seated, okay.

We are back on the record, and the record should reflect that all parties are present. The defendant is present. All counsel are present, and our panel of 60 prospective jurors are present.

Good morning, jurors.

PROSPECTIVE JURORS: Good morning.

THE COURT: I'm Judge Frimpong. It's my pleasure to welcome you to Courtroom 8B of the First Street Courthouse. It

is really a thrill to be with you today.

I love my job for many reasons, and I love being in trial for many reasons, and one of the things that I do outside of my regular day job, I guess, is I work with a lot of students, law students, college students, and one of the law students asked me what my favorite part of trial is, or the phase of the trial that is my favorite.

I don't really have one, but the part of the trial that I love the most is working with all of you.

I do this job because I -- it's very important for me to serve my community. This is a way that I serve my community. And when I'm in a jury trial, what I love about working with the jurors is, this is one of the rare opportunities where I get to see and meet the people in the community that I serve, talk to you, find out what you are thinking, find out what you do, and to see you participate in such an important part of our democracy.

So, that is amazing to me and always inspiring, and what I love about it too, is this is an opportunity for you to see how this part of our democracy works, good, bad and indifferent, and for you to see the incredible professionals I get to work with every day.

I think you are going to be as impressed with them as I am on a daily basis.

So I really love working with jurors, and I want to

thank all of you for coming in today and thank you in advance for the time and attention you will give to me and your sacrifice of being here.

You will notice that every time you enter the courtroom or leave the courtroom, we stand, and that is a little reminder to us of how important you are, and a little reminder to you that, once selected, you are the judges of the case.

You are going to hear me say that multiple times, that you are the judges of the case.

By show of hands, who has had jury duty, not selected for jury duty, but jury duty before today?

Keep your hand up if it was a good experience.

You can put your hand down, if it was not a good experience.

It is okay, not everybody has a good experience.

It is the same for my entire staff and, frankly, the attorneys on the case to make this jury duty a great experience for you.

We have done a lot of work to prepare in advance so that we can be as efficient as possible with your time.

By show of hands, who is excited to be here?

Okay, a few. Excellent. My hope is to change at least some of your minds by the end of this process. We're going to try to move as efficiently as possible.

Two things in my job that I don't play around with is,

one, my oath to the Constitution, the other is my jurors' time.

So these attorneys have already heard from me, when we are in trial we use the jurors' time efficiently. You are going to hear me repeat that at various points, but please know that is a very high priority for me, and I will say, there is many things we do to prepare for the trial.

One of the things I do before every trial, and I wasn't able to do it last night, so I did it this morning, I open up my phone, open up the Google App and I typed in how to get out of jury duty.

Because I know some of you did that this morning, yesterday, or when you first got the announcement.

There are actually some great stuff out there, some really good videos by people, they seem like they know what they're talking about.

I will say, however, I would not advise you to use the excuses that you saw there, because I already know them, I have already seen them. I have done a lot of jury trials, and when you are watching the video it seems really compelling, like, this is going to get me out of it.

When you say it in open court, it doesn't land.

I don't want anyone to be embarrassed or waste anybody's time, so it's best if you just answer the questions honestly.

I think that is the best thing to do.

As I told you, we're going to use your time as

efficiently as possible.

This is actually going to be a pretty short trial, and if you use one of these excuses to get off of this case, you might be on a longer trial.

One of my colleagues just finished a trial that was three and a half months.

So, just answer the questions. Just answer the questions honestly. All we're trying to do is determine who can be fair and impartial in this case.

And I have presided over dozens of jury trials. I know when you are sitting here, you are feeling, first of all, you are thinking about all of the other things you could be doing, all of the other things you need to be doing.

And some of you are thinking, I just got to get out of here, I just got to get out of here.

I have got to tell you that most jurors, the vast majority of jurors, I do talk to my jurors after my trials, they thoroughly enjoyed the experience.

I had a trial, I can't remember if Mr. Berry was here. It was a three-week trial, very technical evidence. Some of the jurors, just because of how things work, were traveling two hours each way, and at the end of the trial, those jurors, there were two of them, they were the most enthusiastic.

Even though they left their job and other obligations, and they are sitting on the freeways, which nobody likes for

two hours, that might not be your experience, I can't promise that, but generally my jurors have a wonderful time.

When I was speaking with one of my colleagues last week, and she said you have got to see this, she showed me this letter she got from a juror, and as judges, we are human beings, we can tell when you don't want to be here, but there was a particular juror that was so unhappy they were picked.

This juror wrote her a letter and said, I have never even gotten a letter like this, saying how delighted she was at the end of the trial, learning about the process, she felt so important, she really understood things.

Again, that might not be your experience, but I just want to say this because I know I can imagine, how you are feeling right now.

Let me start by introducing you to the professionals that work with the Court.

You have already met Mr. Berry, but it really takes a whole village to run this courtroom well, so there is going to be a lot of people, not all of whom will necessarily be introduced to you, but who make this work efficiently.

But I do want to officially introduce you to Mr. Berry, who is the courtroom deputy clerk. He is your main point of contact.

So let him know if you ever need to communicate with me outside of the court and importantly if an emergency happens

while we are here, you will follow his instructions.

Mr. Berry is also responsible for all of the paperwork and exhibits that we work with, and generally as you can see, he makes sure that everything is running smoothly.

Now, as part of this process, what we're going to be doing is I should have started with this. I'm going to introduce everyone to you.

I'm going to tell you what the case is about.

I'm going to tell you about some of the rules that you have to follow while you are with us, and then we're going to start the formal process which involves me asking you a number of questions to determine who can be fair and impartial.

Again, just answer the questions honestly. Don't give the answers that the YouTube lawyers told you to give.

So, later on, we're going for ask you those questions, and for that reason we need to put you under oath.

And that's one of Mr. Berry's responsibility as well.

So if you are able, please stand, and I will ask Mr. Berry to put all of the prospective jurors under oath. Thank you.

THE COURTROOM DEPUTY: Please raise your right hand.

Ladies and gentlemen, do you and each of you solemnly swear or affirm you will truthfully answer such questions that may be asked of you by this Court touching upon your qualifications to serve as jurors upon the trial of the cause

now pending before this Court, so help you God?

PROSPECTIVE JURORS: I do.

THE COURT: If you answered in the affirmative, have a seat.

Okay. The record will reflect all jurors are now seated.

All jurors answered in the affirmative.

Give me just one moment.

Okay. Give me just a second.

I'm going to -- Mr. Berry, we have our microphone. We're ready. Thank you.

Okay. So, our jurors are now under oath. As I indicated, there are a number of people that help this courtroom run well, and one of them is our court reporter. Our court reporter is Terri Hourigan.

She will take down everything we say. So it is very important for everyone to speak audibly in the courtroom and into the microphone and for only one person to speak at a time.

I have had the pleasure of working with Ms. Hourigan. She's excellent, she's one of the best reporters that we have, but even the best reporter can only write down one person's words at a time.

Also, she is only writing down the words you say.

So, we need to have a complete record of what happened here, so you can't say uh-huh, or nod your head, and we will

definitely need those of you in the back to speak loudly and audibly into the microphone.

With that, let me tell you what this case is about. This is a criminal case brought by the United States of America versus the defendant, Isaias Lopez.

And the United States charges defendant Isaias Lopez with assaulting a federal officer in violation of Title 18 of the United States Code, Section 111 subdivision (a)(1).

Specifically, the government alleges that the defendant struck a federal officer with a camera, and pushed him.

The defendant has entered a plea of not guilty and asserts that he acted in self-defense.

So, this is just a summary of what each side is planning on presenting or arguing in this case.

Nothing has been proven yet.

So, actually, you are going to be the judges of whether each side proves what it needs to, this being a criminal case, the burden is solely on the government.

You will hear me say that a number of times, you are going to be the judges of whether the government has proven what it needs to, and whether anything needs to be anything else.

With respect to your duties, our goal this morning is to select 12 jurors, and two alternates, who can be fair and impartial, who can follow the law and respect the

constitutional rights that govern.

Some of you have never served on a jury before, so you are wondering what it entails.

You are going to hear a number of people, we call them witnesses who will testify under oath. They will sit to my left.

You are going to see a number of documents, photographs, videos, that relate to the case. We call those exhibits.

And then you are going to hear the attorneys' perspectives on what you should believe.

You are going to hear me say this a number of times too, you are going to be the judges of the credibility of the witnesses, you are going to decide whether the witnesses are telling the truth in total, not at all, or in part.

And after you -- after we hear from the witnesses and you see the exhibits, and after you hear the defendants -- excuse me, the attorneys' arguments, I will explain to you the questions that you will need to decide, and the rules you have to follow in answering those questions.

Then we are going to leave you to discuss those questions and decide what you think the answers are.

That is the part of the trial that we call jury deliberation.

Now, as many of you know in many countries around the world, ordinary citizens are not entrusted with this

responsibility, especially not in criminal cases.

Frankly, even in our own country, for much of our history many of us here today were not considered intelligent or sophisticated enough to decide criminal cases because of our race, gender, or wealth.

So I certainly don't take for granted you are here today and I hope you don't either.

Let me start by asking by a show of hands and we're going to need our microphone a moment, how many students, how many students do we have, any students?

And what is your number?

You are 31.

Okay, thank you.

We just have one student. And you are 24, and you are 36.

THE COURT: Let's start with 36.

You can ask for help if you need to.

I like to start with the students because you are used to pop quizzes, right, you look like an A student.

Can you name any one of our Constitutional rights, any Constitutional right you can think of?

PROSPECTIVE JUROR: I need help.

THE COURT: Okay. Let's turn to Juror Number 31, at the end of the row. We need to speak in the microphone.

Any Constitutional right that comes to mind?

PROSPECTIVE JUROR: Can we list all of them?

THE COURT: No, just list one. But I see you are like me, you like extra credit, you are going to get that extra credit, but for now just list one.

PROSPECTIVE JUROR: Freedom of speech, press, and the No. 1 is freedom of speech, religion. Speech, religion, No. 2, is bear arms.

THE COURT: That is awesome. She had to squeeze in the second one, and I love that.

Let's hear from Juror 24, any other Constitutional rights that you could think of, we have got speech, religion, and the right to bear arms.

24, any others that come to mind. I will give you a hint. We all did this hopefully last week.

PROSPECTIVE JUROR: The right to vote.

THE COURT: Yes. We have got a good number here.

Did that jog your memory, Number 36? If not, you are good, you are going to get the same points as 24.

Wonderful.

Let me say this too, jurors, we're going to refer to you by the number that is on the front of your jury badge.

We have your names, you are not a number to us, but we do use the numbers just to protect your privacy and to make things move a little bit faster.

As I will say before I became a judge, you can imagine

my name was misspelled and mispronounced all of the time.

When I became a judge, people stopped doing that and somehow they got it right, but I don't want to mispronounce anybody's name, so we're going to use the numbers.

So we have heard from a couple of jurors about some of our constitutional rights, and thank you for our students for being brave.

The founders of our country came to the new world, fought for independence, because they wanted to establish a nation with all of these rights that Juror Number 31 wanted to tell us about.

They believed all of these rights were essential to life, liberty, and pursuit of happiness. As we all know they thought these rights were so important and that they were willing to fight and die for them.

One principle was extremely important to the founders that all of us be protected from the government.

They thought it was wrong that somebody could be accused of the crime and that would be the end of the story.

They determined and wrote into our Constitution and Bill of Rights that a person can only be found guilty of a crime if a jury of his peers determines that the government has proven its case against him beyond a reasonable doubt.

That is why we are here today because of that very important Constitutional right.

As I mentioned this requires a significant sacrifice from each of you.

I think you will agree that it pales in comparison to the sacrifices our founders made to ensure these rights or the sacrifices, frankly, that many people have made over the course of our country's history, to ensure all of us here today were eligible to serve as trial jurors.

And if I may, another little story about jury duty.

So, before this job, I was a judge in the Superior Court and the court reporter that I worked with in the Superior Court, her sister came to visit one time with her two teenagers. All of us were teenagers at some point, some of you may still be teenagers, some of you have teenagers, this will make sense to you.

She watched a half a day of a trial, we were chatting afterwards and she was so impressed with how everything worked, how the attorneys conducted themselves, she thought it was so fascinating and she told me that.

So then one of your teenagers said, well, mom, if you think it's so great, why are you trying to get out of jury duty? She turned right red, and I think she was embarrassed because in that moment, she realized what she had been doing in terms of trying to get out of jury duty, it wasn't in keeping with her values, or what she's trying to teach her children, or frankly, what she believes.

So I mention that to you. I mention these other rights just to put everything in context.

Again, I'm not trying to diminish the sacrifice that you are making to be with us, it is significant.

But I do think it's helpful to put it in the context of our history and our Constitution and the values that I imagine many of you share.

Okay. Thank you for indulging me with that.

As mentioned, I have spoken with the attorneys. We're going to try to move as efficiently as possible.

I think this is going to be a relatively short trial, and so I imagine that we will be ready to submit the questions to you that you are going to answer by next week, I would say Wednesday, Tuesday or Wednesday of next week, probably Wednesday.

And we will generally be in session each day from 8:30 to 2:30, with three 20-minute breaks. I have found this schedule is most convenient for the jurors because it allows you to get on the road before the evening rush hour.

Today we're going to go all the way to the end of the day, we're going to go all the way to 5:00 today.

Every day I will let you know what time you are supposed to come in the following day.

Now that I'm in this trial, this is my most important case, because like I said, I don't play around with my oath to

the Constitution and your time.

However, I do have 450 other cases and sometimes I do have to do things regarding those cases, even when I'm in trial.

So, sometimes that means you are going to come in a little bit later than possible. We do try to handle everything else in the afternoon after you have left, but sometimes it's not possible.

Occasionally, I need to take a break during the trial to handle one of those items, but I can't emphasize to you enough what a priority your time is to me.

So if you are waiting, which I hope you will not be at any point, please know that I did everything I could to avoid it.

Okay. And so we will be in session from now every day until the trial is completed.

I will let you know as well, there is going to be a lot of talking and listening. We do take breaks from time to time for my staff and for the jurors.

We're going to take a break today at 10:30.

But if at any time you need to stand and stretch, feel free to do so, everyone, including the parties are welcome to stand and stretch at any time if they wish to do so.

You don't have to ask for permission for that. If you need to step out of the courtroom, you do need to ask for

permission because we can't do anything involving the jurors unless all of the jurors are present.

As I mentioned, Mr. Berry has advised me we need to take a break at 10:30, so we will do that, but let's all stand and stretch now if anybody needs to stretch.

Okay. And at our first break, probably before you come in after the end of the first break, Mr. Berry will give you the courtroom telephone number.

That is for you to use in case of an emergency.

When you need to contact the Court, please make every effort to be here on time.

As I mentioned, we can't get started until everyone is here.

If something beyond your control happens, then call and let us know when you are able to get here.

Okay. Let me go over with you some of the rules you have to follow while you are with us.

First of all, let's talk about phones, phones and Apple watches, and Samsung watches, and I just found out about smart glasses, those too, let's talk about all of those.

If you have a cell phone, Apple watch, take it out now, and I need you to confirm it is turned off or do not disturb.

You will be able to check your phone at our breaks.

If someone needs to reach you in an emergency, you are going to give them, Mr. Berry, the number, and Mr. Berry is

going to give you -- and if you get any calls during the trial, we will immediately stop and deliver the message to you.

But we do want you to turn your phones and watches and smart glasses off, because the reality is these things can distract us.

I think we're all clear on how important the matter that we're here for is, and how important it is to respect the constitutional rights that govern, and so we don't want you to be distracted.

So let me give you a moment to pull out your phones and watches and all of that and make sure they are on off or do not disturb.

Let's not just do vibrate, because vibrate is very loud and distracting to you and to your fellow jurors.

I'm going to give you a moment to do that.

All good? All phones are off? Thank you.

And then we have one of our Court Security Officers in the back, so anybody who is looking at their phone, he's going to address it with you.

Another important rule that I'm going to ask you to follow is to not do any research on this case or talk to anyone about this case, even each other.

I know we're all used to looking online to answer questions we have, or just to find out more information, or even talking to or texting our friends about our lives and what

we're up to, but there are good reasons why I am going to ask you not to do any research on this case or talk to anyone about this case.

As I mentioned, I'm going to ask you to decide certain important questions at the end of the trial.

It's critical that those questions are answered, just based upon what you see and hear in the courtroom which we refer to as the evidence.

That's the word we used to refer to what the witnesses say and what the documents, videos, photos show.

The evidence that is presented in court can be tested. It can be shown to be right or wrong by either side. It can be questioned.

It can be contradicted by other evidence, but what you read or hear on your own or online or from a friend, it could be wrong, it could be out of date, it could be inapplicable to this case.

The parties can only receive a fair trial if the facts and information on which you base your decisions are presented to you as a group with each juror having the same opportunity to see, hear, and evaluate the evidence.

Related to that, it is extremely important you wear your juror badge whenever you are in the courthouse or near the courthouse to ensure there is no contact between you and the parties, attorneys, and any witnesses.

That way everyone that is in involved in the case will know who you are, and they can avoid contact with you.

And I have instructed the defendant and all of the attorneys not to have any contact with any jurors and for them to tell their witnesses not to have any contact with any jurors.

So if you say good morning to an attorney in the elevator -- I'm going to introduce you to them in just a moment -- and they don't say anything to you, they are not being rude.

They are following my instructions. I cannot emphasize to you enough how important it is you don't have any contact with any parties, attorneys or witnesses.

If any of them contact you, please let Mr. Berry know immediately. You will sometimes see me in the hallway or in the courthouse, and even me, as friendly as I am, I will not speak to you just to be on the safe side.

Just to give you an example, imagine one of the attorneys sees Juror Number 13 in the hallway, and Juror 13 on this particular day is wearing a Dodger's jersey, I don't know if you are Dodgers fan or not, and they start talking about how exciting it was, Second Time World Series, et cetera.

If one of the attorneys from the other side sees you talking, they don't know what you are talking about, and it would be their obligation to bring it to my attention.

And we want to avoid that, avoid the time wasted that is

involved with that, so don't talk to them at all, they won't talk to you at all.

Okay. Let me have the parties introduce themselves to you, and we're going to start with the defense.

MS. ABEL: Thank you, Your Honor.

My name is Rebecca Abel. I'm a Deputy Public Defender.

MS. NICKELL: My name is Kyra Nickell, and I am also a Deputy Public Defender.

MS. ABEL: Together, we represent Mr. Isaias Lopez.

THE COURT: Thank you.

MR. HARI: Good morning, Rahul Hari. I'm an Assistant United States Attorney here in the Central District of California.

MR. MACKIE: Good morning, everyone. My name is Assistant United States Attorney Eric Mackie, and I represent the government.

MR. HARI: With us at counsel table is Special Agent Thomas J. Smith with the Federal Protective Service.

THE COURT: When I refer to the government, I mean Mr. Hari or Mr. Mackie.

When I refer to defense counsel, I mean Ms. Abel and Ms. Nickell, the attorneys who are representing Mr. Lopez.

So now you know who they are, so you are not going to talk to them.

Okay. And now the purpose of this trial is for the jury

to determine whether the government has proven what it needs to for the defendant to be found guilty.

You are going to get more instructions on this, but for now, what is most important for you to know is for the defendant to be found guilty, the government will have to prove that to you beyond a reasonable doubt.

This is very important. In our system, the defendant is presumed innocent, and it is up to the government to prove the defendant guilty beyond a reasonable doubt as to each and every crime charged.

Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction, that the charge is true.

The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

Now, even one of us has this right, if any one of you or any one of us were charged with a crime, we would also be considered innocent until proven guilty beyond a reasonable doubt.

But until I give you the questions you are supposed to answer, explain to you how you are supposed to answer those questions, I need you to keep an open mind on everything and not do any research, not talk to anyone about the case, and not even talk to each other about the case. Understood?

Okay. No one is responding, I take that as a yes.

Remember, the defendant is presumed to be innocent. So, if, for instance, I don't believe this is going to happen, but when the case started, the government simply said we don't have any evidence to present.

The law would require each of you to vote not guilty because no evidence was presented to you.

To be clear, you cannot find the defendant guilty until -- unless and until -- the prosecution has proven to you beyond a reasonable doubt that the defendant is guilty.

Okay. We are now going to start asking you the questions that I told you about.

The process we will follow gives the Court and the parties the opportunity to see and hear you as you answer the questions that are asked of you.

The goal is to select 12 jurors, and two alternates who can be fair and impartial to both sides in this case and who will be able to decide the questions presented to them based solely on what the witnesses say, and what the evidence shows.

Please understand that in asking questions, we are only trying to select a fair, impartial, and an unbiased jury. We're not trying to make anyone look bad or pry to the private affairs, but part of these questions ask for private questions.

If it's too private to share openly, let me know. We will have you answer the questions without the jurors present, but all attorneys have the right to hear your answers and the

court reporter has to write everything down.

It is very important you be completely honest in your answers and that's why we had you take an oath earlier.

First of all, do any of you know any of the other prospective jurors who are in the courtroom, by show of hands?

I see no hands.

Are any of you acquainted with the defendant in this case? Isaias Lopez or think that you have heard his name or seen him before today?

By show of hands? I see no hands.

Do any of you know any of the attorneys sitting at counsel table or the Special Agent?

I see no hands.

Do any of you know me or a member of the court staff that I introduced to you?

I see no hands.

Do any of you think that you have any prior knowledge of any fact involved in this case?

I see no hands.

The following people may be called as witnesses in this case. They may not be called as witnesses.

Please listen to this list and raise your hand if you believe you know any of these people.

Leo Ranjo, Jr. R-A-N-J-O. I see no hands.

Anthony Sermons. I see no hands.

Gary Wilson. I see no hands.

Paul Seemore. I see no hands.

As I mentioned, the law is that the government must prove the defendant beyond a reasonable doubt.

Is there anyone who disagrees with this rule of law? Please raise your hand and keep it raised until I call your number.

Anyone who disagrees with this rule of law?

I see no hands.

I also discussed in the American legal system, Defendant Isaias Lopez, is presumed innocent until proven guilty beyond a reasonable doubt.

Is there anyone that disagrees with this rule of law?

Raise your hand. I see no hands.

Now, there is something very important we must discuss, the defendant, Mr. Lopez, has a constitutional right not to testify.

He can rely on the evidence presented by the government and argue that the government has failed to prove the charge beyond a reasonable doubt.

If Mr. Lopez decides not to testify in this case, you cannot consider that for any reason.

You cannot go into the jury deliberation room and say, you know, I really would have liked to hear from Mr. Lopez.

Is there anybody that is going to have a problem

respecting Mr. Lopez's right not to testify?

Raise your hand high. I see no hands.

Now, as we go through this process, I'm going to give you a set of instructions.

Those instructions are the law you need to follow. Before we go further, I need to make sure all of you will be able to follow the instructions and the law as I give to you and limit it to the evidence in this case.

Raise your hand if you will be unable to do that.

I see no hands. Thank you.

Okay. Jurors, by a show of hands, have you or to your knowledge, have any of your relatives, close friends, or significant others had any law enforcement training or experience or been employed by any law enforcement agency?

And by law enforcement agency, I'm including any police department, Sheriff's Office, Highway Patrol, Federal Law Enforcement agency, including the Federal Bureau of Investigations, also known as the FBI, the Federal Protective Service, known as FPS, the Department of Homeland Security, known as DHS, Customs and Border Protection, known CBP, also known as Border Patrol, and Immigrations and Customs Enforcement, also known as ICE.

Have you, or to your knowledge have any of your relatives, close friends, or significant others had any law enforcement training or experience or been employed by any law

enforcement agency?

Please keep your hands up until I call your number. When I call your number, you can put your hands down.

We have Juror No. 1, 3, 5, 6, 8, 9, 11, Juror No. 13, 15, 16, Juror No. 20, 21, anybody else on your row?

Okay, 25, and in black with the mask on, your number is?

PROSPECTIVE JUROR: 28.

THE COURT: 28, 30, 32, and then in the back row we have 38 and 42. Thank you so much.

I'm going to start with Juror No. 1.

I'm sorry, were there hands on the right side?

Don't put your hand down until I call your number. I told you that.

Okay. So we have Juror No. 47, thank you. I can only see the five, 52, thank you so much, 58, thank you, and 59. Thank you so much.

Okay. So we will start with Juror No. 1. Can you hand her the microphone?

And, Mr. Berry, if I could speak to you for just a moment?

THE COURTROOM DEPUTY: She just recalled something.

THE COURT: You are 31. You're answering yes to this question I just asked. Wonderful.

Let's start with Juror No. 1.

Thank you so much, good morning.

PROSPECTIVE JUROR: Good morning.

THE COURT: So who is it that you know that has law enforcement training or experience or being employed by a law enforcement agency?

PROSPECTIVE JUROR: Cousins.

THE COURT: How many cousins?

PROSPECTIVE JUROR: Four.

THE COURT: Are they all employed by the same law enforcement agency?

PROSPECTIVE JUROR: No.

THE COURT: Tell me what law enforcement agencies.

PROSPECTIVE JUROR: LA, Whittier, and retired.

THE COURT: The ones that are retired, how many of those?

PROSPECTIVE JUROR: One.

THE COURT: Who did they work for before they are retired?

PROSPECTIVE JUROR: Whittier.

THE COURT: So we just have LAPD and Whittier PD, correct?

PROSPECTIVE JUROR: And Santa Ana if that's --

THE COURT: Santa Ana Police Department?

PROSPECTIVE JUROR: Yes.

THE COURT: Anybody else -- any other relatives, close friends, or significant others that have law enforcement

training or experience or have been employed by a law enforcement agency?

PROSPECTIVE JUROR: None.

THE COURT: I'm going to talk to you about this, but I'm going to talk to all of the jurors about this as well.

I mentioned earlier, we are going to have witnesses come in to testify, and it's going to be for you to decide the credibility of those witnesses, whether you believe everything they say is true, only part of what they say is true or none of it.

So one of the important principles is that law enforcement witnesses need to be treated the same as any other witness.

So, is the fact that you know some law enforcement, is that going to cause you to be biased for or against the law enforcement witnesses?

PROSPECTIVE JUROR: No.

THE COURT: You will be able to judge the law enforcement witnesses by the same standard as any other witness?

PROSPECTIVE JUROR: Yes.

THE COURT: You won't come into it thinking they are more likely to be telling the truth or more likely to be lying?

PROSPECTIVE JUROR: No.

THE COURT: Thank you so much, Juror No. 1.

Juror No. 3. Thank you.

PROSPECTIVE JUROR: Good morning.

THE COURT: Good morning. Just one moment.

Okay, Juror No. 3, good morning, who is it that you know that has law enforcement training, or experience, or employment?

PROSPECTIVE JUROR: Many close friends.

THE COURT: What law enforcement agency are we talking about?

PROSPECTIVE JUROR: Ventura and LA County Sheriff's.

THE COURT: Are some of these people currently in the Sheriff's Department?

PROSPECTIVE JUROR: Yes.

THE COURT: You heard the question that I asked Juror No. 1. Are you going to have any problem applying the same standard to law enforcement witnesses as any other witnesses?

PROSPECTIVE JUROR: No.

THE COURT: Thank you.

Thank you, Juror No. 5, thank you.

Who is it that you know?

PROSPECTIVE JUROR: It's my cousin. He's a correctional officer, but he's out of state now.

THE COURT: Okay. What state?

PROSPECTIVE JUROR: Oregon.

THE COURT: Thank you.

Juror No. 6?

PROSPECTIVE JUROR: Just close friends. Orange County Sheriff's, Torrance PD, and LAPD.

THE COURT: Thank you. Juror Number 8?

PROSPECTIVE JUROR: Hello. I have cousins, and LA County Sheriff's Department and LAPD, and then a brother-in-law in Airport Police.

THE COURT: Thank you. Juror No. 9.

PROSPECTIVE JUROR: Good morning. Your Honor.

THE COURT: Good morning.

PROSPECTIVE JUROR: It's a lot of family members so LAPD, my brother-in-law, and some of the cousins, and LA County Sheriff's, and my husband also was in the military and so many of his friends are now serving in different branches of the government and different law enforcement agencies throughout the country.

So, it's a lot.

THE COURT: Thank you. And total you would say the number of people we're talking about is somewhere between 10 and 15, 15 and 20?

PROSPECTIVE JUROR: Maybe 15/20. By default everybody associates with each other so we're kind of like --

THE COURT: Okay. I'm going to assume you have a high opinion of your husband, and his credibility and just his

character as a person?

And, but, you understand you don't know any of the people that are coming into testify and so are you going to apply to them the -- are you going to assume that they have the high standards that your husband and your friends and your family members have or will you judge them neutrally like any other witnesses?

PROSPECTIVE JUROR: I would say, given the background, it would be pretty hard to judge them neutrally.

I would tend to believe their testimony based on their training and just our experience.

THE COURT: Okay. Do you think it's possible for law enforcement to tell a lie?

PROSPECTIVE JUROR: I mean, we're all human beings.

THE COURT: Okay. You think it's less possible for them to tell a lie than any other person?

PROSPECTIVE JUROR: Probably less possible for them to be sitting here in a courtroom under oath lying.

THE COURT: And one of the things I'm going to ask you to do is to judge the credibility of the witnesses based upon what you see and hear them say, and how they say it and how it compares to the other testimony and how it compares to the other evidence.

Will you be able to do that or will you be bringing in certain assumptions that they are coming in to tell the truth?

PROSPECTIVE JUROR: I think -- I would try to be as neutral as possible, and try to listen to the evidence without judgment, but, as you can imagine, I do probably have some biases that are pretty hard to overcome, but I can try.

I mean, just based on what I heard you share this morning already, I mean, if somebody assaults a federal officer, it's pretty hard for me to not believe that that actually happened.

THE COURT: Okay. Thank you for raising that.

Some of you, when you heard the charges maybe are thinking the same thing, so I said this before, but I do want to emphasize those are just the charges. You haven't seen any evidence, so nobody knows if this even happened.

What I need and what the Constitution requires is that the jurors that are selected, which are the jurors who are Mr. Lopez's peers that you don't decide the case based upon just what the government has argued, because that's what our founders, that's why they set up the Constitution and the Bill of Rights the way they did, that that wasn't a way they wanted our country to operate.

And they wanted a trial where evidence would be presented and the jurors would determine, not if it probably happened, not if it maybe happened, but if the government had proven it happened beyond a reasonable doubt.

Will you be able to adhere to that standard here?

PROSPECTIVE JUROR: I will do my best.

THE COURT: Thank you so much.

Okay. Jurors, we need to a break at this time, to be on the safe side, our breaks may not always be this long, but we're going to take a 25-minute break.

Let me advise you, jurors, do not talk about the case or about any of the people or any subject involved in it with anyone including the other jurors.

Do not do research, share information, or talk to each other or anyone else about the facts of the case or anything else connected with the trial.

Do not use any form of electronic or wireless communication to do any of those things either.

Do not make up your mind or express any opinion about the case or any issue connected with the trial until after you have discussed the case with other jurors during deliberation.

We will see you at 10:55. Please line up outside. Thank you.

THE COURTROOM DEPUTY: All rise.

(Jury panel exits the courtroom at 10:32 a.m.)

THE COURT: We're back on the record, I was advised that Juror Number 21 needed a break at 10:30 to use the lactation room, so hence, the 25-minute break.

Anything that the parties need to raise before we go on recess?

MR. HARI: No.

THE COURT: Okay. The Court stands in recess. Let me have you come back before 10:55, so 20 minutes. See you at that time.

(Morning recess.)

THE COURTROOM DEPUTY: All rise.

(Jury panel enters the courtroom at 11:03 a.m.)

THE COURT: Jurors, you can be seated and the court reporter can be seated. It's okay.

So that everyone doesn't have to move, the last six jurors, you can just -- there is a row -- there is a last row, just go back there where you were before.

At some point we will get this right.

THE COURTROOM DEPUTY: You may be seated.

THE COURT: Okay. Let's continue. I think our last juror was Juror No. 9. Thank you.

Let's turn to Juror No. 11.

So I had asked whether you, any of your relatives or close friends or significant others had any law enforcement training or experience or been employed by any law enforcement agency.

So who is it that you know that falls into those categories?

PROSPECTIVE JUROR: I have a lot of friends that work for Long Beach PD. I'm actually one the persons in my job

supporting them, so since I need access to police network, so annually, I have DOJ training.

THE COURT: Do you work for Long Beach Police Department?

PROSPECTIVE JUROR: I do not work for Long Beach Police Department.

THE COURT: Thank you. Let's turn to Juror No. 13.

THE COURTROOM DEPUTY: It's No. 12.

THE COURT: Go ahead.

PROSPECTIVE JUROR: Sorry, I didn't know if it applied. Two of my mom's ex-boyfriends are ex-military and retired police officers.

THE COURT: And what law enforcement agency?

PROSPECTIVE JUROR: One was Los Angeles Police Department.

THE COURT: And the other?

PROSPECTIVE JUROR: I'm not sure.

THE COURT: Thank you.

Juror Number 13. Who is it that you know?

PROSPECTIVE JUROR: Myself, four years military police, my brother, obviously, family and friends that are currently in DEA, all the way to local enforcement.

THE COURT: Your brother is in what agency?

PROSPECTIVE JUROR: Currently Air Force Military Police.

THE COURT: And you said you have a lot of friends that are also military police?

PROSPECTIVE JUROR: Military police and current law enforcement.

THE COURT: Any -- how many would you say are military police, by estimate?

PROSPECTIVE JUROR: At this point probably only about 10 or 15.

THE COURT: Okay. Any that are with DHS, FPS, FBI, Border Patrol, or ICE?

PROSPECTIVE JUROR: I have one for sure with border patrol in Texas, and then, like I said, I have two DEA agent friends that, one in Santa Barbara, and one is out here in Los Angeles.

THE COURT: Okay. And you heard what I said regarding the need to judge law enforcement witnesses the same as any other witness.

Will you be able to do that?

PROSPECTIVE JUROR: It would be difficult but --

THE COURT: Why will it be difficult?

PROSPECTIVE JUROR: It's been in my life for the past 25 years. It's hard to get out of and it is ingrained. I mean, like you said under oath, their job is to protect and serve and make sure they are telling the truth.

THE COURT: Okay. So you don't think, or you never

seen, in your experience, that any one of these people that you know, friends, family, have not told the truth?

PROSPECTIVE JUROR: Definitely not, but under the oath setting, no.

THE COURT: Okay. Thank you. When you say definitely not, you know that on occasions that they have not told the truth?

PROSPECTIVE JUROR: Yes, ma'am.

THE COURT: And it's possible they could not tell the truth even under oath?

PROSPECTIVE JUROR: Yes, ma'am.

THE COURT: Turning to Juror No. 15.

PROSPECTIVE JUROR: I have a cousin who was former LAPD and a councilman.

THE COURT: LAPD and what?

PROSPECTIVE JUROR: And LAPD and former councilman.

THE COURT: Thank you, Juror No. 15.

Juror No. 16.

PROSPECTIVE JUROR: My father worked for LAPD. He passed, it was in the 60's and then my uncle also. He passed.

THE COURT: He was also with LAPD?

PROSPECTIVE JUROR: I'm not sure where he worked but he was in a wheelchair, and he was shot in the line of duty but that was a long time ago.

THE COURT: Thank you. Thank you.

Turning to Juror No. 20. Thank you.

PROSPECTIVE JUROR: I have my husband, LAPD, detention officer.

THE COURT: And that's it?

PROSPECTIVE JUROR: Yes.

THE COURT: Will you be able to apply the same standards to law enforcement witnesses as any other witness?

PROSPECTIVE JUROR: Quite honestly, it will be difficult for me, because hearing a lot of stories from jail that he brings home.

THE COURT: Okay. Because of those stories, you are more likely to believe a law enforcement witness than a lay witness?

PROSPECTIVE JUROR: Correct.

THE COURT: Thank you.

Juror No. 21?

PROSPECTIVE JUROR: I have a cousin in the LAPD and two in the LA Sheriff's Department.

THE COURT: Thank you.

Juror No. 25?

PROSPECTIVE JUROR: My best friend for 30 years was LA patrol in Van Nuys for LAPD.

THE COURT: Thank you.

You heard the question that I asked before, I explained as a juror it's your duty to judge the credibility of each

witness.

You will see them here and testify whether everything they are saying is true or part of it, or none it of.

Will you be able to judge a law enforcement witness by the same standards as any other witness?

PROSPECTIVE JUROR: I will do my best.

THE COURT: Thank you, Juror No. 28.

PROSPECTIVE JUROR: I work with law enforcement on a daily basis with Highway Patrol Officers.

THE COURT: What is the nature of your job?

PROSPECTIVE JUROR: I'm a evidence custodian at the medical examiner.

THE COURT: Besides the law enforcement that you work with, are there any that you are friends with or socialize with?

PROSPECTIVE JUROR: Yes, I have two friends in Sheriff's.

THE COURT: We're going to have to take a break because somebody's phone just went off.

Let's have everybody take out our phones and make sure they are still off.

Maybe Juror No. 4. It looks like she can help you.

Are we good, Juror No. 3?

Yes, wonderful.

Back to Juror No. 28, you indicated in your work as an

evidence custodian for the offers of medical examiner you work with a lot of law enforcement, and then I was asking aside from your work, or maybe these are people you know through work, people that are your friends you socialize with that are law enforcement; how many of those would you estimate?

PROSPECTIVE JUROR: Two in Sheriff's, one in Immigration, and two in LAPD.

THE COURT: And when you say, one in immigration, do you know if it's ICE or Border Patrol or somewhere else in DHS?

PROSPECTIVE JUROR: Border patrol.

THE COURT: Border Patrol.

Will you be able to set aside any preconceived notion of this person, and judge all law enforcement witnesses by the same standard as any other witness?

PROSPECTIVE JUROR: Yes, I believe so.

THE COURT: Thank you.

Juror No. 30?

I know it's officers. We do school officer resources, because I work at a school.

THE COURT: You know the police officers that work at your school?

PROSPECTIVE JUROR: Yes, Buena Park PD, so that's every day we have them at our school site.

THE COURT: And are you friends socially with any of these officers?

PROSPECTIVE JUROR: Just co-workers.

THE COURT: Okay. And how many officers are we talking about, five to ten?

PROSPECTIVE JUROR: Well, depending on how we need them. We always have two at the school site.

THE COURT: Okay. But I'm talking about sort of overall, if you had to list all of the Buena Park Police Officers that you know through your work, would you say it's five to ten, or greater or?

PROSPECTIVE JUROR: Probably five.

THE COURT: Okay. Thank you so much, I appreciate it.

Juror No. 32?

PROSPECTIVE JUROR: Yes, I have a brother-in-law who is a CHP officer.

THE COURT: You said brother-in-law?

PROSPECTIVE JUROR: Correct.

THE COURT: Okay. That's it?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you so much.

Juror Number 38?

PROSPECTIVE JUROR: I have a brother-in-law, military police at Camp Pendleton. I have a girlfriend who is retired Secret Service Protection Detail in Washington D.C.

THE COURT: And by girlfriend, do you mean a friend

or do you mean a partner, a romantic partner?

PROSPECTIVE JUROR: A friend.

THE COURT: Thank you. Juror No. 38.

Juror No. 42?

PROSPECTIVE JUROR: Hi, I have an aunt and uncle who are both retired LAPD and cousins who are in law enforcement. One in Florida, one in Colorado, and a brother-in-law who is Homeland Security.

THE COURT: And the brother-in-law that is in Homeland Security, do you know which portion of Homeland Security?

PROSPECTIVE JUROR: I don't know specifically.

THE COURT: Okay. Is it your understanding that that person is a law enforcement officer or they have some sort of an office job?

PROSPECTIVE JUROR: Mostly an office job.

THE COURT: Okay. Thank you.

Juror No. 47. Give me just a moment.

Okay. Juror No. 47?

Who was it that you know?

PROSPECTIVE JUROR: I used to work in law enforcement, parking enforcement.

THE COURT: You were a Parking Officer?

PROSPECTIVE JUROR: Yes, I was.

THE COURT: And so the law enforcement that you know

are your fellow parking officers?

PROSPECTIVE JUROR: Yes, and peace officers from the department I work for.

THE COURT: Okay, which is what department.

PROSPECTIVE JUROR: Cerritos College in the City of Norwalk.

THE COURT: Were you a sworn peace officer?

PROSPECTIVE JUROR: I was not.

THE COURT: Okay. Juror No. 48, I understand you also needed to answer yes in response to this question.

PROSPECTIVE JUROR: Yes, please.

THE COURT: Go ahead.

PROSPECTIVE JUROR: Growing up I was pretty close friends with a lot of the officers in my neighborhood, in Beverly Hills PD.

I have been on some type of ride-alongs with them and I know almost the whole force on a first named basis.

THE COURT: How many years ago was this?

PROSPECTIVE JUROR: I'm 28 now, so when I was 16, so about 12 years ago.

You know, I know a sergeant, different people on the force.

THE COURT: So you were doing the ride alongs, et cetera, 12 years ago, but you have maintained close contacts with them since then?

PROSPECTIVE JUROR: Not texting or phone call contact, but when I see them on the streets, I always give them a hug, and I used to have a scanner, so I would be able to -- any of the scenes, my dream is to be on the Reserve, so it kind of would be like block-by-block patrolling, and I was extra eyes for the community.

THE COURT: Any other law enforcement that you know besides the Beverly Hills PD officers you met while doing these ride alongs?

PROSPECTIVE JUROR: Yes, I would say some LAPD as well, because unfortunately, as a property owner and manager, there was a lot of vandalism that was going, so a lot of times is where we have to call the peace officers to help us be safe.

THE COURT: And these are people you would consider friends or that officers you called?

PROSPECTIVE JUROR: Role models, not friends.

THE COURT: What?

PROSPECTIVE JUROR: Role models.

THE COURT: Okay. I'm trying to clarify. The LAPD officer you met because you had to call them as a property owner, would you call them friends or you dealt with them like any one of us would deal with the police, meaning you called them, and they addressed the issue.

PROSPECTIVE JUROR: I would say, it was in between the two. I'm a personable person, so I love to have

conversations.

After they would help, I would always offer them a drink and we get to know each other.

THE COURT: Just to be clear this question was about you, relatives, close friends or significant others.

Would you consider these LAPD officers that you have met as close friends?

PROSPECTIVE JUROR: No.

THE COURT: Thank you.

Would you consider the Beverly Hills Police Officers, you mentioned that you know the entire department.

Would you consider all of them close friends?

PROSPECTIVE JUROR: I don't want to say close friends, like we hang out. I would say role models, friends.

THE COURT: How many would you characterize as close friends?

PROSPECTIVE JUROR: All the ones I know, at least seven or eight.

THE COURT: Okay. Thank you so much.

Juror No. 52?

PROSPECTIVE JUROR: I have a close friend who works for ICE.

THE COURT: Do you know what that person does? Do they have, like, a desk job, are they out on the street, do you not know?

PROSPECTIVE JUROR: In the jails, and out on the street.

I have two cousins that are -- one cousin is a sheriff in North Carolina, and another one works for Albuquerque or Santa Fe PD in New Mexico. That's it.

THE COURT: Thank you.

The friend that works for ICE in the jails and on the street, where do they work, like, where in the country?

PROSPECTIVE JUROR: Los Angeles area.

THE COURT: Okay.

PROSPECTIVE JUROR: But I think he had been recently moved, like transporting people.

THE COURT: Okay. Thank you, I understand.

Next, Juror No. 58?

PROSPECTIVE JUROR: Hello.

THE COURT: Hello. Give me just one moment. Okay. You're Juror No. 58, go ahead.

PROSPECTIVE JUROR: I have a cousin in law enforcement in Connecticut, and I have a close friend in the Federal Bureau of Investigations in the organized crime unit here in Los Angeles.

THE COURT: Your cousin that is in law enforcement in Connecticut, do you know what agency they work for, is it state or federal?

PROSPECTIVE JUROR: State police.

THE COURT: Okay. Do you think you are going to have any difficulty applying the same standards to law witnesses as any other witness?

PROSPECTIVE JUROR: I think it will be challenging at times to not let my biases come into question, but I will try my best.

THE COURT: Sitting here now, do you think you will succeed or you just don't know?

PROSPECTIVE JUROR: I'm not sure.

THE COURT: Thank you. Juror No. 59.

PROSPECTIVE JUROR: I have a cousin in Orange County Sheriff's Department and her husband as well, I believe they are both sergeants.

Then my husband's side, he has a cousin at Gardena PD. I work at a LAUSD school site. We usually deal with LAPD.

THE COURT: Thank you.

Okay. So a question for all of the jurors that answered yes to the prior question.

Again, the prior question was whether any -- whether you or to your knowledge, any of your relatives close friends or significant others have had any law enforcement training or experience or being employed by any law enforcement agency?

So the follow-up question to all of you -- Juror Number 31, is there somebody you know in that category?

PROSPECTIVE JUROR: My cousin's husband.

THE COURT: What law enforcement agency?

PROSPECTIVE JUROR: Police department. I'm not sure, they lived in Fremont and then they moved somewhere in the midwest.

THE COURT: Thank you.

So everyone who answered yes to that question, including the people that were added on including 12, 31, 48, is there anything about what you know of the persons you mentioned to me or your relationship to those persons that will prevent you from being fair and impartial to both sides in this case?

Raise your hand if that is the case.

Juror No. 12. Juror No. 16, and 20 -- oh, 13.

So we have got 12, 13, 16, 20, and 25?

Juror No. 48?

PROSPECTIVE JUROR: Well I'm saying I will do my best, I'm not saying, you know, I will do my best.

THE COURT: Thank you, and Juror No. 48.

PROSPECTIVE JUROR: I will do my best.

THE COURT: I don't want you to answer. I want you to raise your hand if the answer to this question is yes. Is there anything about, you know, the person you told me about or the persons or your relationship with those persons that will prevent you from being fair and impartial to both sides in this case?

Raise your hand if the answer is yes.

Let's do everybody again.

Okay. So we have Juror No. 11, 12, from before, 13, 16, 20, 25, 30, and on the right side we have 58.

Thank you so much.

Next question.

THE COURTROOM DEPUTY: Your Honor, 48 as well.

THE COURT: Thank you so much.

Okay. A question for all jurors, have you or any of your close friends or relatives had any strong positive experiences involving the police or any other member of law enforcement?

Raise your hand if you or any of your close friends or relatives have had any strong positive experiences involving the police or any other member of law enforcement.

Keep your hands up until I call your number.

Juror No. 2, 8, 9, 13, 16, 17, and you are in the back sir, what are you?

37?

PROSPECTIVE JUROR: 37.

THE COURT: Juror 11, thank you so much, 47, 48, and you are 54? And 59? Yes, thank you.

THE COURTROOM DEPUTY: Your Honor, 48.

THE COURT: I'm going to need you to raise your hands high, jurors, if you can, because when you are just raising it like this, I can't see you.

Okay. So all of the jurors that answered that question about whether you had any strong positive experiences involving the police or any other member of law enforcement, raise your hand if you will not be able to put those feelings and experiences aside and render a verdict solely based on the evidence before you.

Raise your hand if you will not be able to put those feelings and experiences aside and render a verdict based on the evidence before you.

Juror No. 9. Thank you.

Next question: Jurors, for everyone, have you or any of your close friends or relatives had any strong negative experiences involving the police or any other member of law enforcement?

This is regardless of whether you answered yes to the other question.

Have you or any of your close friends or relatives had any strong negative experiences involving the police or any other member of law enforcement.

. Raise your hand. Keep your hand up until I call your number.

Juror 3, 12, 13, 17, 21, 24, 32, 35. Thank you so much, 38, and 42. Thank you so much.

And then on this side we have -- I did miss somebody, 50, 51 -- no -- 52, 53, 54, 57, and 58. I got everyone. Thank

you.

So those jurors that answered yes to that last question, please raise your hand if you will not be able to put those feelings and experiences aside and not be able to render a verdict solely based on the evidence before you.

Juror No. 35, 50, 57, and 58.

Thank you.

THE COURTROOM DEPUTY: Your Honor, and 21.

THE COURT: 21, thank you.

Okay. Jurors, next question.

Have you or to your knowledge has any relative, close friend, or significant other ever been investigated, arrested or charged with any criminal offense other than a minor traffic infraction?

This includes any potentially false accusations. I will ask the question again, and then please raise your hands.

Have you or to your knowledge has any relative, close friends or a significant other ever been investigated, arrested for, or charged with any criminal offense other than a minor traffic infraction, and I'm including even when somebody was falsely accused.

Raise your hands. Keep your hands high until I call your number.

Juror No. 4, No.'s 5, 8, 9, 12. Juror No. 13, Juror No. 14, 15, Juror No. 21, Juror No. 24, and then the next row,

Mr. Berry, can you help me with that?

THE COURTROOM DEPUTY: 25, 28, 30.

THE COURT: Thank you. We should have been doing this all along.

THE COURTROOM DEPUTY: 31, 33, 34, 35, 40, 42.

THE COURT: Thank you.

THE COURTROOM DEPUTY: 44, 47, 48, 52, and 57.

THE COURT: Thank you. Okay, let's start with Juror No. 4. Who is it that you know?

PROSPECTIVE JUROR: My cousin.

THE COURT: What were they investigated or arrested or charged with?

PROSPECTIVE JUROR: I don't know, but conspiracy.

THE COURT: Okay. Do you know what the conspiracy had to do with? What type of a crime?

PROSPECTIVE JUROR: I'm allowed to say it?

THE COURT: Yes.

PROSPECTIVE JUROR: Well, he was with his friend and they were delivering something, they got stopped by the cops and they had -- I believe they had two firearms, so they got arrested for that.

THE COURT: Thank you.

Juror No. 5?

PROSPECTIVE JUROR: It is my brother-in-law out of state.

THE COURT: What is the crime?

PROSPECTIVE JUROR: Domestic violence, kidnap and rape.

THE COURT: And was the victim of the crime somebody you are related to?

PROSPECTIVE JUROR: No.

THE COURT: Thank you.

Juror No. 8?

PROSPECTIVE JUROR: It's my brother.

THE COURT: Your what?

PROSPECTIVE JUROR: Brother.

THE COURT: Brother, okay, what was the crime?

PROSPECTIVE JUROR: Grand theft auto.

THE COURT: How long ago was it?

PROSPECTIVE JUROR: Last year. He's currently in jail right now.

THE COURT: Okay. He's been convicted?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. Thank you.

Juror No. 9?

PROSPECTIVE JUROR: It was my brother when he was a teenager.

He was riding in a car that was stolen so he was arrested, but didn't serve any time or anything.

THE COURT: Thank you. Juror No. 12?

PROSPECTIVE JUROR: My mother and her boyfriend and it was child neglect and abuse and a DUI for my mother.

THE COURT: Is the child someone -- the child victim was that somebody you are related to?

PROSPECTIVE JUROR: Myself.

THE COURT: How long ago did this happen?

PROSPECTIVE JUROR: Over 20 years ago.

THE COURT: Were they convicted?

PROSPECTIVE JUROR: The charges were dropped.

THE COURT: Thank you. Juror No. 13?

PROSPECTIVE JUROR: Yes, my mother and her husband.

THE COURT: What was the crime?

PROSPECTIVE JUROR: Two felony counts in New Broadful, Texas, breaking and entering and property damage as well.

THE COURT: Thank you.

How long ago did that happen?

PROSPECTIVE JUROR: They are still currently in the court proceedings.

THE COURT: Okay. So the alleged crime happened recently?

PROSPECTIVE JUROR: October of '24.

THE COURT: Thank you.

Anybody else that you know?

PROSPECTIVE JUROR: No, ma'am.

THE COURT: Juror No. 14?

PROSPECTIVE JUROR: My nephew was in prison for 20 years. He's been out now for three years. And my son is currently in a case, a felony.

THE COURT: What is the crime that your son is accused of?

PROSPECTIVE JUROR: Attempted murder.

THE COURT: And your nephew?

PROSPECTIVE JUROR: A lot of stealing. He did a lot of stealing. I don't know what other charges there were, but he had the three strikes, so he had to stay in longer.

THE COURT: Have you been attending the court proceedings for your son?

PROSPECTIVE JUROR: Every one.

THE COURT: Okay. Do you have an impression or a view or an opinion as to whether he's being treated fairly in the court proceedings?

PROSPECTIVE JUROR: We haven't gotten that far yet. It's going on four years.

THE COURT: Thank you.

Juror No. 15?

PROSPECTIVE JUROR: My brother, elderly abuse about 16 years ago. He served maybe less than a year.

THE COURT: He was convicted?

PROSPECTIVE JUROR: Yes, I don't think he asked but

he never went through a trial or anything.

THE COURT: Do you have an impression as to whether he was treated fairly?

PROSPECTIVE JUROR: No impression.

THE COURT: Okay. Was the alleged victim somebody that you are related to?

PROSPECTIVE JUROR: Yes. My parents.

THE COURT: Thank you.

Juror number, I think the next one is 21.

PROSPECTIVE JUROR: My sister-in-law's brother was caught with illegal possession of weapons.

THE COURT: How long ago was this?

PROSPECTIVE JUROR: It was, I want to say three years ago.

THE COURT: Thank you.

Juror No. 24?

PROSPECTIVE JUROR: My stepdad and my cousin.

THE COURT: What was the crime? Is it together?

PROSPECTIVE JUROR: No. My stepdad, a DUI and hit and run.

My cousin, I don't know the specific details, but I know she evaded the police.

THE COURT: And with your stepdad, how long ago was this?

PROSPECTIVE JUROR: Six years ago.

THE COURT: Do you have an impression as to whether he was treated fairly, do you have an opinion about that?

PROSPECTIVE JUROR: No.

THE COURT: You don't have an opinion?

PROSPECTIVE JUROR: No.

THE COURT: Juror No. 25?

PROSPECTIVE JUROR: My nephew. It was drugs and he was guilty. There was no doubt, so.

THE COURT: How long ago was that?

PROSPECTIVE JUROR: It's kind of still going on. It started when he was 18 and he is 55 now, he's a felon obviously. He keeps going in and out.

THE COURT: Okay. Thank you.

Juror No. 28?

PROSPECTIVE JUROR: My ex-husband.

THE COURT: What was the crime?

PROSPECTIVE JUROR: I believe burglary and I had a call because he was harassing me.

He served time and broke his probation, so he got deported.

THE COURT: How long ago was the burglary?

PROSPECTIVE JUROR: I'm going to say maybe 16 to 18 years.

THE COURT: And the harassment of you?

PROSPECTIVE JUROR: That happened in 2008.

THE COURT: Do you have an impression as to whether he was treated fairly in the court system? Do you have an opinion on that?

PROSPECTIVE JUROR: I was -- I believe it was fair.

THE COURT: Juror No. 30?

PROSPECTIVE JUROR: My husband. DUI, domestic, but he was never convicted.

THE COURT: How long ago was the DUI?

PROSPECTIVE JUROR: Five years ago.

THE COURT: How long ago was the domestic violence?

PROSPECTIVE JUROR: Seven years ago.

THE COURT: Was this something that was reported to the police?

PROSPECTIVE JUROR: Yes.

THE COURT: And do you believe he was treated fairly in the court system?

PROSPECTIVE JUROR: Yes.

THE COURT: Were you the person -- were you the alleged victim in the case?

PROSPECTIVE JUROR: Yes.

THE COURT: Do you believe you were treated fairly?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you. Juror No. 31?

PROSPECTIVE JUROR: My cousin's husband.

THE COURT: What was the crime?

PROSPECTIVE JUROR: Sexual assault.

THE COURT: How long ago?

PROSPECTIVE JUROR: I think two or three years ago because they had to put off the wedding.

THE COURT: Do you know the person that he was alleged to have assaulted?

PROSPECTIVE JUROR: No.

THE COURT: Are the court proceedings completed?

PROSPECTIVE JUROR: Yes, he served time.

THE COURT: Do you believe that he was treated fairly or do you have an opinion about that?

PROSPECTIVE JUROR: No opinion.

THE COURT: Thank you.

Juror No. 33?

PROSPECTIVE JUROR: Roommate was charged with accidental manslaughter.

THE COURT: How long ago was this?

PROSPECTIVE JUROR: About four years ago.

THE COURT: Are the court proceedings still continuing?

PROSPECTIVE JUROR: They finished about six months ago.

THE COURT: Did you attend any the court proceedings?

PROSPECTIVE JUROR: No.

THE COURT: Did you stay abreast of them in some other way?

PROSPECTIVE JUROR: Just through casual conversation, living together.

THE COURT: You were living with him while he was going through the case?

PROSPECTIVE JUROR: Correct.

THE COURT: Who was the person that was alleged to be the victim?

PROSPECTIVE JUROR: Someone that I'm not familiar with, a random bystander, unfortunately.

THE COURT: Was this alleged to have happened -- when you said accidental, was this something in a car?

PROSPECTIVE JUROR: Yeah.

THE COURT: So your roommate hit somebody in the car who died and he was charged with accidental manslaughter?

PROSPECTIVE JUROR: Correct.

THE COURT: Do you have a sense from talking with your roommate, whether he was treated fairly or not?

PROSPECTIVE JUROR: I believe so.

THE COURT: He was treated fairly, yes?

PROSPECTIVE JUROR: I believe so.

THE COURT: Thank you. Juror No. 34?

PROSPECTIVE JUROR: My cousin, he was convicted for shoplifting and also one of my mom's closest friends, her and

her mother -- I'm not sure if the Court is still going or if they are convicted yet, but it was, I believe, grand theft auto and credit card fraud.

THE COURT: Thank you.

Juror No. 35?

PROSPECTIVE JUROR: Myself for petty theft.

THE COURT: How long ago?

PROSPECTIVE JUROR: I believe it was 2012 or '14. It was in -- when it was during the Inglewood, the lawsuit that they had going on, I was part of that.

THE COURT: I'm not familiar with that. How old were you when this happened?

PROSPECTIVE JUROR: 24 or 25.

THE COURT: Do you feel you were treated fairly in the court system?

PROSPECTIVE JUROR: No, I was not. I was not treated fairly.

THE COURT: Will you be able to set aside those feelings if you are selected as a juror in this case?

PROSPECTIVE JUROR: Absolutely not.

THE COURT: You will assume Mr. Lopez is innocent?

PROSPECTIVE JUROR: No, I'm not assuming, but I do have a strong thing against government or I guess federal cops in general, because of what happened in the jail.

THE COURT: Understood. Thank you. Juror No --

that was 34 -- 35.

Juror No. 40?

PROSPECTIVE JUROR: My grandfather.

THE COURT: What was the crime?

PROSPECTIVE JUROR: Sexual assault.

THE COURT: Do you know the person that is alleged to be the victim?

PROSPECTIVE JUROR: Relative, my aunt.

THE COURT: A relative of your aunt?

PROSPECTIVE JUROR: No, it was a relative and the relative is my aunt.

THE COURT: I got you. How long ago did this occur?

PROSPECTIVE JUROR: Three years.

THE COURT: And was your grandfather convicted?

PROSPECTIVE JUROR: He was, he's in jail.

THE COURT: Did you follow the court proceedings?

PROSPECTIVE JUROR: I did not. We're not close.

THE COURT: Okay. So is it safe to say you don't have an opinion as to whether he was treated fairly or do you?

PROSPECTIVE JUROR: I don't. I don't have an opinion.

THE COURT: Thank you. Juror No. 42?

PROSPECTIVE JUROR: Two brothers, both DUIs.

THE COURT: How long ago?

PROSPECTIVE JUROR: Five or six years ago.

THE COURT: Do you have an impression with the first brother as to whether he was treated fairly?

PROSPECTIVE JUROR: I really don't.

THE COURT: Okay. What about the second one?

PROSPECTIVE JUROR: I would say the same.

THE COURT: No opinion?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you. Okay. Turning to Juror No. 44?

PROSPECTIVE JUROR: My friend's grandson. I don't know if it started off minor, and then he ended up on probation and had a dirty test and ended up back in.

THE COURT: What was the original crime?

PROSPECTIVE JUROR: It was like a minor fight. He had just turned 18, so they gave him probation, and he ended up getting high, or I'm not 100 percent sure what drug or whatever, but they ended up putting him in prison or jail because, yeah.

THE COURT: Thank you so much.

Juror 47?

PROSPECTIVE JUROR: I have a close friend who is in law enforcement. He was investigated for corruption, LAPD.

THE COURT: Is the case still going on?

PROSPECTIVE JUROR: I think he's been convicted.

THE COURT: Do you have an opinion as to whether he

was treated fairly?

PROSPECTIVE JUROR: I'm not 100 percent sure.

THE COURT: You can't say whether it was fair or not; is that correct?

PROSPECTIVE JUROR: I can't say, no.

THE COURT: Thank you so much. Juror No. 48?

PROSPECTIVE JUROR: Couple of people. My dad had some tax issues in 2008, I believe, 2010 or something like that. My uncles, both my uncles got charged for labor disputes.

THE COURT: When you say labor disputes, meaning not paying their employees?

PROSPECTIVE JUROR: I mean, overtime and breaks, car wash, stuff like this.

THE COURT: Okay. To your understanding they were charged with a crime for this?

PROSPECTIVE JUROR: I think both my dad and my uncle ended up with house arrest.

THE COURT: Anything else?

PROSPECTIVE JUROR: My other uncle, same uncle, DUI, and two of my best friends got a DUI within the last 12 to 18 months.

THE COURT: When was your uncle's DUI?

PROSPECTIVE JUROR: I think -- I don't know. Within the last five years, I know because he told me never do it, it

is the stupidest thing. He was trying to teach me.

THE COURT: And your friend's DUI's, those were recent?

PROSPECTIVE JUROR: Yes.

THE COURT: Did you follow the court proceedings for your friend, your uncles, your dad?

PROSPECTIVE JUROR: Because of my interest in law, I just read about my dad and my uncles, and did my own research.

THE COURT: Okay. And do you have an opinion as to whether they were treated fairly?

PROSPECTIVE JUROR: I think you do the crime, you deserve it so, no. They did the crime and so.

THE COURT: You do think they were treated fairly in the court system?

PROSPECTIVE JUROR: Yes.

THE COURT: Is that true for your friends too?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you.

Juror No. 52?

PROSPECTIVE JUROR: I got a brother that was investigated for drugs.

THE COURT: How long ago was that?

PROSPECTIVE JUROR: Less than ten years.

THE COURT: Did you follow the court proceedings?

PROSPECTIVE JUROR: He ended up pleading out.

THE COURT: But did you -- were you kind of keeping up with him while he was going through the process?

PROSPECTIVE JUROR: Yes, I was.

THE COURT: Do you have an opinion as to whether he was treated fairly?

PROSPECTIVE JUROR: I do have an opinion.

THE COURT: What's the opinion?

PROSPECTIVE JUROR: That he wasn't treated fairly.

THE COURT: He was not treated fairly?

PROSPECTIVE JUROR: Correct.

THE COURT: Go ahead.

PROSPECTIVE JUROR: I also have two cousins that were investigated and convicted for drug trafficking.

THE COURT: Okay. How long ago was that?

PROSPECTIVE JUROR: He got deported as of this year. My other cousin, he got arrested at the time and got deported less than five years ago.

THE COURT: Okay.

PROSPECTIVE JUROR: I have got a friend that is doing life.

THE COURT: What is the crime?

PROSPECTIVE JUROR: He got in a shootout with the police.

THE COURT: How long ago was that?

PROSPECTIVE JUROR: 10 or 15 years ago.

THE COURT: With your friend that is doing life, do you believe that he was treated fairly during the court system during the court proceeding?

PROSPECTIVE JUROR: Yes, he was treated fairly.

THE COURT: Your cousins, the two cousins you mentioned that had or were accused of drug related crimes.

PROSPECTIVE JUROR: Correct.

THE COURT: Do you believe that they were treated fairly?

PROSPECTIVE JUROR: There were two separate cases. One was, and the other one wasn't.

THE COURT: It sounds like you have some people you know who have gone to the court system and been treated fairly and some who have gone through the court system and not treated fairly.

PROSPECTIVE JUROR: Correct.

THE COURT: Would you be able to set aside the experiences and your opinions regarding those, especially those that were treated unfairly in -- if you were selected as a juror in this case?

PROSPECTIVE JUROR: Yes, I can set them aside.

THE COURT: Thank you.

And Juror No. 57?

PROSPECTIVE JUROR: Hello.

THE COURT: Hi.

PROSPECTIVE JUROR: I have two close friends that just got DUIs last year, one has her second DUI, she got it in January of last year, and my best friend got her DUI right before my birthday in October of last year.

THE COURT: Oh.

PROSPECTIVE JUROR: They were arrested. One is doing community service as well as AA meetings, and my best friend is waiting for her court hearing next year.

THE COURT: So your friend that had the second DUI, do you feel she was treated fairly in the court system?

PROSPECTIVE JUROR: For her second DUI, no. For her first one, yes.

THE COURT: And then your best friend, I guess it's still going through the process.

Do you feel -- do you have an opinion as to whether she's been treated fairly up until now?

PROSPECTIVE JUROR: I believe she has been treated fairly with the court system.

THE COURT: Will you be able to set aside your opinions regarding your other friend and her unfair treatment if you are selected as a juror in this case?

PROSPECTIVE JUROR: Yes, ma'am.

THE COURT: Thank you.

Okay. One last question, and then --

THE COURTROOM DEPUTY: Your Honor, Juror No. 58?

THE COURT: Apologies. Go ahead, Juror No. 58.

PROSPECTIVE JUROR: My cousin was arrested for possession as a charge because he was on a school grounds when this happened.

THE COURT: Possession of what?

PROSPECTIVE JUROR: Heroin.

THE COURT: Heroin. How long ago was this?

PROSPECTIVE JUROR: 2019.

THE COURT: 2019, thank you, okay. I think that's it for you.

One last question for all of the jurors, I'm going to let you go on your lunch break.

Jurors, if there anything about what you shared or your relationship with the person you shared or your opinions about what they experienced that will prevent you from being fair and impartial to both sides in this case, raise your hand if the answer is yes.

Is there anything about what you shared or your relationship with the person or your opinion about what happened to them that will prevent you from being fair and impartial to both sides in this case?

Raise your hand if the answer is yes.

That is Juror No. 35.

THE COURTROOM DEPUTY: Yes.

THE COURT: Thank you.

Jurors, we're going to leave you to have your lunch break. I will have you come back -- let me have you come back at 1:00 p.m.

Please remember, do not make up your minds about the case. Do not research the case or anybody involved in it, and do not talk about the case with anyone, including each other.

We will have you come back at 1 o'clock.

Let me have Juror No. 34 stay behind.

The rest of the jurors, we will see you outside at 1:00, and just so you know, we seem to be making good time.

There are a lot of you here, so I don't anticipate we will complete our jury selection today, but we are making good time.

Okay, we will see you at 1:00.

Juror 34, please stay behind.

THE COURTROOM DEPUTY: All rise.

(Jury panel exits the courtroom at 11:54 a.m.)

THE COURT: We're back on the record. We are in the presence of Juror 34. And Juror 34, I understand you wanted to speak with the Court. The parties can be seated.

I understand you wanted to speak with the Court?

PROSPECTIVE JUROR: Yes. I was hoping that I would be excused from this case. It's just due to health -- I found out I was pregnant for the second time, and the first time I was pregnant, I had a miscarriage because I had traveled far

from home, there was no nearby hospitals until an hour away from where we were.

I don't want any other further complications to happen again for my second one.

Also, the only ride I have today, he has work at 5:00, and I live all the way in Oxnard, and I wouldn't have any other way to go home.

THE COURT: What time will you need to leave today, if you are going to catch a ride with this person?

PROSPECTIVE JUROR: To avoid traffic, and especially traffic in our town, I would say at least 1:00 or 2:00.

THE COURT: Okay. And did you raise your concerns with the jury assembly room downstairs?

PROSPECTIVE JUROR: I did. I accidently checked in before I went to go do the form, and they told me I need to talk to the judge assistant in order to be able to talk to you.

I wish I wasn't pregnant so I could know more, but I would rather protect myself and my future child in order to be safe.

THE COURT: Understood. Congratulations to you.

PROSPECTIVE JUROR: Thank you.

THE COURT: Let me see the parties at sidebar on the record.

(Sidebar begins.)

THE COURT: Okay. You just need to speak into the

microphone.

Any objection to excusing this juror?

I normally don't like to excuse jurors in the middle of jury selection, because everybody thinks it's a free pass to go, but she does seem to have some significant concerns about being far from home at this point and not having someone who can take her home.

MR. HARI: No objections.

MS. ABEL: No objections.

THE COURT: Okay.

(Sidebar ends.)

THE COURT: We're back on the record. Thank you, Juror No. 34. Thank you for sharing with us, and we will excuse you at this time.

We will excuse you at this time, and I believe you will go to the jury assembly room to check out.

Let them know you have been excused, and I and the attorneys wish you all the best with this pregnancy.

PROSPECTIVE JUROR: Thank you, I'm so sorry.

THE COURT: That is okay. Travel safely.

PROSPECTIVE JUROR: Thank you.

THE COURT: Okay. Counsel, anything you need to raise with the Court before the lunch hour?

MR. MACKIE: No, Your Honor.

MS. ABEL: Your Honor, just a logistical concern,

when the Court asks the questions at the conclusion about is there anything that will prevent you from being fair and impartial and various persons raised their hand, is that question designed to identify for cause challenges?

What I'm asking only is, otherwise, we would want certain followup with that, if that's the Court's goal, I just want to understand that.

THE COURT: I tend to not do the followup in front of the other jurors, because I don't know what they're going to share, and I don't want to poison the rest of the panel.

MS. ABEL: If we do need more information, or -- can the parties understand that to be sufficient to raise a for cause challenge?

THE COURT: I don't know. I will let you know at the end if -- I will ask you before I'm done questioning, I will ask you if you want any more followup.

So, you can let me know at that point if I haven't done the followup that you think is necessary.

MS. ABEL: Understood, thank you.

THE COURT: We will take our recess at this time. Let's have the parties back here by 12:55, so we can go on the record at 1:00.

Have a good lunch, Mr. Lopez.

THE DEFENDANT: Thank you.

(Lunch recess.)

THE COURT: We're back on the record.

Let me just advise the parties, off the record.

(Discussion, off the record.)

THE COURT: We're back on the record.

As I advised the parties just a few minutes ago, off the record, Juror No. 14 indicated that she wanted to speak with me about a hardship.

She just had surgery. This is the juror that her son is also currently facing charges for attempted murder.

She's been in all of the court dates.

As I indicated, off the record, I'm thinking that she is probably a candidate for a for cause challenge, but in any event, I did want to advise the parties she made that request.

Juror No. 36 is seeking a hardship excusal for work issues.

I will handle hardships sometime later in the afternoon.

I did want to advise the parties of those requests from 14 and 36.

THE COURTROOM DEPUTY: All rise.

(Jury panel enters the courtroom at 1:04 p.m.)

THE COURTROOM DEPUTY: You may be seated.

THE COURT: Okay. We are back on the record. Welcome back, jurors. We have nearly our entire panel back. Jurors, I hope you had a good lunch.

I did not go outside because I have too much work to do.

I don't know what it was like outside, I hope it was pleasant if you went outside.

Jurors, I want to thank for your time and attention and candor as we continue.

The next question I have, this is for all jurors, raise your hand if the answer is yes, and keep your hand up until I call your number.

Have you, or to your knowledge, has any relative, close friend, or significant other ever been the victim of any crime?

Sorry, just a moment, do we have an issue?

Before we have an answer, I'm just checking in with the CSO.

THE COURT: All phones are off? Yes?

Juror No. 44?

PROSPECTIVE JUROR: I can't. I have a blood sugar monitor. It's on silent, though.

THE COURT: Wonderful, I appreciate that. Thank you. For the record that was Juror 44. She indicated she can't turn her phone off altogether because she has a blood sugar monitor.

Are you raising your hands in response to the question I just asked?

I appreciate your attention and promptness.

Have you, or to your knowledge, has any relative or close family member, or significant other been a victim of any

crime?

Raise your hand if the answer is yes. You can put your hand down when I call your number.

Juror No. 2, 3, 5, 1, 41, 48. I was confused because you were no longer in the front row. In the back, that is Juror No. 50?

54, and 58.

Thank you. Juror No. 12, why do I always miss you?

Okay. Let's pass the microphone to Juror No. 2.

THE COURT: Juror 2, who is it that you know?

PROSPECTIVE JUROR: My husband and I were foster parents for over a decade, and I have two sons who were victims of child abuse and neglect.

THE COURT: How long ago were these crimes?

PROSPECTIVE JUROR: Eight years and 14 since they were removed.

THE COURT: Eight years ago?

PROSPECTIVE JUROR: Yes, eight years ago and 14 years ago.

THE COURT: Did you participate in any court proceedings concerning these criminal matters?

PROSPECTIVE JUROR: I did not.

THE COURT: Okay. Thank you.

Juror No. 3?

PROSPECTIVE JUROR: I have one family member and

several friends who have, yeah.

THE COURT: Let's start with the family member, who was this person to you?

PROSPECTIVE JUROR: It was my cousin.

THE COURT: What was the crime?

PROSPECTIVE JUROR: Murder.

THE COURT: I'm sorry to hear that. When did this happen?

PROSPECTIVE JUROR: Probably 20 years ago.

THE COURT: Was anybody apprehended?

PROSPECTIVE JUROR: Yes.

THE COURT: Did you follow any court proceedings?

PROSPECTIVE JUROR: No.

THE COURT: And the friends, what were the crimes that your friends were victims of?

PROSPECTIVE JUROR: Murder.

THE COURT: This was one person, more than one?

PROSPECTIVE JUROR: One -- three.

THE COURT: How many years ago or when did these murders occur?

PROSPECTIVE JUROR: The most recent was probably 20 years ago. And then, let's just say high school was bad.

THE COURT: It sounds like it.

PROSPECTIVE JUROR: Yeah, two were in high school so that was, so, I am 62, I can't do the math.

THE COURT: Over 40 years ago?

PROSPECTIVE JUROR: Yeah.

THE COURT: Excuse me.

PROSPECTIVE JUROR: One was vehicular, I don't know what you call it, I think he was charged with murder, a close friend who was, I think, they call it murder from drunk driving. It's still in the court system.

THE COURT: When was that?

PROSPECTIVE JUROR: That was probably eight years ago.

THE COURT: Okay. And have you followed -- did you follow the court proceedings for your friends that were murdered 20 to 40 years ago?

PROSPECTIVE JUROR: No.

THE COURT: And what about the more recent?

PROSPECTIVE JUROR: Just a little bit.

THE COURT: Do you have an opinion as to whether your friends or family have been treated fairly or just that the court proceedings have been fair to what happened to your friend?

PROSPECTIVE JUROR: Knowing what I have a feeling about is my cousin because there was no doubt that this guy shot him in the head, but he was let go.

THE COURT: Thank you.

Do you think you will be able to set that aside if you

are serve as a juror in this case?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you. Juror No. 5?

My cousin, he overdosed on Fentanyl. Someone gave him pills with Fentanyl, and then my sister is a victim of domestic violence.

THE COURT: How long ago did your cousin overdose?

PROSPECTIVE JUROR: Three years ago.

THE COURT: And was anyone ever apprehended or charged?

PROSPECTIVE JUROR: Yes.

THE COURT: Was that person eventually convicted?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. And do you have an opinion about whether the court proceedings were fair?

PROSPECTIVE JUROR: No. Because I was not a part of it. I didn't want to be.

THE COURT: And then your sister, when did this crime happen?

PROSPECTIVE JUROR: About 11 years ago.

THE COURT: And were there any court proceedings?

PROSPECTIVE JUROR: I believe so. I know he was convicted and I know he was put in prison. I don't know the full story.

THE COURT: Okay. Is it fair to say you don't have

an opinion about those court proceedings?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you so much.

Juror No. 12?

PROSPECTIVE JUROR: My best friend and myself, best friend was a victim of sexual assault and rape.

Then myself child abuse and neglect and physical abuse.

THE COURT: That's what you mentioned to us earlier?

PROSPECTIVE JUROR: Yes.

THE COURT: Your best friend, and when did this assault occur?

PROSPECTIVE JUROR: Less than ten years ago.

THE COURT: And did you follow the court proceedings?

PROSPECTIVE JUROR: She did not proceed with -- she dropped the charges.

THE COURT: I see.

Do you have an opinion about what happened with her case or what happened with your own case that you think will prevent you from being fair and impartial to both sides in this case?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. We will come back to you. Thank you.

Juror No. 17?

PROSPECTIVE JUROR: Can we start?

THE COURT: Yes.

PROSPECTIVE JUROR: So recently -- within the most recent, my God daughter was murdered, four years ago last month.

I have had -- just counting six friends of mine who have been murdered as well.

THE COURT: Sorry to hear that.

The friends that you have that were murdered, how long ago did those occur?

PROSPECTIVE JUROR: Between 10 and 20 years ago.

THE COURT: And with respect to your God daughter, was anyone ever apprehended?

PROSPECTIVE JUROR: Yes.

THE COURT: Do you have an opinion as to whether the Court proceedings concerning her murder were fair?

PROSPECTIVE JUROR: Yeah, they were fair. They were fair.

THE COURT: What about with your friends, do you have an opinion about those?

PROSPECTIVE JUROR: Not really. Not really.

THE COURT: Okay. Thank you very much.

Juror No. 22?

PROSPECTIVE JUROR: Hello.

THE COURT: Hello.

PROSPECTIVE JUROR: I was robbed about 20 years ago

and then my home was burglarized in 2023.

THE COURT: And when you say robbed, do you mean somebody took something from your person?

PROSPECTIVE JUROR: It was a home invasion.

THE COURT: You were home?

PROSPECTIVE JUROR: Yes.

THE COURT: And was anybody apprehended?

PROSPECTIVE JUROR: No, because the person threatened to kill me if he saw police officers circling, so I did contact the police, but I didn't -- I was too afraid to go through with it.

THE COURT: And the burglary in 2023, was anyone apprehended for that?

PROSPECTIVE JUROR: No, they never caught the person. I wasn't home at the time.

THE COURT: Okay. Do you have an opinion as to whether -- I guess let me ask it to you this way, these experiences, do you think they are going to affect your ability to be fair in this case?

PROSPECTIVE JUROR: No.

THE COURT: Thank you.

Juror No. 31. Go ahead.

PROSPECTIVE JUROR: My friend was a victim of a hit and run.

THE COURT: Did your friend die in this or they were

injured?

PROSPECTIVE JUROR: No. Well, she was injured, light injuries, car totaled, but she survived.

THE COURT: How long ago was this?

PROSPECTIVE JUROR: Four months ago.

THE COURT: Okay. And was anyone apprehended?

PROSPECTIVE JUROR: No.

THE COURT: Okay. Thank you.

Juror No. 41?

PROSPECTIVE JUROR: I have a second answer.

THE COURT: My apologies.

PROSPECTIVE JUROR: If they never -- if the person never brought charges or took it to Court, then is it something that should be mentioned?

THE COURT: Yes, that is still a victim of a crime.

PROSPECTIVE JUROR: Myself.

THE COURT: Okay. What was the crime?

PROSPECTIVE JUROR: Sexual assault.

THE COURT: How long ago?

PROSPECTIVE JUROR: Six and seven years ago.

THE COURT: Six and seven years ago, meaning two different incidents?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you. And do you think that your experience with that or your friend's experience, either of

those, will they prevent you from being fair and impartial to both sides in this case?

PROSPECTIVE JUROR: It will not affect me, my decision-making in this case.

THE COURT: Thank you, I appreciate it.

Juror No. 41?

PROSPECTIVE JUROR: Hello.

THE COURT: You are in your new location, I hope you like it.

PROSPECTIVE JUROR: I do.

THE COURT: Who is it that you know who is a victim of a crime?

PROSPECTIVE JUROR: My dad got robbed, assaulted, and beaten up. That is 2018, and both of them were apprehended. Went to Norwalk LA Court and I'm happy with the verdict.

It's just that after that, I was emotional because sometimes it doesn't show you are okay, but after a year or something, something happened physically.

So for me, just watching here, and I remember that this is an assault case, if it's not serious one, then I'm okay. But if it's like blood or something, and hospital, I might get emotional sometimes, because I'm still taking care of my dad right now.

THE COURT: Understood. Thank you, Juror No. 41.

Juror No. 48. Good afternoon.

PROSPECTIVE JUROR: Hi. My family home got burglarized and we got robbed.

THE COURT: I missed the first part of what you said.

PROSPECTIVE JUROR: My family's home got broken into and I believe it was 2018.

THE COURT: Was anyone home?

PROSPECTIVE JUROR: No one was home.

THE COURT: Was anyone apprehended?

PROSPECTIVE JUROR: No. I don't think they ever caught the guy, unfortunately. And then pretty often we get vandalized, graffiti, broken into, stuff like that.

THE COURT: At the properties you indicated that you own, or that your family owns?

PROSPECTIVE JUROR: Correct.

THE COURT: Thank you so much.

PROSPECTIVE JUROR: Last week after the Dodger parade we got completely attacked.

THE COURT: Okay. Thank you so much.

Juror No. 50?

PROSPECTIVE JUROR: Good afternoon. My family and myself were victims of burglary in 2024.

THE COURT: And this was at your home?

PROSPECTIVE JUROR: Yes.

THE COURT: Are you speaking into the microphone?

PROSPECTIVE JUROR: I am.

THE COURT: Was anyone home at the time?

PROSPECTIVE JUROR: We were.

THE COURT: Was anyone apprehended?

PROSPECTIVE JUROR: No.

THE COURT: Okay. Do you have an opinion about the work that law enforcement did in the case?

PROSPECTIVE JUROR: I do.

THE COURT: Okay. Is it a positive opinion, negative opinion?

PROSPECTIVE JUROR: Unsatisfactory.

THE COURT: Okay. Is that going to affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR: Absolutely.

THE COURT: It will?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you.

Juror No. 54?

PROSPECTIVE JUROR: My younger sister was mugged at a bus stop. This is 30 years ago, in the morning going to work. It was handled appropriately, but this is before cameras, and so there was no outcome to it.

But all of the channels took immediate action and did the best they could. Thank you.

THE COURT: Thank you.

Juror No. 58?

PROSPECTIVE JUROR: Hi.

THE COURT: Hello.

PROSPECTIVE JUROR: I am a survivor of childhood sexual abuse, and I also had a domestic violence incident in adulthood.

THE COURT: Thank you.

How many years ago would you say the crime against you happened?

PROSPECTIVE JUROR: Domestic violence or the sexual assault?

THE COURT: Both of them.

PROSPECTIVE JUROR: The sexual abuse was when I was nine and 10-years-old, and the other crime happened in 2020.

THE COURT: Okay. I don't know how old you are. I don't know how long ago -- when you were ten-years-old?

PROSPECTIVE JUROR: I'm sorry. I'm 30, so 20 years ago.

THE COURT: Thank you. Were there any court proceedings for your case?

PROSPECTIVE JUROR: No.

THE COURT: Was it ever reported to the police?

PROSPECTIVE JUROR: The second crime, the domestic violence crime was.

THE COURT: Sorry, the sexual abuse that you suffered, was that reported to the police?

PROSPECTIVE JUROR: No.

THE COURT: But the domestic violence was?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. And were there court proceedings concerning the domestic violence?

PROSPECTIVE JUROR: No. The perpetrator fled the scene, so no.

THE COURT: And are these experiences -- your experiences of being a victim of a crime, is that going to affect your ability to be fair and impartial to both sides in this case?

PROSPECTIVE JUROR: I don't think either crime is relevant to this case.

THE COURT: Thank you.

Juror 58?

For all of the jurors that answered yes to the last question, whether you, close relative, or significant other has been a victim of any crime, I did some followup for some of you, but this is still a question for all of you that answered yes to that question.

Is there anything about what you shared or your relationship with that person or that experience, that will prevent you from being fair and impartial to both sides in this

case?

Raise your hand if the answer is yes.

Juror No. 12.

THE COURT: Thank you.

Okay. Next question, do you have -- this is a question for all jurors, do you have any friends or family members who work in the legal industry?

For example, judges, lawyers, paralegals or court employees.

Do you have any family members or friends that work in the industry? Judges, lawyers, paralegals, court employees? Please keep your hand up until I call your number.

Juror 5, 6, 5, 11, 13, 16, 17, is that 22?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you, 23. I didn't see you over there in the corner.

And 19, and then in the back row, you are 33. And then on this side, we have 38, 40, 42, 44, 45, 48, 49, 50, 52, and 53 and 60.

Thank you so much.

Let's start with Juror No. 60. Just one moment.

Okay, Juror No. 60, who is it that you know who works in the legal industry?

PROSPECTIVE JUROR: My husband is an attorney.

What type of an attorney?

PROSPECTIVE JUROR: Family law.

THE COURT: And I have instructed you a couple of times, you are not to discuss this case with anyone.

Are you going to be tempted at the end of the day to speak with your husband about this case or ask him questions that were not answered?

PROSPECTIVE JUROR: He's going to ask, but I'm not going to let him know.

THE COURT: Thank you.

PROSPECTIVE JUROR: He's definitely going to ask.

THE COURT: Even though he, of all people, should know he shouldn't ask.

Anyway, you will take that up with him tonight.

Juror No. 53, who is it that you know that works in the legal industry?

PROSPECTIVE JUROR: My nephew is an attorney in international law.

And I have a very good friend who is an estate attorney.

THE COURT: Thank you. Juror No. 52?

PROSPECTIVE JUROR: I have a friend who is a paralegal.

THE COURT: Do you know where they work?

PROSPECTIVE: I know they go a lot to the West Covina Courthouse.

THE COURT: Do you know if they work for a law firm

or for a prosecutor or a defense attorney?

PROSPECTIVE JUROR: I believe a law firm.

THE COURT: Do you know what types of cases they handle?

PROSPECTIVE JUROR: No, not exactly.

THE COURT: Thank you.

Juror No. 50?

PROSPECTIVE JUROR: My wife is a public defender.

THE COURT: Okay. Where is she a public defender?

PROSPECTIVE JUROR: LA County.

THE COURT: Do you know what kinds of cases she handles?

PROSPECTIVE JUROR: I know that she handles felonies.

THE COURT: Thank you.

Are you going to be tempted today go home and talk with her about what happened in this case?

PROSPECTIVE JUROR: I talk to my wife about everything.

THE COURT: Okay. But you have been instructed not to discuss this case with anyone.

Will you still, nevertheless, discuss this case with her?

PROSPECTIVE JUROR: I will try not, to but she's going to pry.

THE COURT: You don't have the same willpower as Juror No. 60? Understood, understood.

Juror No. 9?

PROSPECTIVE JUROR: Hi, my partner is an entertainment attorney.

THE COURT: Will you be able to refrain from speaking to your partner about this case?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you. Juror No. 48?

PROSPECTIVE JUROR: It's more than ten of my friends growing up are attorneys, recently attorneys, mainly in the field of personal injury, lemon law, and real estate contracts.

THE COURT: Thank you.

Juror No. 45?

PROSPECTIVE JUROR: I have a friend who is a lawyer. His firm, I think, mostly handles cases for defending the corporations or the business.

THE COURT: Okay. 44?

PROSPECTIVE JUROR: My great aunt is actually a retired judge for California. She worked in Workman's Comp. I rarely talk to her, though, so I probably won't even have the opportunity to avoid talking about it.

She would know better, my brother is actually studying for the bar.

I don't know if that counts, I don't talk to him much

either.

THE COURT: Thank you. Juror No. 42?

PROSPECTIVE JUROR: My sister-in-law is a lawyer but mostly corporate lawyer, and a friend is in family law.

THE COURT: Thank you.

Did I get everybody on that side?

Forty and 38, sorry. Go ahead, 40.

PROSPECTIVE JUROR: Two friends. One is entertainment attorney, the other does family law.

THE COURT: Thank you. And 38?

PROSPECTIVE JUROR: Hi, I have one friend who is a corporate employment lawyer, and another one who is a tax lawyer.

THE COURT: Thank you so much.

Okay. Did I get everybody on that side?

Let's then turn to Juror No. 33. Give me one moment before you start speaking.

Okay. Juror No. 33, who is it that you know?

PROSPECTIVE JUROR: I have two cousins that work, one in corporate law, another one in climate litigation and then cousin-in-law that is a public defender.

THE COURT: Do you speak with your cousin-in-law about their work?

PROSPECTIVE JUROR: Yes, but not on a daily basis.

THE COURT: Okay. Will you be tempted to speak with

them about this case?

PROSPECTIVE JUROR: I don't know -- no, I don't need to.

THE COURT: Okay. Where are they a public defender? Here in LA?

PROSPECTIVE JUROR: No, in Massachusetts.

THE COURT: Thank you so much, Juror No. 33.

Juror No. 23, good afternoon.

PROSPECTIVE JUROR: My aunt is a bank lawyer.

THE COURT: When you say "bank lawyer," she represents banks or works at a bank?

PROSPECTIVE JUROR: She worked at Bank of America. She retired three years now.

THE COURT: Thank you so much. Juror No. 22?

PROSPECTIVE JUROR: Hi, I'm a paralegal in civil litigation.

THE COURT: What types of cases -- do you work for a law firm?

PROSPECTIVE JUROR: I work for the City of Los Angeles.

THE COURT: Okay. And what types of cases -- you are in their civil division?

PROSPECTIVE JUROR: Yes.

THE COURT: And what types of cases do you handle?

PROSPECTIVE JUROR: Police litigation.

THE COURT: And by police litigation, that is litigation against the city alleging police misconduct?

PROSPECTIVE JUROR: Yes.

THE COURT: And no doubt you have some -- you have your legal training and you also have some specialized training or experience in the particular areas that you work in.

Will you be able to set those aside and decide this case based solely on the evidence as you see it in the courtroom and the law as I explain it to you, even if it differs from the law as you understand it in your work?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you.

Juror No. 19. Good afternoon, way in the corner.

PROSPECTIVE JUROR: Hi.

THE WITNESS: I have two uncles that are attorneys, and two cousins that are attorneys. Two do corporate, one anti-trust, and the other one does international law.

During college, I interned at a law firm.

THE COURT: Do you remember what type of work you did when you were an intern or what type of cases did the firm handle?

PROSPECTIVE JUROR: Corporate.

THE COURT: It was corporate. Thank you so much. Juror No. 17?

PROSPECTIVE JUROR: I work with four probate and

estate planning attorneys pretty frequently.

A really good friend of mine is a personal injury attorney. He was a judge, but he now is an attorney.

My step-father was the presiding judge of San Bernardino County.

THE COURT: And so with respect to the friend that was a former judge and your step-father, I have already instructed you not to discuss this case with anyone.

Are you going to be tempted to say --

PROSPECTIVE JUROR: Not at all.

THE COURT: I don't even need to spell it out. Thank you.

Juror No. 16?

PROSPECTIVE JUROR: My brother is a retired tax attorney.

My nephew works with children getting the services they need, I'm not sure what type of lawyer that is.

And then my sister-in-law works in San Diego for businesses like a tort law, kind of, for businesses. And then the other is a divorce lawyer in LA.

THE COURT: Your sister-in-law that handles tort cases, do you know what type of -- is it personal injury, is it police misconduct, is it --

PROSPECTIVE JUROR: Corporations. I'm not sure, I don't know what --

THE COURT: Your nephew you said that helps to get kids services. Is that kids that have been abused and neglected by their parents or need special education?

PROSPECTIVE JUROR: Special education.

THE COURT: Thank you. Juror No. 13?

PROSPECTIVE JUROR: Yes, ma'am. My wife has two close friends that are court reporters in Ventura County.

THE COURT: Would they like to move here, we need more.

PROSPECTIVE JUROR: I will let them know.

THE COURT: We are hiring and they are hiring across the street too.

Do you speak with these people about their work?

PROSPECTIVE JUROR: Not often.

THE COURT: Okay. Will it be difficult for to you speak with them -- not speak with them about this case?

PROSPECTIVE JUROR: No, ma'am.

THE COURT: Thank you.

Juror No. 11?

PROSPECTIVE JUROR: Yes. Two of my best friends, they are lawyers. One is for personal injury and the other is a corporate lawyer.

THE COURT: Thank you.

And Juror No. 9?

PROSPECTIVE JUROR: My uncle was a DA in San Diego,

retired. And one of my best friends is a commissioner of the Court for the LA County, really close by, and through my work, just medical malpractice attorneys that I get to work with.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm a risk manager, professional liability.

THE COURT: You work for an insurance company?

PROSPECTIVE JUROR: No, I work for a U.C.I Health.

THE COURT: A health organization.

And your best friend that is the commissioner, do you know what assignment they have? What discipline, what type of cases they are handling?

PROSPECTIVE JUROR: Sure, it's medical malpractice.

THE COURT: Thank you. Juror No. 6?

PROSPECTIVE JUROR: I just have a close friend who -- close friend who is a DA in Orange County.

THE COURT: Do you speak with your friend about their cases?

PROSPECTIVE JUROR: No.

THE COURT: Okay. Juror No. 5?

PROSPECTIVE JUROR: I have a best friend who is a paralegal and then my aunt is actually a court reporter.

THE COURT: Where is she a court reporter?

PROSPECTIVE JUROR: She used to work for the LA court reporters but she got laid off. Now she's a contractor,

so she works remotely, but she comes down here every once in a while.

THE COURT: As I mentioned, we're hiring.

Your best friend, what type of work did you say she does or he does?

PROSPECTIVE JUROR: She primarily does family and divorce, and also family wills and trusts in Lake Havasu.

THE COURT: Okay. Thank you. Okay, I think I got everybody.

So this is a question for everybody who answered yes to that last question.

Anything about what you shared or your relationship with that person that is going to prevent you from being fair and impartial to both sides in this case?

I see no hands.

Sorry, that is Juror Number 50.

PROSPECTIVE JUROR: Correct.

THE COURT: Thank you.

Okay. Next question. For all jurors, do you have any feelings about the criminal justice system generally that would affect your ability to be a fair and impartial juror in this case?

Raise your hand if you have feelings about the criminal justice system generally that would affect your ability to be a fair and impartial juror in this case.

We have Juror No. 35, thank you, and Juror No. 48, and 57, and 58. Thank you.

Okay. Next question, for all jurors, for all jurors, some of the witnesses in this case may be law enforcement officers.

I have asked some version of this question before, but I still need everyone to answer it. Some of the witnesses in this case may be law enforcement officers. Are you more or less likely to believe the testimony of a law enforcement officer just because the witness is a law enforcement officer?

So raise your hand if you are more likely to believe and raise your hand if you are less likely to believe the testimony of a law enforcement officer, just because the witness is a law enforcement officer?

Raise your hand if the answer to that question is yes, you are either more likely, or less likely to believe the testimony of a law enforcement officer just because they are law enforcement officer.

Jurors 8, 9, 11, and we have 13, behind you is 19, 20, 21. Sorry, I missed 16, 25. Are you 32?

PROSPECTIVE JUROR: Yes.

THE COURT: 32, 33, 35. Thank you.

And over here we have 52, 57, and 58.

Okay. Raise your hand if you are more likely to believe the testimony of a law enforcement officer just because they

are a law enforcement officer. More likely, before I asked if it was more or less, just more.

Raise your hand if the answer is yes, you are more likely to believe the testimony of a law enforcement officer just because the witness is a law enforcement officer.

That is Juror No. 9, 13, 16, 19, 20, 25, and 32.

I missed somebody? 11. Thank you.

Okay. Raise your hand if you are less likely to believe the testimony of a law enforcement officer just because the witness is a law enforcement officer, less likely.

That is 8, 12, 21, 33, 35, and over here 52, and 58, and, sorry, 7. Thank you.

Okay. Jurors, next question for everyone.

The testimony in this case will involve events that occurred at recent protests of immigration enforcement in Los Angeles.

Have you read or seen any media coverage including social media about these protests?

I'm going to ask the question again. Testimony in this case will involve events that occurred at recent protests of immigration enforcement in Los Angeles.

Have you read or seen any media coverage including social media about these protests?

Raise your hand if the answer is yes.

Keep your hand up until I call your number.

Let's do it this way, raise your hand if you have not read or seen any media coverage including social media about these protests.

That is Juror No. 44.

For the rest of you who have read or seen media coverage, I have talked with you a little bit about what you are going to be required to do if you are selected as jurors in this case, and that is to decide the case based solely on the evidence you see and hear in the courtroom and the law as I describe it to you.

So, you are not to decide the case based upon anything you saw or read in the media, including social media.

Raise your hand if you will be unable to put aside what you have read or seen in the media, including social media in deciding this case.

Raise your hand if you will be unable to put it aside.

That is Jurors No. 9, 11, 12, 21, 23, 32, 33, 35, 30, 16. Now I see you are answering late. I'm not missing you, you are answering late, that is okay.

It's good to take time to think about your answers. So 38, and then we have 45, I believe. 50, is it 50? Thank you. 52, 57, and 58.

Thank you. I think I got everybody.

Next question. Have you or someone close to you ever attended a protest or demonstration? Have you or anyone close

to you ever attended a protest or demonstration, not necessarily related to immigration enforcement?

Raise your hand if you ever attended a protest or demonstration.

Keep your hand up until I call your number.

2, 3, 12, 13, 14, 17, 18, 19. Thank you, 20.

21, 23, 24, you are 26?

26, 30, 31, 33, 35, and 36.

Then on this side we have, 40, 42, 49, 50, was that 49?

PROSPECTIVE JUROR 48.

THE COURT: Oh, 48, and the row behind you that is 50, 51, and 52, correct, and 53?

PROSPECTIVE JUROR: 54.

THE COURT: Now, you are trying to confuse me, I see you.

So 57, 58, and 59. Okay, thank you.

So for those of you that have answered yes, that you have attended a protest or demonstration, is there anything about your experience having attended a protest or demonstration that will prevent you from being fair and impartial to both sides in this case and limiting your decision to the evidence in this case and the law as I give it to you?

Anything about your experience attending a protest or demonstration, that will prevent you from being fair and impartial to this case, to both sides in this case and deciding

this case based solely on the evidence -- sorry, just a moment.

Mr. Berry will come over there. Thank you.

THE COURT: Okay. Juror No. 54, you had a question?

PROSPECTIVE JUROR: The first time I heard.

THE COURT: Sorry, if you pass her the microphone.

PROSPECTIVE JUROR: Thank you. The first time I heard the question I heard if I had attended or anyone I knew had attended. And then I heard if I had attended.

THE COURT: That's true. You are correct.

PROSPECTIVE JUROR: Okay.

THE COURT: So the first question should have been have you or someone close to you ever attended a protest or demonstration?

So my apologies I asked the question two different ways.

Let me do it this way, since we do have a lot of jurors that answered yes to this question, I'm going to ask it in the reverse.

Raise your hand if the answered the following question no.

And the question is: Have you or someone close to you ever attended a protest or demonstration?

Raise your hand if the answer is no.

That is Juror No. 1, 5, 9, 10, 11, 15 -- sorry. The answer to the question is no?

PROSPECTIVE JUROR: Correct.

THE COURT: After 15, we have Juror No. 20. Does 19 have her hand up? No. Juror No. 20, you are her buddy. 23, and behind 23, what is your number?

PROSPECTIVE JUROR: 22.

THE COURT: 22, and then behind 23.

PROSPECTIVE JUROR: 29.

THE COURT: 29, and 25 and 32 and I'm sorry behind 23?

I have called 15. You can put your hand down, 15. Sorry, and then on this side we have 37, 38, 39, 43, 44, 45, and 56. Thank you.

Okay, those were the no's. Everyone else has a yes.

THE COURTROOM DEPUTY: Your Honor, I think we missed one, 46 and 41.

THE COURT: My apologies.

That was no. Everyone was no on that one so those of you that answered yes, that either you or someone close to you has attended a protest or demonstration, is there anything about that experience, you or the person close to you that will prevent you from being fair and impartial to both sides in this case, and beside this case, based only on the evidence in this courtroom and the law as I give it to you?

Raise your hand if your experience or the experience of the person close to you that has attended a protest or demonstration will prevent you from being fair and impartial to

both sides in this case and decide the case based solely on the evidence presented in this courtroom and the law as I give it to you.

Raise your hand if it will prevent you from doing so.

That is Juror No. 35.

Okay. The next question for all jurors: Have you witnessed personally any encountered between protestors and law enforcement?

Have you personally witnessed any encounters between protestors and law enforcement, raise your hand.

Juror No. 9, Juror No. 13.

Juror No. 35, Juror No. 48, Juror No. 49, and Juror No. 57.

THE COURTROOM DEPUTY: 58.

THE COURT: It was 58, and not 57. Correct, thank you.

Juror No. 9, what were the circumstances under which you witnessed an encounter between a protestor and law enforcement. Based upon your prior answer I think you have not attended a protest, so was this something you saw on TV?

PROSPECTIVE JUROR: No.

THE COURT: Passerby?

PROSPECTIVE JUROR: I was in Anaheim.

THE COURT: Were you a passerby?

PROSPECTIVE JUROR: Yes, I got caught up.

THE COURT: Thank you, and Juror No. 49. The incident in which you were witness to an encounter between protestors and law enforcement, you were also a passerby?

PROSPECTIVE JUROR: No, it was actually when I was much younger. It was something that I recollected when you asked the second question.

THE COURT: So you have attended a protest?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. Anything about that experience that is going to prevent you from being fair and impartial to both sides or prevent you from deciding this case based solely on the evidence presented and the law as I give it to you?

PROSPECTIVE JUROR: No.

THE COURT: Thank you so much.

And another question for all jurors.

Do you have any opinion -- do you have any opinion -- let's start with this: Do you have a positive opinion about law enforcement's response to immigration protests in Los Angeles.

Raise your hand if you have a positive opinion about law enforcements' response to immigration protests in Los Angeles.

I see no hands.

Do you have a negative opinion about -- I'm sorry. Who was that? It was 48. Anybody else that I missed.

PROSPECTIVE JUROR: Could you repeat that?

THE COURT: Yes. Do you have a positive opinion about law enforcement's response to immigration protests in Los Angeles. A positive opinion about how law enforcement has responded to immigration protests in Los Angeles.

So that was 25, 36, 19, your buddy didn't tell me, and 48.

Anybody else? No.

Okay. Now, the next question is: Do you have a negative opinion about how law enforcement has responded to immigration protests in Los Angeles?

That is juror number -- keep your hands up until I call your number.

Juror No. 3, 7, 8, 10, 12 -- 6 my apologies -- 13, 21, 23, 24, 29, 31, 33, 35. 30 also, okay. And then over here on this side we have 38, 43, 45, 46, 49, 50, 51, 52, 53, 54, 55, and 57, 58, is that 60? Okay. Thank you.

Okay. So all of the jurors that answered yes to the question of having a positive opinion about law enforcements' response to immigration protests in Los Angeles, those of you that have a positive opinion, will that positive opinion prevent from you being fair and impartial to both sides in this case in deciding the case based solely on the evidence presented in this courtroom and the law as I give it to you?

Raise your hand if your positive opinion will prevent you from being fair and impartial to both sides in this case

and deciding this case based solely on the evidence presented in this courtroom and the law as I give it to you.

Raise your hands.

I see no hands.

For those of you that answered that you have a negative opinion about law enforcements' response to immigration protests in Los Angeles, raise your hand if that negative opinion will prevent you from being fair and impartial to both sides in this case, in deciding this case based solely on the evidence presented in this courtroom and the law as I give it to you.

Raise your hands. Juror No. 33, and 35. Thank you.

Okay jurors, I'm going to ask the microphone to be passed to Juror No. 1.

We have some questions for all of you. I will read them out in full for Juror No 1. After that you might sort of remember the questions. Give me just a moment to get myself organized.

Okay. Juror No. 1. What is your occupation?

PROSPECTIVE JUROR: Environmental health and safety manager.

THE COURT: What type of organization do you work for?

PROSPECTIVE JUROR: Private.

THE COURT: Do you have a significant other such as

a spouse, domestic partner or life partner?

PROSPECTIVE JUROR: I do.

THE COURT: What's that person's occupation?

PROSPECTIVE JUROR: Pilates instructor.

THE COURT: Do you have any children?

PROSPECTIVE JUROR: I do.

THE COURT: How old are your children?

PROSPECTIVE JUROR: 30-year-old nurse and 21-year-old esthetician.

THE COURT: You beat me to the punch. I was going to ask you what their occupations are.

Have you ever served on a jury before, not just been to jury duty, but served on a jury before?

PROSPECTIVE JUROR: I have in City of Murrietta.

THE COURT: How long ago was that or what year was it?

PROSPECTIVE JUROR: 15 years ago.

THE COURT: And do you remember if it was a civil case or criminal case?

PROSPECTIVE JUROR: It was a smash and grab. I'm not sure if that is civil or criminal.

THE COURT: Was there anybody that was accused of committing a crime, was that your understanding?

PROSPECTIVE JUROR: Correct.

THE COURT: And did the jury reach a verdict --

first of all, were you the jury foreperson?

PROSPECTIVE JUROR: No.

THE COURT: Okay. Without telling me what the verdict was, did the jury reach a verdict?

PROSPECTIVE JUROR: Yes.

THE COURT: Anything about your experience as a juror that left you disappointed or dissatisfied with the court or justice system?

PROSPECTIVE JUROR: None at all.

THE COURT: Anything about your jury service that would affect you to be a fair and impartial juror in this case?

PROSPECTIVE JUROR: No.

THE COURT: Juror No. 2.

PROSPECTIVE JUROR: Hello.

THE COURT: What's your occupation?

PROSPECTIVE JUROR: I'm a public school teacher in Las Virgenes Unified.

THE COURT: Do you have a significant other?

PROSPECTIVE JUROR: Yes.

THE COURT: What is that person's occupation?

PROSPECTIVE JUROR: Software engineer.

THE COURT: Do you have any children?

PROSPECTIVE JUROR: We have had four foster children, two adopted.

THE COURT: And so four children total?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you. Are any of them adults?

PROSPECTIVE JUROR: Yes, my two adopted are 21 and 18. They are both currently students.

THE COURT: What are they studying? They are figuring it out.

PROSPECTIVE JUROR: Yeah, my older son is probably going to join a radiology program.

My younger one started at a trade school learning how to make guitars.

THE COURT: The younger two, how old are they?

PROSPECTIVE JUROR: They are no longer with us.

THE COURT: Have you served on a jury before?

PROSPECTIVE JUROR: Twice.

THE COURT: And the most recent one was when?

PROSPECTIVE JUROR: Before COVID. Like, six years ago.

THE COURT: And with that case was that a civil case or criminal case?

PROSPECTIVE JUROR: They were both drug related, whatever that is.

THE COURT: Okay. And were you the foreperson in either one?

PROSPECTIVE JUROR: No.

THE COURT: And did the jury reach a verdict in

either case?

PROSPECTIVE JUROR: In one of them, yes, and one of them, no.

THE COURT: Okay. Anything about your experience that left you disappointed or dissatisfied with the jury system?

PROSPECTIVE JUROR: No.

THE COURT: Or the court system or justice system?

PROSPECTIVE JUROR: No.

THE COURT: Anything that would affect you to be fair and impartial in this case?

PROSPECTIVE JUROR: No.

THE COURT: Thank you. Juror No. 3?

PROSPECTIVE JUROR: I'm the Director of Public Safety for the City of Malibu.

THE COURT: What do you do as the Director of Public Safety?

PROSPECTIVE JUROR: It feels like everything. Everything from emergency management, homelessness, parking enforcement, sheriff's contract, fire, you name it. They throw it at me.

THE COURT: Do you oversee law enforcement or do you work with them?

PROSPECTIVE JUROR: I manage the contracts with that, and CHP as well, and then sometimes directing what they

do in the city.

THE COURT: When you say manage contracts, because Malibu doesn't have its own police department, you contract with other police departments?

PROSPECTIVE JUROR: We contract with the Sheriff's Department.

THE COURT: I got it. In what county?

PROSPECTIVE JUROR: LA County.

THE COURT: Okay. And I may have asked you some form of this question before, but I have indicated that if you are selected as a juror, we need you to decide this case based solely on the evidence presented in this courtroom and the law as I provide it to you.

I would guess that as a part of your work, you have a lot of contact with law enforcement and awareness of many different incidents that happened in your city and perhaps some training as well.

Will you be able to set that aside and just decide this case, based on the evidence that is presented in this courtroom and the law as I explain it to you?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. Do you have a significant other?

PROSPECTIVE JUROR: Yes. He is a retired city planner.

THE COURT: Thank you. Also for Malibu?

PROSPECTIVE JUROR: No, Los Angeles.

THE COURT: Do you have any children?

PROSPECTIVE JUROR: Three children, 32 who is a physicist working in the tech industry, 30 year-old who is in grad school for biology. And my youngest is 26 and he works at Best Buy.

THE COURT: Have you ever served on a jury before?

PROSPECTIVE JUROR: No.

THE COURT: Thank you. Juror No. 4?

PROSPECTIVE JUROR: Hello.

THE COURT: Hi, what is your occupation?

PROSPECTIVE JUROR: I am a cashier.

THE COURT: Do you have a significant other?

PROSPECTIVE JUROR: Yes, I do.

THE COURT: What's that person's occupation?

PROSPECTIVE JUROR: He is a paint manager in the company, ECT.

THE COURT: Paint or Pain?

PROSPECTIVE JUROR: Paint.

THE COURT: So a paint manager. Like paint on the walls?

He paints like parts, like, army parts, Panasonic parts, different kind of parts.

THE COURT: Thank you so much. Do you have any children?

PROSPECTIVE JUROR: Yes, one.

THE COURT: How old is your child?

PROSPECTIVE JUROR: She's three.

THE COURT: I'm not going to ask you her occupation. I'm not going to make this joke again, but her main job is very cute.

Okay, have you served on a jury before?

PROSPECTIVE JUROR: No, I haven't.

THE COURT: Thank you. Juror No. 5?

What is your occupation?

PROSPECTIVE JUROR: I'm a radiology assistant and scheduler.

THE COURT: Do you have a significant other?

PROSPECTIVE JUROR: I do. He is a chef.

THE COURT: Any children?

PROSPECTIVE JUROR: A fur baby. Besides that, no.

THE COURT: A human child, do you have a human child?

PROSPECTIVE JUROR: No.

THE COURT: Have you served on a jury before?

PROSPECTIVE JUROR: Yes.

THE COURT: How many times?

PROSPECTIVE JUROR: Once.

THE COURT: How long ago was that or when was it?

PROSPECTIVE JUROR: 2019.

THE COURT: Do you remember if it was a civil case or a criminal case?

PROSPECTIVE JUROR: I believe it was a criminal case. It was literally right across the street.

THE COURT: The big building?

PROSPECTIVE JUROR: Yes.

THE COURT: Were you the foreperson?

PROSPECTIVE JUROR: I don't know what that means.

THE COURT: There was one juror who was responsible for speaking for all of you in court.

PROSPECTIVE JUROR: No.

THE COURT: And did the jury reach a verdict?

PROSPECTIVE JUROR: No.

THE COURT: Thank you. Anything about your experience that left you disappointed or dissatisfied with the court or justice system?

PROSPECTIVE JUROR: No.

THE COURT: Anything that would prevent from you being fair and impartial to both sides in this case?

PROSPECTIVE JUROR: No.

THE COURT: Thank you, Juror No. 6?

PROSPECTIVE JUROR: I'm, a pastor and missionary, and my husband is also the same.

THE COURT: Okay. Do you have any children?

PROSPECTIVE JUROR: No, we don't.

THE COURT: Have you ever served on a jury before?

PROSPECTIVE JUROR: No, I haven't.

THE COURT: Thank you, Juror No. 6.

Juror Number 7, what is your occupation?

PROSPECTIVE JUROR: I'm a mail carrier for the Post Office.

THE COURT: And do you have a significant other?

PROSPECTIVE JUROR: I do. She's a nurse.

THE COURT: Do you have any children?

PROSPECTIVE JUROR: One.

THE COURT: How old?

PROSPECTIVE JUROR: He's 30-years-old.

THE COURT: What does he do for work?

PROSPECTIVE JUROR: He just goes to school.

THE COURT: What is he studying?

PROSPECTIVE JUROR: Physical therapy.

THE COURT: Have you served on a jury before?

PROSPECTIVE JUROR: First time.

THE COURT: Okay. You are pretty excited, aren't you? I can tell.

PROSPECTIVE JUROR: Yeah.

THE COURT: Juror No. 8, good afternoon.

PROSPECTIVE JUROR: Good afternoon.

THE COURT: What is your occupation?

PROSPECTIVE JUROR: I'm a caregiver.

THE COURT: For an adult or children?

PROSPECTIVE JUROR: Two blind adults.

THE COURT: And do you have a significant other?

PROSPECTIVE JUROR: No.

THE COURT: Do you have any children?

PROSPECTIVE JUROR: No.

THE COURT: Have you served on a jury before?

PROSPECTIVE JUROR: No.

THE COURT: Thank you.

Juror No. 9, good afternoon.

PROSPECTIVE JUROR: Good afternoon. I am a healthcare risk analyst professional.

THE COURT: Thank you. And your significant other?

PROSPECTIVE JUROR: Retired from the Navy, and now a building engineer.

THE COURT: Okay.

PROSPECTIVE JUROR: We have two children, a 23-year-old student and a 17-year-old student.

THE COURT: What is the 23-year-old studying?

PROSPECTIVE JUROR: Marketing at U of A.

THE COURT: The 17-year-old is in high school?

PROSPECTIVE JUROR: Yes, senior.

THE COURT: Exciting year. Thank you. Have you served on a jury before?

PROSPECTIVE JUROR: I have, yes.

THE COURT: How many times?

PROSPECTIVE JUROR: Once.

THE COURT: How long ago or when was it?

PROSPECTIVE JUROR: It was in 2012. It was a criminal case, I believe.

THE COURT: Were you the foreperson?

PROSPECTIVE JUROR: No. I was an alternate juror No. 2. I didn't get to participate in that process.

THE COURT: Do you know, even though you were an alternate, do you know whether the jury reached a verdict?

PROSPECTIVE JUROR: They did, but I was not able to get any information.

THE COURT: They did or did not?

PROSPECTIVE JUROR: They did.

THE COURT: Thank you. And anything about that experience that left you disappointed or dissatisfied with the court or justice system?

PROSPECTIVE JUROR: No.

THE COURT: Anything about that experience that would prevent you from being fair and impartial in this case?

PROSPECTIVE JUROR: No.

THE COURT: Thank you so much.

Juror No. 10, good afternoon.

PROSPECTIVE JUROR: Hello.

THE COURT: What is your occupation?

PROSPECTIVE JUROR: Dental assistant.

THE COURT: Do you have significant other?

PROSPECTIVE JUROR: Yes.

THE COURT: What does that person do?

PROSPECTIVE JUROR: She's a wonderful homemaker.

THE COURT: Do you have any children?

PROSPECTIVE JUROR: Two kids, 19 and 21.

THE COURT: Is the 19 year-old in high school?

PROSPECTIVE JUROR: Junior college.

THE COURT: What are they studying?

PROSPECTIVE JUROR: He's going for dental hygiene.

THE COURT: Following in your footsteps.

The 21 year-old?

PROSPECTIVE JUROR: He's also in school. He's going for business.

THE COURT: Thank you.

Have you served on a jury before?

PROSPECTIVE JUROR: I have not.

THE COURT: Thank you. Thank you, Juror No. 10.

Juror Number 11, what is your occupation?

PROSPECTIVE JUROR: I'm a supervisor, working in information technology.

THE COURT: Sorry, you said a supervisor?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you. Do you have a significant

other?

PROSPECTIVE JUROR: Yes.

THE COURT: What is that person's occupation?

PROSPECTIVE JUROR: He's an acupuncturist.

THE COURT: Do you have any children?

PROSPECTIVE JUROR: I have two.

THE COURT: How old are they?

PROSPECTIVE JUROR: 16 and 20, both students.

THE COURT: Is the 20-year-old in college?

PROSPECTIVE JUROR: Yes.

THE COURT: What are they studying in college?

PROSPECTIVE JUROR: I think computer or biology.

THE COURT: Computer and biology?

PROSPECTIVE JUROR: Yes.

THE COURT: Have you ever served on a jury before?

PROSPECTIVE JUROR: No.

THE COURT: Thank you, Juror No. 12. Good afternoon.

PROSPECTIVE JUROR: Hi, talent manager in an entertainment company.

THE COURT: What does a talent manager do?

PROSPECTIVE JUROR: I represent actors.

THE COURT: Do you have a significant other?

PROSPECTIVE JUROR: Yes, he's animator director and writer.

THE COURT: Any children?

PROSPECTIVE JUROR: No children.

THE COURT: Have you ever served on a jury before?

PROSPECTIVE JUROR: No.

THE COURT: Thank you.

Okay. We will turn to Juror No. 13. I'm going to stand for a bit, I have been sitting for a while.

Juror 13, what is your occupation?

PROSPECTIVE JUROR: Key account manager for Anheuser Bush.

THE COURT: What account manager?

PROSPECTIVE JUROR: Key account manager.

THE COURT: Key account manager, as in important?

PROSPECTIVE JUROR: That's right.

THE COURT: Do you have a significant other?

PROSPECTIVE JUROR: She's a teacher. Kids are 9 and 5.

THE COURT: Okay. And have you served on a jury before?

PROSPECTIVE JUROR: No, ma'am.

THE COURT: Thank you. Juror No. 14?

PROSPECTIVE JUROR: Executive assistant for the City of Ventura County.

I'm divorced. I have two children. One is 47, and one is 43.

The 47 year-old is a manager at -- something like a construction company, and the 43 is disabled.

And this is the second time I have ever been in a courtroom, but I have never served.

THE COURT: Thank you.

And I think you mentioned earlier that one of your children is currently facing a criminal charge?

That is the 47-year-old?

PROSPECTIVE JUROR: No, 43.

THE COURT: That's the 43-year-old. Understood. Thank you.

Juror No. 14, thank you. Juror No. 15?

PROSPECTIVE JUROR: Hello, I was recently laid off as part of the big entertainment layoff.

I was formally a manager in mastering and localization.

THE COURT: What is mastering and localization?

PROSPECTIVE JUROR: So I oversaw the ordering of subtitles and dubs and bringing in, you know, all of the content for digital distribution.

THE COURT: Okay. Thank you. Do you have a significant other?

PROSPECTIVE JUROR: Yes, I do. He manages an Italian restaurant and we have two children, 20-year-old, who is a bio-molecular and informatics engineer major and a 17-year-old high school student.

I have never served on jury duty.

THE COURT: Thank you so much.

Juror No. 16, good afternoon to you.

PROSPECTIVE JUROR: I'm a retired RN, and my husband is a retired civil engineer at Caltrans.

I have two daughters. One is 30, she works for Caltrans in the business department, and my older daughter is a biology scientist, I guess that is her title, up in Canada.

What else do you need to know?

THE COURT: How old is the older daughter?

PROSPECTIVE JUROR: She's 33.

THE COURT: So 33, thank you. Have you served on a jury before?

PROSPECTIVE JUROR: Yes.

THE COURT: How many times?

PROSPECTIVE JUROR: Once.

THE COURT: Okay. When was it?

PROSPECTIVE JUROR: I'm saying, like, five years ago maybe.

THE COURT: And do you remember if it was a criminal case or civil case?

PROSPECTIVE JUROR: It was criminal.

THE COURT: And were you the foreperson?

PROSPECTIVE JUROR: No.

THE COURT: And did the jury reach a verdict?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. Anything about your experience that left you disappointed or dissatisfied with the court or justice system?

PROSPECTIVE JUROR: No.

THE COURT: Anything that would prevent you from being fair and impartial in this case?

PROSPECTIVE JUROR: No.

THE COURT: Thank you. Juror Number 17.

PROSPECTIVE JUROR: Your Honor, I'm in real estate sales.

I have a 25-year-old -- I don't have a significant other -- I have a 25-year-old, 24-year-old and a 21-year-old. Never served.

THE COURT: And, thank you. Your 25-year-old, who do they work for work?

PROSPECTIVE JUROR: UPS. Delivery driver. He works in the warehouse moving stuff around.

THE COURT: The 24-year-old?

PROSPECTIVE JUROR: She's in retail and going to school.

THE COURT: What's she studying?

PROSPECTIVE JUROR: Studying micro-biology.

THE COURT: What about the 21-year-old?

PROSPECTIVE JUROR: He doesn't know what he's doing.

THE COURT: Thank you. But he's not a student, I gather?

PROSPECTIVE JUROR: No, ma'am.

THE COURT: Juror No. 18, good afternoon.

PROSPECTIVE JUROR: Good afternoon.

THE COURT: What is your occupation?

PROSPECTIVE JUROR: I'm a ICU nurse.

THE COURT: Thank you. And do you have a significant other?

PROSPECTIVE JUROR: Yes, my husband.

THE COURT: What is his occupation?

PROSPECTIVE JUROR: We have an insurance agency. He's the owner.

THE COURT: Do you have children?

PROSPECTIVE JUROR: Yes, I do.

THE COURT: How old are they?

PROSPECTIVE JUROR: My daughter, she's 13, my son, he's 12.

THE COURT: So you knew what I meant when I was talking about the teenagers earlier.

You are getting into that age.

Have you served on a jury before?

PROSPECTIVE JUROR: No.

THE COURT: Thank you so much, Juror 18.

Juror No. 19?

PROSPECTIVE JUROR: Hi.

THE COURT: What's your occupation?

PROSPECTIVE JUROR: I am an excess casualty underwriter for an insurance company.

THE COURT: Thank you.

PROSPECTIVE JUROR: My husband is a financial planner. We have three kids. Three daughters, 9, 10 and 13, and I have never served on a jury before.

THE COURT: Thank you.

Juror No. 20?

PROSPECTIVE JUROR: Well, good afternoon, everybody.

THE COURT: Good afternoon.

PROSPECTIVE JUROR: I am LAUSD kinder teacher. My husband is a LAPD detention officer.

We have a child. It's a girl, and she is 14.

I have never served.

THE COURT: Thank you.

Juror No. 21?

PROSPECTIVE JUROR: I'm a sales coordinator for a window coverings company.

THE COURT: Window coverings?

PROSPECTIVE JUROR: Correct.

THE COURT: Do you have a significant other?

PROSPECTIVE JUROR: Not any more, but we do have a nine-month old.

THE COURT: Your former significant other, what was that person's or what is that person's occupation?

PROSPECTIVE JUROR: He's an automobile technician.

THE COURT: And besides the nine-month old, do you have any other children?

PROSPECTIVE JUROR: No.

THE COURT: Have you ever served on a jury before?

PROSPECTIVE JUROR: No.

THE COURT: Thank you.

Juror No. 22. Good afternoon, again.

PROSPECTIVE JUROR: Good afternoon, Your Honor. I'm a paralegal and my significant other works in retail.

I have no kids, and I have never served on a jury.

THE COURT: Thank you. I think I had asked you before, but, remind me, what type of organization do you work for?

PROSPECTIVE JUROR: City of Los Angeles.

THE COURT: Juror No. 23?

PROSPECTIVE JUROR: I'm a registered nurse. My significant other works for a payroll company, account manager. We have a 16-year-old and I have never served on a jury.

THE COURT: Thank you so much, Juror No. 23. Juror No. 24?

PROSPECTIVE JUROR: I'm a waiter, no kids, no significant other. I never served before.

THE COURT: Thank you, Juror No. 24.

Juror No. 25?

PROSPECTIVE JUROR: Hi, I'm a hospice registered nurse. My husband works for the studios, he's a scenic painter.

THE COURT: He's a scenic painter? What does that mean? They paint, like, the set?

PROSPECTIVE JUROR: Exactly. If they are shooting, he will have to clear something up, if they shot differently, et, cetera.

I have not served before, I have no children.

THE COURT: Thank you so much, Juror No. 25.

Juror No. 26?

PROSPECTIVE JUROR: I'm an accountant. My husband is a admin analyst for LACCD. I have two children 17 and 15. I served about 20 years ago.

THE COURT: And remind me, your significant other's occupation is what?

PROSPECTIVE JUROR: Admin analyst for Los Angeles Community College District.

THE COURT: Thank you. And you only served as a juror one time?

PROSPECTIVE JUROR: Yes.

THE COURT: And how long ago -- you said that was 20 years ago. Was it a civil case or a criminal case?

PROSPECTIVE JUROR: Criminal.

THE COURT: Criminal, and were you the foreperson?

PROSPECTIVE JUROR: No.

THE COURT: Did the jury reach a verdict?

PROSPECTIVE JUROR: Yes.

THE COURT: Anything about your experience that left you disappointed or dissatisfied with the jury system?

PROSPECTIVE JUROR: No.

THE COURT: Anything that would prevent you from being fair and impartial to both sides in this case?

PROSPECTIVE JUROR: No.

THE COURT: Thank you so much.

Juror No. 27, good afternoon.

PROSPECTIVE JUROR: Hello.

THE COURT: Hello. Good to talk to you.

What is your occupation?

PROSPECTIVE JUROR: I'm retired.

THE COURT: What did you do before you were retired?

PROSPECTIVE JUROR: Worked with the phone company for 42 years.

THE COURT: What did you with the phone company?

PROSPECTIVE JUROR: I was always outside, technician.

THE COURT: You worked on the phone lines outside?

PROSPECTIVE JUROR: Yes.

THE COURT: And do you have a significant other?

PROSPECTIVE JUROR: Yes. She's -- we have two Seven/11 stores, she's busy with that.

THE COURT: Any children?

PROSPECTIVE JUROR: We have got two children.

THE COURT: How old are they?

PROSPECTIVE JUROR: Daughter is 56 and my son is 50.

THE COURT: And your daughter that is 56, what is her occupation?

PROSPECTIVE JUROR: She's a dentist.

THE COURT: And your son?

PROSPECTIVE JUROR: My son is Down Syndrome.

THE COURT: Thank you. Have you served on a jury before?

PROSPECTIVE JUROR: No.

THE COURT: Juror No. 28, good afternoon.

PROSPECTIVE JUROR: Good afternoon. I'm a evidence custodian for LA County Medical Examiner.

My husband is a cement mason. I have a 28-year-old, a 26-year-old and a 14-year-old.

I have never been a juror. I get subpoenaed for chain of custody all of the time.

THE COURT: Okay. What does the 28-year-old do?

PROSPECTIVE JUROR: He works in Chicago for a company. I'm not sure, he just started.

THE COURT: Okay. Do you know what type of work he did before this, even to know like what area we're talking about?

PROSPECTIVE JUROR: He was doing construction before he started this new company.

THE COURT: And the 26-year-old.

PROSPECTIVE JUROR: He works for, like, big events like Netflix the Grammy's. They set up the events.

THE COURT: They do what?

PROSPECTIVE JUROR: They do the setup.

THE COURT: Set up. Thank you so much.

Juror No. 29. Good afternoon.

PROSPECTIVE JUROR: Good afternoon, Your Honor. My occupation, I'm a real estate asset manager for a national bank trust and estate company, and overall wealth management firm.

I have a significant other. She is currently a stay at home mom. We have two children.

My daughter is four-years-old, my son is 11 months.

I have not served on a jury before.

THE COURT: Okay. Thank you.

Juror No. 30, good afternoon.

PROSPECTIVE JUROR: Good afternoon. My name is --

THE COURT: You don't need to tell me your name, we have your name, but we do need your occupation.

PROSPECTIVE JUROR: School secretary for Bueno Park

School District. I have three adult children, a 30-year-old, a 26 and a 23.

THE COURT: Thank you. Do you have a significant other?

PROSPECTIVE JUROR: Yes.

THE COURT: And what is that person's occupation?

PROSPECTIVE JUROR: Project manager.

THE COURT: For what type of a company or organization?

PROSPECTIVE JUROR: For Pacific Hydration Corporation.

THE COURT: What type of work does that company do?

PROSPECTIVE JUROR: They do the water tanks.

THE COURT: Okay. Your 30-year-old child, what is their occupation?

PROSPECTIVE JUROR: She works with her dad as a safety coordinator for the company.

THE COURT: Okay. And the 26-year-old?

PROSPECTIVE JUROR: UPS.

THE COURT: Delivery driver?

PROSPECTIVE JUROR: Warehouse.

THE COURT: Then the 23-year-old?

PROSPECTIVE JUROR: She's going to school to become a teacher. She's an instruction aid for special education.

THE COURT: Thank you so much. Have you served on a

jury before?

PROSPECTIVE JUROR: No.

THE COURT: Juror No. 31, one of our students.

Do you have an occupation outside of being a student?

PROSPECTIVE JUROR: Yes.

THE COURT: What is that?

PROSPECTIVE JUROR: I'm a retail lead at Universal Studios Theme Park.

THE COURT: What are you studying in school?

PROSPECTIVE JUROR: I'm getting my second degree in business. The first was in musical theater.

THE COURT: Do you have a significant other?

PROSPECTIVE JUROR: No significant other, no jury. This is my first jury summons.

THE COURT: Exciting, thank you.

Juror No. 32?

PROSPECTIVE JUROR: I'm a member service rep. My wife is an RN. We have two children, 22, and 24. This is my first time serving.

THE COURT: What does a member service rep do?

PROSPECTIVE JUROR: Healthcare.

THE COURT: So you -- you assist people that are members of the healthcare plan when they have questions?

PROSPECTIVE JUROR: Correct.

THE COURT: Your 22-year-old child, what do they do

for work?

PROSPECTIVE JUROR: She works in finance for the City of Seal Beach.

THE COURT: And the 24-year old?

PROSPECTIVE JUROR: That's the 24-year-old.

THE COURT: The 22-year-old?

PROSPECTIVE JUROR: Student.

THE COURT: What are they studying?

PROSPECTIVE JUROR: Business.

THE COURT: Thank you so much. Juror No. 33, good afternoon.

PROSPECTIVE JUROR: I'm a software designer and my partner is a producer for entertainment marketing. I do not have any kids and I have not served on a jury.

THE COURT: Thank you.

Juror No. 34 is gone. 35 -- she's okay. But she's not here any more. 35?

PROSPECTIVE JUROR: Basically I'm a secretary for my husband's company, electrical contractor company.

THE COURT: Thank you.

PROSPECTIVE JUROR: I don't have any kids and I never served on a jury before.

THE COURT: Thank you. Your husband's occupation is he is an electrical contractor?

PROSPECTIVE JUROR: Yeah, it's his company.

THE COURT: Thank you. Juror No. 36?

PROSPECTIVE JUROR: Good afternoon, Your Honor.

THE COURT: Good afternoon, another one of our students.

PROSPECTIVE JUROR: Student, at Cal State Dominguez Hills. I'm studying -- majoring in business administration. My job is, I'm a security guard, my significant other --

THE COURT: Your job is what?

PROSPECTIVE JUROR: Professional security guard.

THE COURT: Thank you.

PROSPECTIVE JUROR: My significant other works for UCLA as an accounting clerk.

No kids, and I was summoned but was excused.

THE COURT: Okay. Now, Juror No. 36 as you heard, this case involves an allegation of an assault on a federal officer.

I'm assuming that in your work as a security guard you have gotten some training about how to deal with different situations?

PROSPECTIVE JUROR: Yes.

THE COURT: So my question to you is: Are you going to be able to set that aside and decide this case based solely on the evidence that is presented here and the law as I explain it to you, as opposed to what you learned in your training?

PROSPECTIVE JUROR: Well, precisely, that is

basically my job to go on the evidence.

THE COURT: Thank you, I appreciate that, 36?

Now we're on the right side. We're getting there jurors.

So Juror 37, good afternoon.

PROSPECTIVE JUROR: Good afternoon, Your Honor. I'm a pastor, and my wife is a stay-at-home mom. We have four children.

Our oldest is 19. She's a student studying English, then I have a 17 year-old, 15-year-old and a little 9-year-old.

THE COURT: Thank you.

PROSPECTIVE JUROR: I have not served in jury duty before.

THE COURT: I sense the excitement and the anticipation, though.

PROSPECTIVE JUROR: I'm excited.

THE COURT: Okay. Juror No. 38?

PROSPECTIVE JUROR: Hi, good afternoon. I'm a senior budget analyst for a higher education institution here in Los Angeles.

I'm married with a husband I have known for 60 years or so. Have no children.

THE COURT: And have you served on a jury?

PROSPECTIVE JUROR: I have. About 20 years ago. Very interesting experience. It was wonderful experience,

actually.

THE COURT: Excellent. We love those.

PROSPECTIVE JUROR: I'm very technical.

THE COURT: Do you remember if it was civil case or criminal?

PROSPECTIVE JUROR: Criminal.

THE COURT: Were you the foreperson?

PROSPECTIVE JUROR: No, I was not.

THE COURT: Did the jury reach a verdict?

PROSPECTIVE JUROR: Yes, it did.

THE COURT: Anything about the experience that left you -- well, it sounds like you have answered this. Anything that left you disappointed or dissatisfied with the court or the justice system?

PROSPECTIVE JUROR: No.

THE COURT: Anything that would prevent you from being unfair to both sides here?

PROSPECTIVE JUROR: No.

THE COURT: What does your husband do for work?

PROSPECTIVE JUROR: He is newly retired by two months.

THE COURT: Congratulations. What did he do before retirement?

PROSPECTIVE JUROR: He was a financial advisor.

THE COURT: Thank you, Juror No. 38. Juror No. 39,

good afternoon, good to talk to you.

PROSPECTIVE JUROR: Good afternoon. I develop antibody drugs to treat cancer and inflammatory diseases. My husband is a software engineer.

We have no children.

I have served on a jury about two years ago, actually, just at Stanley Mosk.

THE COURT: Okay. So was it a civil case?

PROSPECTIVE JUROR: Civil, yes.

THE COURT: And were you the foreperson?

PROSPECTIVE JUROR: No.

THE COURT: Did the jury reach a verdict?

PROSPECTIVE JUROR: Yes.

THE COURT: A question I have for, because I think you are the first juror that served on a jury in a civil case, you may recall, because it wasn't that long ago, that the standard of proof in a civil case is a preponderance of the evidence.

So all the plaintiff, the person that was suing had to prove, was that their version of the events was more likely than not.

And, in this case, in this criminal case, the prosecution has to prove their version and the various elements of the crime by beyond a reasonable doubt which is a much higher standard than the standard in a civil case.

Do you understand that distinction?

PROSPECTIVE JUROR: Yes.

THE COURT: Do you think you will have any difficulty applying this higher standard in this case?

PROSPECTIVE JUROR: No.

THE COURT: Okay. Thank you so much.

Anything about your experience that left you disappointed or dissatisfied with the justice system?

PROSPECTIVE JUROR: I wish it was more accessible to people.

Like I tell everybody about how good of a time I had at jury duty, and they all think I'm crazy. That's about it.

THE COURT: Thank you. Another one of my ambassadors for jury service.

Anything about your experience that would prevent from you being fair and impartial to both sides in this case?

PROSPECTIVE JUROR: No.

THE COURT: The case you were a juror on, generally what was it about?

PROSPECTIVE JUROR: It was about police on police hazing.

THE COURT: Thank you. Thank you, Juror No. 39. Juror No. 40, good afternoon.

PROSPECTIVE JUROR: Good afternoon, Your Honor.

THE COURT: What's your occupation?

PROSPECTIVE JUROR: I'm a creative producer to a marketing agency. I don't remember the other questions.

THE COURT: That's all right. What does a creative producer do?

PROSPECTIVE JUROR: Managing budgets, organizing film shoots, and delivering social media material to clients.

THE COURT: Thank you. Do you have a significant other?

PROSPECTIVE JUROR: I do not.

THE COURT: Do you have any children?

PROSPECTIVE JUROR: No.

THE COURT: Have you served on a jury before?

PROSPECTIVE JUROR: First time.

THE COURT: Thank you.

Juror No. 41?

PROSPECTIVE JUROR: Hello, I am a pharmacy technician. And then my wife is a stay-at-home mom and we have a seven-year-old kid and then I served in the jury once, 2017. I'm not sure if it's criminal or civil.

THE COURT: Okay. And were you the foreperson?

PROSPECTIVE JUROR: No.

THE COURT: Did the jury reach a verdict?

PROSPECTIVE JUROR: Yes.

THE COURT: And anything about your experience that left you disappointed or dissatisfied with the jury system or

the court, or the justice system, in general?

PROSPECTIVE JUROR: I'm not really dissatisfied. It's just that the pressure on the inside where it's either you stay a lot more days, so I believe sometimes juries, they get a pressure something, either we set a verdict or we have to be, like, stay longer here or something like that.

It's that jury is, like, conflict.

THE COURT: There was a lot of conflict in that jury. Different people had different views?

PROSPECTIVE JUROR: Yes.

THE COURT: Anything about that experience that would prevent you from being fair and impartial to both sides in this case?

PROSPECTIVE JUROR: No.

THE COURT: Okay. And this is something we will talk about at the end of the case.

If you end up serving as a juror, but we might as well talk about it now. At the end of the case, I'm going to give you some instructions, and I'm going to tell the jurors you are to reach a unanimous verdict, but only if you can do so based upon your own assessment of the evidence and based upon your own assessment of the evidence after hearing the law from me and talking with your other jurors.

Given your prior experience, do you think you are going to have difficulty doing that or you will feel pressured to do

what the other jurors are doing?

PROSPECTIVE JUROR: No.

THE COURT: Thank you. Thank you so much, Juror No. 41.

Juror No. 42?

PROSPECTIVE JUROR: I'm a costumer for film and TV and my husband is a librarian for LA County.

We have an eight-year old and 18-month old and I have never been on a jury.

THE COURT: What does a costumer do?

PROSPECTIVE JUROR: We dress everybody, everybody you see on TV, we dress them.

THE COURT: Thank you. Thank you, Juror No. 42. I appreciate it.

Juror No. 43, pass the microphone back. I appreciate it.

PROSPECTIVE JUROR: Me and my wife are happily retired.

THE COURT: You said happily retired. That's the best kind of retired.

What did you do before you were retired?

PROSPECTIVE JUROR: Project manager and my wife was a teacher.

THE COURT: Project manager in what type of organization?

PROSPECTIVE JUROR: Construction management.

THE COURT: Do you have any children?

PROSPECTIVE JUROR: Two children. My son is 38, my daughter is 34.

THE COURT: What does your son do?

PROSPECTIVE JUROR: My son is a Major in the U.S. Marines.

My daughter works in the VA Hospital.

THE COURT: She works in the hospital?

PROSPECTIVE JUROR: She's the Medical Director.

THE COURT: Thank you. Does that mean she's also a doctor?

PROSPECTIVE JUROR: No, administration.

THE COURT: And then your son that is a Major in the U.S. Marines, what is his occupation in the Marines? Do you know what type of work he does?

PROSPECTIVE JUROR: He was a logistician. Serving in Afghanistan for 18 months.

THE COURT: Have you served on a jury before?

PROSPECTIVE JUROR: No, jury selection. Close to serving it.

THE COURT: This may be your lucky day.

Juror No. 43, thank you.

Juror No. 44, what is your occupation?

PROSPECTIVE JUROR: I'm a 7th and 8th grade teacher

for junior high and my husband is the operations supervisor for the Waste Water of Lompoc.

THE COURT: You said Lompoc?

PROSPECTIVE JUROR: Lompoc.

THE COURT: Thank you.

PROSPECTIVE JUROR: We have no children.

THE COURT: Have you served on a jury before?

PROSPECTIVE JUROR: I have been summoned but that was it.

THE COURT: Thank you.

Juror Number No. 45, good afternoon.

PROSPECTIVE JUROR: Good afternoon. I'm a architectural designer, no significant other, no kids. Never served on a jury before.

THE COURT: Thank you. What does an architectural designer do?

PROSPECTIVE JUROR: Just design layout, like, mainly I do 3D rendering and Photoshop to present to clients what a project could look like.

THE COURT: Thank you. Juror Number 46?

PROSPECTIVE JUROR: I'm a widow. I currently am a Special Ed Instructor Assistant.

I have three daughters. The eldest is 35, unemployed right now.

My second one is IT, and my youngest is 27, she's

unemployed too.

I have never served.

THE COURT: Thank you. And the middle child the one that works in IT. How old are they?

PROSPECTIVE JUROR: She's 34.

THE COURT: Okay. And the oldest one, what type of work were they doing before they were unemployed?

PROSPECTIVE JUROR: She was working in Subway.

THE COURT: The Subway sandwiches?

PROSPECTIVE JUROR: Yes.

THE COURT: Then the 27-year old, what type of work were they doing before they were unemployed?

PROSPECTIVE JUROR: She was an instruction assistant also.

THE COURT: Like the work you do?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you. And your late husband, what type of work did he do?

PROSPECTIVE JUROR: He was -- what do you call this? He was sick actually, yeah.

THE COURT: Okay. Did he have an occupation before his illness?

PROSPECTIVE JUROR: He did part-time real estate but he also did -- what do you call it, worked in Burlington.

THE COURT: Burlington Coat Factory?

PROSPECTIVE JUROR: Yes.

THE COURT: I think you have said you have not served as a juror before.

Thank you very much, No. 46, I appreciate it.

No. 47?

PROSPECTIVE JUROR: Right now, I'm a security guard and I take care of my mom, who is 81 years-old.

THE COURT: Do you have a significant other?

PROSPECTIVE JUROR: No spouse and no babies.

THE COURT: And have you served on a jury before?

PROSPECTIVE JUROR: No, I haven't.

THE COURT: Similar to the question I had for Juror No. 6, I imagine you have gotten some training as a security guard.

Are you going to be able to set that aside and just decide this case based on the evidence you see and hear in the courtroom and the law as I explain it to you?

PROSPECTIVE JUROR: I will try my best.

THE COURT: Thank you so much.

Juror No. 48?

PROSPECTIVE JUROR: I work in real estate, family office. I have no significant other, and I have never been on a jury.

THE COURT: Thank you.

Juror No. 49?

PROSPECTIVE JUROR: I'm a film and television and streaming producer.

I have a significant other, who is an entertainment attorney.

THE COURT: Any children?

PROSPECTIVE JUROR: A stepdaughter, she's 17, high school.

THE COURT: Thank you. And have you ever served on a jury before?

PROSPECTIVE JUROR: I have.

THE COURT: How many times?

PROSPECTIVE JUROR: Once.

THE COURT: How long ago or when was it?

PROSPECTIVE JUROR: It was 11 years ago, I believe.

THE COURT: And do you remember if it was a civil case or criminal case?

PROSPECTIVE JUROR: Criminal case.

THE COURT: And were you the foreperson?

PROSPECTIVE JUROR: I was not.

THE COURT: Did the jury reach a verdict?

PROSPECTIVE JUROR: They did.

THE COURT: Anything about that experience that left you disappointed or dissatisfied with the court system?

PROSPECTIVE JUROR: Not the court, but the justice system.

And anything about that experience that would prevent you from being fair and impartial to both sides in this case?

PROSPECTIVE JUROR: I do not think so, no.

THE COURT: And the disappointment you felt regarding the justice system, is that going to affect how you handle your duties as a juror in this case?

PROSPECTIVE JUROR: I don't believe so.

THE COURT: Okay. Thank you.

Juror No. 50, good afternoon.

PROSPECTIVE JUROR: Good afternoon, Your Honor.

THE COURT: What's your occupation?

PROSPECTIVE JUROR: I'm a construction superintendent.

THE COURT: And I think you told us that your wife is a PD?

PROSPECTIVE JUROR: That would be correct.

THE COURT: And any children?

PROSPECTIVE JUROR: Yes, two daughters.

THE COURT: How old are they?

PROSPECTIVE JUROR: 11 and 2.

THE COURT: Have you served as a juror before?

PROSPECTIVE JUROR: I have not.

THE COURT: Thank you so much, Juror No. 50.

Juror No. 51, good afternoon.

PROSPECTIVE JUROR: Good afternoon.

THE COURT: What is your occupation?

PROSPECTIVE JUROR: I'm a archeologist and project manager for an environmental consulting firm in San Luis.

THE COURT: San Luis Obispo. People from there call it San Luis.

PROSPECTIVE JUROR: SLO.

THE COURT: I like to be up with the lingo.

Do you have a significant other?

PROSPECTIVE JUROR: I have a wife. She's a scientist at a biotech company.

THE COURT: Any children?

PROSPECTIVE JUROR: No.

THE COURT: Have you served on the jury before?

PROSPECTIVE JUROR: No.

THE COURT: Thank you so much.

Juror No. 52, good afternoon.

PROSPECTIVE JUROR: Good afternoon. I'm a lead instructor for a company that works with adults with disabilities.

No spouse, no kids. I did serve jury duty about 12 years ago.

THE COURT: You actually were selected for the jury?

PROSPECTIVE JUROR: Correct.

THE COURT: And you said 12 years ago?

PROSPECTIVE JUROR: Correct.

THE COURT: Do you remember if it was a civil or criminal case?

PROSPECTIVE JUROR: Criminal.

THE COURT: Were you the foreperson?

PROSPECTIVE JUROR: No, I was not.

THE COURT: Did the jury reach a verdict?

PROSPECTIVE JUROR: Yes.

THE COURT: Anything about that experience that left you disappointed or dissatisfied with the court system?

PROSPECTIVE JUROR: No.

THE COURT: Anything that left you dissatisfied with the court system?

PROSPECTIVE JUROR: No.

THE COURT: Anything about that experience that would prevent you from being fair and impartial to both sides in this case?

PROSPECTIVE JUROR: No.

THE COURT: Thank you, Juror No. 53. Good afternoon.

PROSPECTIVE JUROR: Hello. I'm a retired accountant in Los Angeles, and my spouse is retired director of group homes for disabled children.

We have no kids.

And yes, I have served, actually in this Court.

THE COURT: Wow.

PROSPECTIVE JUROR: Eight years ago.

THE COURT: Do you remember if it was civil case or criminal case?

PROSPECTIVE JUROR: It was a sting operation.

THE COURT: It was a criminal case?

PROSPECTIVE JUROR: Yes, a cocaine house.

THE COURT: Thank you. Were you the foreperson?

PROSPECTIVE JUROR: I was not.

THE COURT: And did the jury reach a verdict?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. So let me ask you this question, since it sounds like you may be one of the few jurors that sat on a case in this courthouse.

So, there might be things that I do that are different from the other judge that you were before, or the way I explained the law might be different from the other judge.

Are you going to be able to limit your decision to the evidence as presented here in the law as I explain it to you?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you. Juror No. 54, good afternoon.

PROSPECTIVE JUROR: Good afternoon. Retired Long Beach Unified middle school teacher. Husband, retired mechanical engineer.

No kids and this is my first time.

THE COURT: Thank you.

Juror No. 55?

PROSPECTIVE JUROR: Good afternoon, I'm a resident physician, my wife is a pharmacist. We do not have any kids. This is my first time as well.

THE COURT: Thank you. And do you have a specialty?

PROSPECTIVE JUROR: Radiologist.

THE COURT: Thank you so much. I appreciate it, Juror 55.

Juror Number 56, good afternoon.

PROSPECTIVE JUROR: Good to talk to you, Your Honor. I work as a mechanical engineer at UCLA at a power plant that provides services to the campus and hospital.

My wife is an occupational therapist. She works with kids with special needs.

We have no children, and I have never served before.

THE COURT: Thank you so much.

Juror No. 57, good afternoon.

PROSPECTIVE JUROR: Good afternoon. I am a stay-at-home wife right now.

My husband works as a security, as a security guard. We have no children, not yet, maybe later in life. I have never served on a jury.

THE COURT: Thank you. Did you have an occupation

before you became a stay-at-home wife?

PROSPECTIVE JUROR: I worked in customer service for about two and a half years, and before that, I was administrative assistant for a big company.

THE COURT: Thank you so much.

PROSPECTIVE JUROR: You are welcome.

THE COURT: Juror No. 58?

PROSPECTIVE JUROR: I'm a brand strategies for the film industry. I do not have a partner. I do not have kids and I never served on a jury.

THE COURT: What does the brand strategist do?

PROSPECTIVE JUROR: We write the go-to market strategy for theatrical movies.

THE COURT: Juror 59?

PROSPECTIVE JUROR: I'm a clerk for LAUSD. I'm a youth pastor.

My husband is a freight broker, no kids, first time.

THE COURT: Thank you. And last but not least, Juror No. 60.

We have all been waiting to hear from you.

What is your occupation?

PROSPECTIVE JUROR: I'm a financial controller. My husband --

THE COURT: Sorry, what type of an organization?

PROSPECTIVE JUROR: Nonprofit organization. My

husband is an attorney.

I have a 22-year-old daughter who is a researcher for a PR firm.

I have never served on a jury.

THE COURT: You may have told me this before, but I don't recall what type of -- yes, because you said he's going to ask you, but you are not going to answer his questions.

PROSPECTIVE JUROR: He's going to ask me.

THE COURT: Personal injury?

PROSPECTIVE JUROR: Family law.

THE COURT: Okay. Thank you. Jurors, give me one moment.

Let me try to squeeze in two more questions and we will give you a break.

Jurors, if you are -- this is a question for everyone: If you are picked as a juror, it is your solemn duty to accept and follow my instructions and rulings even if you disagree with the law.

You may not substitute your own idea of what you think the law ought to be.

Do any of you feel you would have difficulty obeying my legal instructions and rulings?

Raise your hand if the answer is yes.

I see no hands.

Next question, I know I said I had two, but I have

three.

Based upon what you have seen or heard during this jury selection process, do you know of any other reason that makes you believe you cannot be a completely fair and impartial juror in this case?

If there is any such reason, it is your duty to disclose it at this time.

Any other reason that makes you believe you cannot be a completely fair and impartial juror in this case?

I see no hands.

Yes, Juror No. 36. We will come back to you.

Then this is going to be my last question. As I told you, jurors, I believe that this case will be ready to go to you by next week Wednesday.

It's possible we might go to the end of next week. Is there any juror here, and I understand that you have had the opportunity to raise this below, so this is only if you didn't raise it before.

Any juror that has a conflict and will not be able to serve with us for that period time?

Juror Number 50 and 57. Go ahead, Mr. Berry. On this side, I have 14 and who else? That is 30.

PROSPECTIVE JUROR: 28.

THE COURT: And 35, and 30. Okay. And 9 and 11 and 4.

So those of you, let's do this again. And I'm going to come back to the person who has a question.

Raise your hand if you are going to be unable to serve with us for the duration of this trial. As I indicated, I expect that it will be ready for your decision by next Wednesday.

Raise your hand in response to that question so I can be clear.

So it's 4, 9, 11, 14, you are 27?

PROSPECTIVE JUROR: Yes.

THE COURT: 30, 36, 38, and 50. For those of you who have a conflict, did you already raise this conflict downstairs in the jury assembly room?

Raise your hand if you did not raise this conflict downstairs in the jury assembly room.

Juror No. 4, 14, and 28, 35, 50, and 38.

THE COURT: You did not raise this downstairs.

That is because it's something that has come up -- raise your hand if the conflict is something that has come up over the course of the day, and you didn't have the chance to raise it downstairs.

Something new, okay. Juror No. 38, something new has come up?

Thank you, jurors. Okay, I'm going to give you a break. Let us give me a moment.

Let's do this: Juror No. 4, what is your conflict? We need the microphone.

PROSPECTIVE JUROR: It's not so much a conflict, so with the trial starting, like, today, from next week or until Wednesday we will be back. Because if it's until Wednesday, like, I can ask for Wednesday off.

THE COURT: I'm not sure I understand.

PROSPECTIVE JUROR: Today I was scheduled.

THE COURT: Why don't you let me explain it. So what I meant is -- thank you for the question.

When we finish all of this, we're going to select our 12 jurors and two alternates, then we're going to hear from the attorneys and then you are going to hear the witnesses testify.

When the witnesses are all done testifying, that may take a few days, the attorneys are going to explain to you what they think you should believe, and then you will start deliberating, and I think that may start as late as Wednesday. It may start earlier, but it may start as late as Wednesday.

So I want to find out if anyone has a conflict in that period.

We're going to be going every single day, though.

Do you have a conflict?

PROSPECTIVE JUROR: I'm scheduled today, Thursday and Friday. I thought that we were going to be chosen today.

THE COURT: You might be chosen today, and then you

would be here every day.

PROSPECTIVE JUROR: Okay.

THE COURT: Are you able to be here every day?

PROSPECTIVE JUROR: I have to let them know.

THE COURT: I got it. Understood. Thank you.

Juror No. 9, what is your conflict?

PROSPECTIVE JUROR: I'm having some medical issues going on.

I did speak to the clerk downstairs and they said I should speak to you directly.

THE COURT: Okay.

Did you ask for postponement downstairs?

PROSPECTIVE JUROR: Yes.

THE COURT: They denied you the postponement. You have already gotten a postponement.

PROSPECTIVE JUROR: I have never had a postponement.

THE COURT: They said she couldn't address it. You didn't talk to a judge?

PROSPECTIVE JUROR: Only to a clerk.

THE COURT: Thank you.

Juror No. 11. What is the nature of your conflict?

PROSPECTIVE JUROR: Yes, I talked downstairs to jury clerk, they said better talk to you, because my second child is ADHD kid, so I'm pretty much taking care of him in the morning to give him the medicine, make sure he can go to school, then

after school, I need to take care of him to make sure he stays focused to finish his homeworks.

So being away for period of a long time, it makes me very worried.

THE COURT: And did you -- do you recall when you got the jury summons, there was a question on the jury summons about if you are a caregiver for someone and that would prevent you from serving as a juror.

Do you remember answering that question?

PROSPECTIVE JUROR: I did answer the question, I talked with the jury clerk.

THE COURTROOM DEPUTY: They said since I'm working full-time, so I'm not eligible for the question.

THE COURT: And what hours do you work at your job?

PROSPECTIVE JUROR: I work from 6:30 to 4:30. So I work 980, and then I can have a one day, like, a Friday to take care, to take my kids to activities after school. But otherwise, I can leave, I work early shift, then my son get off of school, I can pick him up and take care of him.

THE COURT: Because we're going to be in session from 8:30 to 2:30, so it sounds like we're going to be in session for a shorter time than you are normally at work. With that, do you still have a conflict in light of that?

PROSPECTIVE JUROR: I will be okay with that.

THE COURT: Thank you so much. Juror No. 14.

PROSPECTIVE JUROR: It's my son's Court date next week.

THE COURT: Understood. What date is it?

PROSPECTIVE JUROR: The 18th.

THE COURT: Juror No. 27?

PROSPECTIVE JUROR: Hi, Your Honor, I feel like I'm too old being here.

THE COURT: Oh really?

PROSPECTIVE JUROR: Yes.

THE COURT: In what sense?

PROSPECTIVE JUROR: Well, I see peoples faces and I don't remember the name.

THE COURT: You don't what?

PROSPECTIVE JUROR: I can't remember people's name. Five minutes later, I will remember it.

THE COURT: Okay. But besides that, have you followed everything that I have said today, have you understood everything?

PROSPECTIVE JUROR: You mean the questionnaire?

THE COURT: Yes.

PROSPECTIVE JUROR: I tell them I had a 50-year-old Down Syndrome son, and I just had a knee replacement three months ago, but I guess they ignored it.

THE COURT: Thank you.

Okay. Thank you, Juror No. 27, I appreciate it.

Juror No. 8, what the nature of your conflict?

PROSPECTIVE JUROR: If I get selected for a jury duty, I have to change my schedule to a five-day a week, right now I'm on a 4/10 they have been waiting for the perfect opportunity to take it away.

But it will be what it will be.

THE COURT: Okay. I appreciate that, thank you.

Juror No. 30?

PROSPECTIVE JUROR: I have a son who is my 26-year-old, who is autistic, but I take him to work in the morning at 4:30 in the morning, then I go to work, and then during, he works four hours, I will go pick him up. He doesn't drive, and I drop him off at home and then I go back to work.

THE COURT: There is no one else that can pick him up?

PROSPECTIVE JUROR: No.

THE COURT: When you got the jury summons, and I think they had a question on there that would get at this, did you respond to that question?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you.

Juror No. 35, your conflict?

PROSPECTIVE JUROR: I have take care of my mom. She just went through psychosis. She was in a psychiatric hold. So I'm the one that is in charge of her basically, I have to

make sure her meds are there, take her to therapy, to psychiatrists and psychologists and we have an appointment November 19th.

THE COURT: Whose taking care of her now?

PROSPECTIVE JUROR: She's actually with my dad right now.

THE COURT: But your dad is not able to take her on the 19th?

PROSPECTIVE JUROR: No. He works on the night shift, we have to watch her. By the time he gets back it's time she has to go.

THE COURT: Understood. Juror No. 36?

PROSPECTIVE JUROR: Well, I heard you mention right now when you were talking to one of the jurors above, you mentioned something about 8:30 to 2:30?

THE COURT: Yes.

PROSPECTIVE JUROR: Because I had talked to Mr. Berry, and --

THE COURT: You are going to throw Mr. Berry under the bus?

PROSPECTIVE JUROR: No. What happened was I was given an opportunity with my manager, he gave me a shift today for 7:00 p.m. to 7:00 a.m., 12 hours, and I'm potentially not going to get any sleep because I spoke to the clerk downstairs. She told me, you might be out, I was thinking by the time I get

home is 5:30. So I am thinking when I get there, go home for no reason, I'm going to drive straight to work after.

So I'm thinking if I leave at 2:30, I can at least get three hours asleep and then head to work after, and I'm fine. I just need to know what time this ends to see what I can do about it.

THE COURT: Understood.

PROSPECTIVE JUROR: Uh-huh.

THE COURT: Thank you, Juror No. 36.

Juror No. 38?

PROSPECTIVE JUROR: My conflict is my body. I have two brand new hips and I'm finding it very hard to sit. I did bring that up downstairs and they asked me to speak with you because I did get -- because of my hips and sitting before this, I did get an extension from last April to now, they said I can only do that so many times, so they said to speak with you.

THE COURT: Okay. If you are permitted to stand as needed, does that alleviate the issue?

PROSPECTIVE JUROR: It does to a certain extent, yes. But also I asked about reasonable accommodation, is there another place to park, because I had to walk two blocks here and up a hill from the garage that was recommended.

THE COURT: So if you were to be accommodated, in terms of being able to stand and having a place to park that

was closer, you would be able to serve?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you. And Juror No. 50. I think that was with the last person that had a conflict.

PROSPECTIVE JUROR: I think my conflict got clarified while you guys were discussing things.

THE COURT: Okay. Thank you. I appreciate it.

Jurors, give me a moment, and I will tell you how long the break will be.

THE COURTROOM DEPUTY: Juror No. 57.

THE COURT: Go ahead.

PROSPECTIVE JUROR: I just need clarification on one thing.

Do you plan on having it go after Wednesday of next week because then we will enter some conflict areas.

THE COURT: But you are good through Wednesday?

PROSPECTIVE JUROR: Yes, ma'am.

THE COURT: Thank you.

I think Mr. Berry indicated that Juror No. 38 had a question before?

There was somebody that you indicated that had a question. I didn't write that down.

THE COURTROOM DEPUTY: We're good.

THE COURT: It's been addressed. Thank you. Give me just a moment, jurors.

Let me see the parties briefly at sidebar on the record.

(Sidebar begins.)

THE COURT: Do the parties anticipate needing the Court to do additional follow-up on any of the jurors?

MS. ABEL: I think we would like a moment to think about it.

THE COURT: So let me just leave them for like a 20-minute recess. They might come back and we send them again.

MS. ABEL: Thank you.

(Sidebar ends.)

THE COURT: Jurors, let's do this, let's do a 20-minute recess at this time, 20 minutes. We will see you in 20 minutes outside of the courtroom.

Remember, don't make up your minds about the case, don't discuss the case with anyone, including each other.

We will see you in 20 minutes. Thank you, jurors.

THE COURTROOM DEPUTY: All rise.

(Jury panel exits the courtroom at 3:00 p.m.)

THE COURT: We're back on the record.

Why don't we do this over this break. The parties will think about whether or not you think there is additional follow-up you would have the Court do.

I didn't do follow-up on some of the questions because there were other questions that certain jurors already seemed like they would be disqualified, like Juror No. 9, for

instance. She's made it pretty clear that she will not be fair.

I didn't do follow-up with other questions, so there may be other jurors in that category. Let me know at the end of the break if you need additional follow up on any of the jurors.

If not, we will have the jurors take an additional break and we will handle for cause challenges and peremptory challenges.

The Court stands in recess for 20 minutes.

Thank you.

(Afternoon recess.)

THE COURT: Okay. We're back on the record.

Let's do this: Well, what I'm inclined to -- so I have been taking notes, I know you have been taking notes. There are a number of jurors that I have identified that I think are likely to be excused for cause or for hardship.

Either because hardship seems of the nature that I should excuse them, or the cause challenged because they answered that they could not be fair, or there was something they talked about, and they said it would prevent them from being fair and impartial to both sides.

I wonder if, just in the sake of efficiency, I can say who those jurors are, and then the parties can let me know if they stipulate to that juror being excused.

If they don't, then if additional followup is needed, we can do additional followup or have argument.

MR. HARI: Before we do that, can I put something on the record that occurred in the hallway at the break?

THE COURT: Yes.

MR. HARI: I went outside to check on Inspector Ranjo. I asked him to come in the witness room, and he said he was watching someone's bag and that person was Juror No. 14.

THE COURT: Okay.

MR. HARI: I informed the defense counsel of that as well.

THE COURT: Thank you so much.

Any concerns with the approach I just outlined, Mr. Hari?

MR. HARI: Your Honor, we would like to hear the list first, but I think we talked with defense counsel, and there are certain categories where we think additional followup with the venire is -- would be something the government would ask for.

THE COURT: Okay. Any concerns with the approach I just described?

MS. ABEL: Your Honor, can I address the government, the point the government first raised?

THE COURT: Yes.

MS. ABEL: In this case, the victim provided a favor

for a potential witness?

THE COURT: Juror?

MS. ABEL: Excuse me, the alleged victim did a favor for a potential juror.

I think the first thing the defense would ask that that juror cannot be an appropriate juror in this case.

However, defense's supplemental concern is what other juror's may have witnessed it.

It was out in the public space in which all of the jurors were standing. They will have a preconceived notion of Inspector Ranjo's kindliness, which would not have happened in the courtroom.

I do not know who those jurors are. I don't believe the government does either.

My request would initially be we ask them; however, but by asking them, we will draw unnecessary attention to the fact that Inspector Ranjo did a favor for Juror No. 14.

So it puts us in a predicament that I don't have a solution for.

We only learned of this moments ago, but the defense certainly has a concern, and I don't want to strike the venire but I'm not sure how to remedy the problem of witness and potential juror interaction.

THE COURT: Okay. Thank you for that.

I thought I made this clear that you are supposed to

advise your witnesses not to have any contact with any jurors so I don't know how this happened.

So, I will need you to advise Inspector Ranjo again, and if you need me to speak to him, I can speak to him.

MR. MACKIE: We have. We actually sent him to a different floor.

I did have a conversation with Inspector Ranjo, and he arrived when we were in the courtroom, and he happened to be sitting outside by the bench.

He did say that the young lady came and just sat her things down and said she was running to the bathroom, and that was it.

There was no other conversation that occurred. He didn't know her name, he couldn't identify her.

If the Court could like to speak to Inspector Ranjo, he's here. We have warned him to not have any contact with any jurors, in fact, he's on a different floor so this doesn't happen again.

THE COURT: I guess what I want to know, is it she said, hey, can you watch my bag for me? And he was, like, yes.

Or was she just, like, I will be right back and she just left.

MR. MACKIE: I believe it was the former, and he agreed to watch the bag, while she was in the restroom.

THE COURT: And that is what the problem is, why is

he even talking to her?

MR. MACKIE: We agree that was inappropriate.

THE COURT: Let's start with this, and then we will figure out if we need to do additional followup questioning.

To address the concern that defense counsel raised, I would be inclined to instruct the jurors to remind them as I have told them, this case is to be decided solely on the evidence that is presented in the courtroom, not anything that happens outside of the courtroom, and the difficulty is not only do we not want to attract attention to -- right now they don't even know who Inspector Ranjo is, and it is unclear if they are going to recognize him when he comes to testify.

So my inclination would be just to give them that instruction, and ask if anyone is going to have difficulty following it, and then they can say, but that is my inclination at this point.

MS. ABEL: It certainly would be hard for jurors to understand the purpose of your instruction without understanding the context that is arises.

If it's permissible, can the defense ask whether if Inspector Ranjo was wearing his FPS uniform?

THE COURT: I guess I saw him before, he's just wearing a suit.

MR. MACKIE: That's correct.

MS. ABEL: I do think that helps to clarify. I do

know he will be a central witness in this case. So the idea they wouldn't remember him from a day ago, seems less likely.

Certainly, we have had Mr. Lopez stay in our witness room the entire time.

So I do believe that the victim doing a favor for a juror in the presence --

THE COURT: I don't doubt it's a potential concern, but you haven't provided a potential solution.

Are you asking for more time to think about a solution, are we proceeding with the jury selection, are you asking to strike the venire?

MS. ABEL: At the very least, we would ask to strike Juror 14, and whether -- I think in the first instance, I would ask Inspector Ranjo, if whether there were other jurors present.

I don't know the answer to that and that might inform what we would request.

THE COURT: Thank you. We will do that in a moment. I will have to figure out if there is other followup we need to do with other jurors.

So the first juror that I would propose, I would ask the parties if they stipulate to this person being excused for cause is Juror No. 9.

MS. ABEL: No objection from the defense.

MR. HARI: No objection from the government.

THE COURT: Okay. Juror No. 11?

MS. ABEL: No objection from the defense.

THE COURT: Juror No. 11 indicated she talked about who she knew in law enforcement, and she answered yes to the question of, anything that you know about that person that would prevent you from being fair and impartial to both sides.

She also said she couldn't put aside what she -- the media coverage she has seen of the protests.

MR. HARI: No objection, Your Honor.

THE COURT: Okay.

Juror No. 12, the same law enforcement issue. Can't put aside what she saw of the protests, and also her -- the experience that she has had as the victim of a crime.

I think she indicated that she was a victim of child abuse and neglect, and I think a more recent, sexual assault.

MS. ABEL: No objection from the defense.

MR. HARI: None from the government, Your Honor.

THE COURT: Juror No. 13, this was the juror that, former military police, a lot of military contacts, would not agree to treat law enforcement witnesses by the same standards as others.

MS. ABEL: As to 13, no objection from the defense.

MR. HARI: No objection from the government.

THE COURT: Okay. Juror No. 14, as I indicated, her son is currently being prosecuted for attempted murder, she has

a Court date next week. I think there are numerous reasons why she is not an appropriate juror.

MR. HARI: No objection. This is the individual with the issue.

MS. ABEL: Your Honor, to be clear, the defense agrees but only for the last reason. She did not answer any question that she could not be fair and impartial, however, as to the final, we consent.

THE COURT: Juror No. 16, both the law enforcement, can't be fair, and can't put aside coverage -- media coverage of the protests.

MS. ABEL: No objection to striking 16, from the defense.

MR. HARI: No objection from the government, Your Honor.

THE COURT: Okay. Juror No. 20, also -- this is the law enforcement, can't be fair because of their relationship with or what they know about a law enforcement person.

She indicated that her husband works for LAPD and in detention in the jails, I guess, and yeah, she said it would be difficult for her to be fair to both and not give law enforcement more weight.

MR. HARI: No objection from the government, Your Honor.

MS. ABEL: No objection from the defense to 20.

THE COURT: Juror No. 21.

This juror has had strong negative experiences involving the police and said they could not put them aside.

Do I have that correct? Yes. Could not put them aside. Also, can't put aside media coverage of the protests.

MR. HARI: No objection from the government, Your Honor.

MS. ABEL: No objection from the defense.

THE COURT: Okay. Juror No. 23, 23 said they could not put aside media coverage that they have seen of the protests.

MR. HARI: No objection from the government.

MS. ABEL: Can I have just one second, Your Honor?

THE COURT: Yes.

MS. ABEL: No objection to 23.

THE COURT: Okay, 27, well this is -- it's a question mark for me. This is the one who said he's too old.

MS. ABEL: The defense has no objection as he seems to raise memory issues as his primary concern.

THE COURT: Okay.

MR. HARI: We don't believe there is cause for potential Juror No. 27.

THE COURT: Any additional followup?

MR. HARI: Your Honor, I think some followup on the memory may be helpful, but I think he answered, Your Honor,

questions about whether or not he was following today's proceedings and he seemed to answer in the affirmative.

THE COURT: Okay. Juror No. 30, I think the issue with Juror No. 30 is they answered yes to the question of not being able to be fair because of their relationship with somebody in law enforcement, and they also said that they could not put aside media coverage of the protests.

MR. HARI: We have no objection.

MS. ABEL: No objection from the defense.

THE COURT: Okay. Juror No. 32, also indicated they cannot put aside any media coverage.

MS. ABEL: Your Honor, can you repeat the number?

THE COURT: Yes, 32.

MS. ABEL: Thank you, one moment.

MR. HARI: Your Honor, we have no objection.

THE COURT: Okay.

MS. ABEL: No objection from the defense.

THE COURT: That was for Juror 32, correct?

MS. ABEL: Yes.

THE COURT: Juror No. 33. This juror said they could not put aside the media coverage. They also said they have a negative opinion about law enforcement's response to the protests that they cannot put aside.

MR. HARI: No objection.

MS. ABEL: No objection.

THE COURT: Okay. Juror No. 35. In addition to the hardship that she raised, she made it clear in response to a number of questions that she cannot be fair, specifically she cannot put aside her strong negative experiences with law enforcement.

She cannot put aside the experience she's had with somebody who was charged with a crime.

She cannot put aside her experience, her personal experience at a protest.

She has feelings about the criminal justice system that are going to affect her ability to be fair and impartial.

MS. ABEL: No objection.

THE COURT: She has a negative opinion about law enforcement's response to immigration protests, et cetera.

MS. ABEL: I believe she said she could not be fair and impartial to almost every question asked by the Court, therefore, the defense agrees.

MR. HARI: We have no objection, Your Honor.

THE COURT: Okay. Juror No. 38, this is one that said they couldn't put aside -- he could not put aside what they have seen or read in the media.

They answered yes to that question regarding the immigration protests.

MS. ABEL: I believe this is also the juror with some -- expressed medical concerns and so for that reason -- my

notes are that she had some --

THE COURT: With the hips?

MS. ABEL: Sitting for long periods, long schedule, the three-break schedule, which we are not objecting to, but we would like to get it done sometime in this century, would agree to excuse her on that basis.

THE COURT: Okay.

MR. HARI: We have no objection, Your Honor.

THE COURT: She did indicate if she's able to stand whenever she wants, that is fine. She did ask about parking, it's unclear to me whether she's asking for the parking as a reasonable accommodation, which the Court would be obligated and would want to try to accommodate or whether it's sort of nice to have.

I also don't know what time frame is for a disability accommodation of that nature, given the parking situation.

But I don't necessarily need to explore that if the parties stipulate to her being excused, which I understand they do.

MS. ABEL: Yes, Your Honor.

MR. HARI: Yes, Your Honor.

THE COURT: Juror No. 45. This is a juror that answered yes to the question about whether they could put aside what they have seen in the media about the protests.

If you could not -- they answered unable to put aside.

Juror No. 45.

MR. HARI: No objection, Your Honor.

MS. ABEL: No objection, Your Honor.

THE COURT: Okay. Juror No. 48, he had a lot of answers and a lot of questions, yes.

It seems to me he has very close relationships with law enforcement and/or has a very high opinion of them that he cannot put aside.

MS. ABEL: No objection.

MR. HARI: No objection.

THE COURT: Juror No. 50, this is the juror that indicated that his wife is a public defender and he is going to talk to her about this case.

He also has -- oh, he withdrew his hardship. But he answered yes to the question about having strong negative experiences with law enforcement that he could not put aside, as well as I think this was in reference to his wife, his relationships with people who work in the legal industry that will prevent him from being fair and impartial.

MR. HARI: No objection, Your Honor.

MS. ABEL: No objection.

THE COURT: Juror No. 52. Also answered yes, unable to put aside what they have seen or read in the media about immigration protests. I think that's it.

MR. HARI: I believe there was also a response to a

negative opinion of law enforcement.

THE COURT: Okay. But they didn't say they could not put it aside. They did not respond that they could not put it aside, although, they had a strong negative experience.

Do the parties stipulate to excuse this juror?

MR. HARI: We have no objection, Your Honor.

MS. ABEL: No objection, Your Honor.

THE COURT: Okay. And then Juror No. 57 answered yes to the question about unable to put aside media coverage, and answered the yes to the question about feelings about the criminal justice system that are going to affect their ability to be fair and impartial, and answered yes to the question of inability to put aside strong negative experiences involving law enforcement.

Any objection or do the parties stipulate?

MR. HARI: We stipulate, Your Honor.

MS. ABEL: No objection to 57.

THE COURT: Then 58, the same issues just mentioned as well as relationship with somebody in law enforcement that will prevent them from being fair and impartial.

I don't -- yeah, do the parties stipulate?

MR. HARI: Yes, Your Honor, the government does.

MS. ABEL: Yes, Your Honor.

THE COURT: Okay. So with that, who would the parties ask for additional followup on? I understand the

government wants additional followup on Juror No. 27.

Any other jurors that the government would like additional followup on?

MR. HARI: One moment, Your Honor.

THE COURT: Yes.

MS. ABEL: Your Honor, in going just quickly back through, I believe 25 also raised her hand in response to cannot be fair and impartial due to relationship with law enforcement officer.

THE COURT: Yes. Thank you.

I feel like she was a little bit equivocal. If the parties want to stipulate to excuse her, that is fine, or they need additional followup.

She was the one who, I want to say, it's her best friend that is in law enforcement in Van Nuys, and she said she will do her best. She kept saying, I will do my best.

MS. ABEL: I will say when you asked the question, she did raise her hand, the followup 13, she was one the jurors who raised her hand.

THE COURT: She shouted out, "I will do my best".

MS. ABEL: That may be true. I don't know if that gives me any greater confidence.

THE COURT: Yeah, that's fine. You would stipulate to excuse her?

MS. ABEL: I would do so. Defense would do so.

THE COURT: What about the government?

MR. HARI: We would ask followup to confirm for the reason she did state she would try her best, so what does that mean?

THE COURT: Okay. And any other followup, any other jurors? The government?

MR. HARI: Your Honor, Juror No. 8 and Juror No -- yeah, Juror No. 8 indicated they were less likely to believe law enforcement officers.

The government requests additional followup with regards to what he meant by that and whether or not he can put that aside.

THE COURT: Okay. Anybody else?

MR. HARI: Not at this time, Your Honor.

THE COURT: Any additional followup from defense?

MS. ABEL: Just cross checking the various lists. Thank you.

THE COURT: Yes.

MR. HARI: Pardon me, Mr. Mackie pointed out to me Juror No. 7 also raised his hand at the end, less likely to believe law enforcement officer's list.

We would add him to the list of Juror No. 8 for additional followup.

THE COURT: Thank you.

MS. ABEL: Your Honor, along the same lines, No. 19

indicated she was more likely to believe law enforcement and no followup question was asked about whether she could be fair impartial or what that means.

THE COURT: Okay. Any other?

MS. ABEL: Just a moment, thank you.

THE COURT: Yes.

MS. ABEL: Your Honor, No. 36 is the one who is not going to sleep all night.

Obviously that raises concerns with regard to his ability to pay attention and focus in the trial.

I'm not -- I can't frame exactly the question I would want to ask. He did raise that concern, that is certainly a concern of the defense, as well as obviously his -- what he is doing overnight is directly related to what daytime trial will be about.

So given the overlapping nature of his work and the subject of this trial, as well as his indication that he, at most, would get three hours of sleep, the defense would like followup on those issues.

THE COURT: Okay. Anybody else?

MR. HARI: Not from the government, Your Honor.

THE COURT: Okay.

MS. ABEL: Your Honor, No. 41.

THE COURT: Yes.

MS. ABEL: There was some issues understanding him.

I wanted to confirm his comfort with the proceedings and his comfort with the language, but he also spoke a couple of different times about the stress that decision-making and jury deliberations would have on him, both as to his dad, who was robbed and assaulted, specifically, his dad being a victim of assault, and that that could get emotional and it would cause some pressure on him was I believe the word he used.

So we would like some followup on those two topics.

THE COURT: Do the parties want to stipulate to excuse 41, or you want more questions?

MS. ABEL: I'm happy to stipulate. I don't know if the government would do so.

MR. HARI: We do not, Your Honor. We don't believe there is any cause, given his equivocation.

We would not oppose additional followup.

THE COURT: Anybody else?

MS. ABEL: Your Honor, 47 is another "try my best," but that one as to applying the law you direct, certainly that causes concern for the defense.

THE COURT: Which question was that?

MS. ABEL: 47, she's a security guard and when you asked specifically whether she could set aside her own training and experience, she said she would try her best to apply the law you give.

THE COURT: Okay. With Juror No. 41, I am happy to

ask additional questions about the situation with the dad.

I think I have exhausted my questions with respect to his prior jury service.

He described the fact that it was -- there was pressure in the jury room that people were undecided. I asked him, you know, if you are selected as a juror here, I talked to him about you have to decide the case based upon your own assessment of the evidence.

After talking with the other jurors, are you going to be inclined to agree with the other jurors just because of the pressure, and he said no.

But I'm happy to follow up with respect to the issue with his dad's criminal case.

I didn't have difficulty hearing him. What I heard him say was that it's just -- he may get emotional because even though this happened a while ago and the person was brought to justice, his dad is still feeling the effects of it, of the assault.

So he may get emotional if he hears about an assault that is particularly bloody, because I think his father was beaten pretty badly.

That is not the kind of assault we're talking about here, but I'm happy to just confirm that he can put that aside.

Any other followup needed by the defense?

MS. NICKELL: If I may just add to that point. I

just wanted, I guess, it's unclear that line for him what he would define. Bloody is part of the serious for him that sounds, but where that line is from a not serious assault to a serious assault, I wrote down and he said, if it's not serious, he would be okay.

If it's serious, he might get emotional.

It's unclear where the line is, even with the followup with that line -- we would still have significant concerns if there is a line. What is that definition to him if could follow the law as the Court gave it to him.

I just wanted to highlight that quote that I wrote down from him.

THE COURT: Thank you. Any other jurors the parties want followup on?

MS. ABEL: Just one moment, Your Honor.

THE COURT: Yes.

MS. ABEL: Just last, I believe the last one. No. 2, she expressed, in response to a couple of questions that she had two sons that were victims of abuse.

I wasn't clear what the nature of that abuse was, if it was an assault or -- I don't know.

But I don't know that it was specifically asked whether that could impact her ability to hear and listen to evidence regarding an assault.

THE COURT: I did ask whether there was anything

about what she shared that would prevent you from being fair and impartial to both sides.

She did not raise her hand in response to that question.

MS. ABEL: I guess my request would be just some followup.

Obviously, this is a painful topic, but what the nature of or whether she was a witness to any of that abuse.

THE COURT: I understood it to be that's why they were in her care as far as her foster children, it was before she knew them, but I can ask her.

Okay. So with that, let us bring in Juror No. 36.

And in the interim, while Mr. Berry is getting Juror No. 36, I have a number of law school interns, and one of the jurors approached him, he thinks it was Juror No. 54, moments ago, and she asked quote: Is this judge any good?

In response, he put his finger to his mouth in a "shhsh" motion and walked away.

She appeared to reply, "Oh, you can't talk."

Nothing else happened besides that.

MS. NICKELL: After we're done speaking with Juror No. 36, I had a quick note I wanted to put on the record as well.

THE COURT: You can do it now.

MS. NICKELL: Kind of the same, out of an abundance of caution, when I was in the bathroom I left my water bottle

by the sink, and when I came by to walk up to the sink, the juror thought it was an abandoned water bottle.

And she was like, oh no, someone left their water bottle, is this yours?

And I said yes, and that was the extent of it.

I don't know, out of an abundance of caution given --

THE COURT: Understood. And you did not say in a kind or not kind way, you said it neutrally.

MS. NICKELL: Of course.

THE COURT: Great, Mr. Berry, thank you.

THE COURTROOM DEPUTY: All rise.

THE COURT: Jury 36. The parties can remain seated. Juror No. 36, I want to thank you for your time today. I had a question about the job that you mentioned, night job.

I appreciate your willingness to still serve and only get a couple of hours of sleep, that is a little concerning. I was trying to figure out whether is this a job -- is it an occupational job you are taking on or you need to take this job to pay your bills, so you are just going to not sleep, that is going to be your plan?

PROSPECTIVE JUROR: Honestly, it's a lot. My life, I have been waiting for this opportunity for three weeks now. My manager wasn't reaching out to me for quite a while, and he just did. I went to the company a while ago. And I told my dad, if I can get the work and also come serve and get that out

of the way as well, I can fully pay my bills, and do everything else I need to do.

Also, my girlfriend's birthday is on the 27th, I was like -- she was in a trip to Cancun right now -- if I can get all of this done with -- and handle it, when she comes back, I can give all of my time to her when she comes back.

So it's not only something I have to do, but serves me as well, my bills and stuff.

I have been waiting for this opportunity.

THE COURT: Okay. Do the parties have any additional followup? If so, I can handle it at sidebar.

MR. HARI: No, Your Honor.

MS. ABEL: No, Your Honor.

THE COURT: Okay. Thank you, Juror No. 36, we will have you wait outside with the other jurors.

If I could have Juror No. 47.

Good, afternoon, Juror No. 47.

PROSPECTIVE JUROR: Good afternoon.

THE COURT: I think you told us before you were -- you used to work or still work in parking enforcement.

PROSPECTIVE JUROR: I used to work in parking enforcement.

THE COURT: I wanted to get clarity on one of the questions I asked you.

I asked you whether you would be able to put aside your

training and what you learned in that experience, presumably you learned some law as a part of that job.

Can you put that aside and just decide the case based upon the law, as I explain it to you?

PROSPECTIVE JUROR: I'm not too sure, because I have done about 20 years in security and law enforcement.

I have seen quite a few law enforcement officers be attacked.

I have been attacked myself verbally, so I think it would be a little difficult for me.

THE COURT: Okay. Does either party want any additional followup? If so, we can handle it at sidebar.

MR. HARI: No, Your Honor.

MS. ABEL: No, Your Honor.

THE COURT: Thank you, Juror No. 47. I will have you wait outside with the other jurors.

PROSPECTIVE JUROR: Thank you.

THE COURT: If we could have Juror No. 41.

Okay. Juror No. 41, good afternoon.

PROSPECTIVE JUROR: Hello.

THE COURT: I just wanted to follow up on one of the questions I asked you earlier.

Before you talked about the fact that your father was the victim of a serious beating, and you still help to take care of him, and he is still feeling the effects of that; is

that correct?

PROSPECTIVE JUROR: Yes, actually he's in hospice now because of the clot in the brain.

There is no surgery for that one because that is 50/50. The doctor just considered hospice.

THE COURT: I see.

And as you heard me say, this case involves an assault.

PROSPECTIVE JUROR: Right.

THE COURT: I think you indicated that if it's not that serious, then you think you could sit as a juror?

PROSPECTIVE JUROR: Yes.

THE COURT: But if it's a serious assault, you think you are going to become emotional; is that accurate?

PROSPECTIVE JUROR: Right.

THE COURT: What do you mean by a serious assault, something like what happened to your dad?

PROSPECTIVE JUROR: Yes, he got beaten up, left in the parking lot, and no one knew about it until two hours or something.

So he's been in the hospital. If it's like that, so for me, it's like, why am I -- it's where the hearing is.

THE COURT: When I gave the description of the case, I said the government is accusing Mr. Lopez of -- give me just a moment -- of striking a federal officer with a camera and pushing the federal officer.

So based upon that description, do you think that this is going to be the type of case you are going to become emotional, and you won't be able to be fair?

PROSPECTIVE JUROR: I'm not sure how serious it is. I only heard a camera and pushed, so what does that mean? Is there something that happened after that, is there bleeding, I really don't know.

THE COURT: If there was bleeding, then that would be difficult for you?

PROSPECTIVE JUROR: Yes, because it's not once the verdict is done. It's not, like -- in my experience, it's what happens next, after maybe he's okay. Maybe there is some things going to happen to that victim or something.

THE COURT: To decide this case, you are not going to be asked to consider what happened afterwards and how the individual who was allegedly struck is feeling now.

But are you saying that you are going to think about, you are not going to be able to put that aside?

PROSPECTIVE JUROR: Yeah, because the feeling, because I feel it. So what if that family felt that too at some point.

It's experience for me, so a long time ago, because it -- this one happens before my jury, okay, now everything is good.

THE COURT: The last jury service you had?

PROSPECTIVE JUROR: This was '72 to '18. Now, it happened to us, so I was, like, I know how it feels now.

THE COURT: I see. I see. Well, thank you so much. Do the parties want any additional followup with this? If so, we can handle it at sidebar.

MR. HARI: No, Your Honor.

MS. ABEL: No, Your Honor.

THE COURT: Thank you.

Thank you, Juror 41. I will have you wait outside with the other jurors.

If I could have Juror No. 27?

We're back on the record with Juror No. 27.

Good afternoon, again.

PROSPECTIVE JUROR: I'm back.

THE COURT: You are back.

PROSPECTIVE JUROR: Yes.

THE COURT: Juror No. 27, I just wanted to follow up, you indicated you might have a hardship with serving, and I wanted to make sure I understood.

I wanted to make sure I understand what you were saying.

First, you said something about sometimes you -- you have difficulty remembering people's names.

PROSPECTIVE JUROR: I'm 77. I'm old.

THE COURT: I don't think as 77 to be that old, to be honest. But, nevertheless, do you have difficulty with your

memory that you think is going to affect your ability to be a juror here?

PROSPECTIVE JUROR: I want to say yes, but --

THE COURT: Yes, you do have difficulties with your memory that will affect your ability to serve here.

PROSPECTIVE JUROR: Yeah, I wouldn't be a good juror.

THE COURT: Then, you also mentioned that I think you mentioned your son that had Downs Syndrome. I wasn't sure -- you mentioned that when I asked if anyone had a conflict with serving, and so, can you explain to me the nature of the conflict?

PROSPECTIVE JUROR: Well having a Downs Syndrome child, he's 50-years-old, I have to be there. My wife has to be there with him, you know.

THE COURT: Who is with him right now?

PROSPECTIVE JUROR: My wife.

THE COURT: Okay. Anything else you want to share as to why you cannot serve?

PROSPECTIVE JUROR: Well, I just had knee surgery a few months ago.

THE COURT: Are you in pain right now?

PROSPECTIVE JUROR: One to 10, probably 2 or 3 right now.

THE COURT: Excuse me, your pain level is 2 or 3?

PROSPECTIVE JUROR: Yes. Just to be honest with you.

THE COURT: I appreciate that.

Anything else you want to share?

PROSPECTIVE JUROR: I want to go home.

THE COURT: Okay. You are probably not the only one.

Thank you, Juror No. 27, I appreciate that. I will have you step outside with the other jurors.

PROSPECTIVE JUROR: Thank you.

THE COURT: Juror No. 25, the parties previously stipulated to excuse 23 for cause, correct?

MS. NICKELL: That's what the defense had.

THE COURT: Okay. Hello.

PROSPECTIVE JUROR: Hi.

THE COURT: I just wanted to follow up with you about one of the questions I had asked you.

So in speaking with you about -- you talked about the people that you know in law enforcement.

And I asked you whether you would be able to gauge law enforcement witnesses by the same standards as other witnesses, and I think you said you will try your best.

PROSPECTIVE JUROR: Yes.

THE COURT: Then I asked if there was anything about what you knew about the people that you know in law enforcement

or your relationship with them that would prevent from you being fair and impartial, and you raised your hand, but then you said you would do your best.

I wasn't sure if the answer to that was yes or no.

If I asked you now, is there anything about what you know about the people you mentioned in law enforcement or your relationship with them that would prevent you from being fair and impartial to both sides?

PROSPECTIVE JUROR: I think I would do my best in being fair, but my friend has been -- you know, my friend for 30 years, she was in the LAPD.

So her influence, of course, is going to influence my decision from just years of knowing her and hearing stories, et cetera, et cetera. So, I'm trying to be as honest as I can.

THE COURT: I appreciate your candor.

Sometimes when people say I will do my best, what they mean is, it's the future, I can't predict the future, my commitment is to not let it influence me, but I don't know what could happen in the future.

Is that what you mean, or do you mean right now, you are not sure if that's what you are going to try to do or you have doubts about your success?

PROSPECTIVE JUROR: No, I will try, you know, there -- I mean, there is a -- I will try. That's it. There is a possibility that her memories or stories, et cetera, I

might say, wait, when she said this -- I don't know -- I will try.

THE COURT: To the best of your ability, you are going to try to put that aside?

Am I understanding you correctly?

PROSPECTIVE JUROR: Legally, that's what I think I have to do.

THE COURT: I appreciate that.

Any additional followup from the parties, if so, we can handle at sidebar.

MR. HARI: No, Your Honor.

MS. ABEL: Yes, Your Honor.

THE COURT: Let me see the parties at sidebar.

(Sidebar begins.)

THE COURT: Additional followup.

We're on the record.

MS. ABEL: Your Honor, my understanding --

THE COURT: Just make sure you are speaking into the microphone.

MS. ABEL: Rebecca Abel, for the defense. My understanding from her response is that she won't know until the moment as to whether she can put aside the influence of her friend, and I think we need a greater insurance than that.

My assessment would be she would need to state affirmatively that she cannot be influenced by her friend and

make her own decision.

THE COURT: I guess my question right now is if you have a followup question you want me to ask her?

MS. ABEL: Sure. Would she be able to set aside the influence of her friend in making a judgment -- her friend of 25 years who is on the LAPD for 25 years in making her judgment.

THE COURT: I don't think we we're going to get a new answer to that question.

MS. ABEL: Her answer remains equivocal.

THE COURT: I can ask the question again, and then we can handle it in argument.

MS. ABEL: Understood.

THE COURT: Okay. And so my question is: Would you be able to put aside the influence of your friend in deciding this case?

PROSPECTIVE JUROR: Yes, I would try very hard. I don't want to say yes, because if I'm -- I don't want to lie.

THE COURT: Understood.

PROSPECTIVE JUROR: You know, my friend has been a big influence in my life, and a situation like that came up, I would be, you know, going back and forth on it. Honestly, I wouldn't forget what she told me.

THE COURT: If you got to a point in the trial where you started to realize, you know what, my experiences with my

friend or something she has told me is something that is influencing me, would you commit to letting me know that?

PROSPECTIVE JUROR: Sure, I would. Sure.

THE COURT: Thank you. Thank you, Juror No. 25.

Let us have -- you will wait outside with the other jurors. Let me have Juror No. 19.

Hello, Juror No. 19.

PROSPECTIVE JUROR: Hello.

THE COURT: I just had a followup question for one of the questions that I asked you.

So, I asked the question about whether you are more or less likely to believe testimony of a law enforcement witness just because the witness is law enforcement?

I think you said you are more likely to believe, yes.

PROSPECTIVE JUROR: Yes.

THE COURT: One of the instructions you are going to get is that you are to judge the credibility of every witness, you are to decide for each witness whether everything they say is true, part of what they said is true, none of what they say is true.

And you are supposed to decide that not based on bias or prior experiences, but based upon what you see and hear them say, their body language, how it compares with the other evidence in the case.

So putting aside maybe when you came in here with what

you are more likely to do, would you able to follow that instruction of the Court, to judge all of the witnesses by the same standards, and to determine their credibility not based upon a bias you have or a belief you have about law enforcement, in general, but just based upon what you see and hear in the courtroom?

PROSPECTIVE JUROR: I will do my best, yes.

THE COURT: When you say you will do your best, do you mean I don't know what the future holds, but you are committed to doing it?

PROSPECTIVE JUROR: Yes.

THE COURT: Or do you mean you are not sure if you can commit to that?

PROSPECTIVE JUROR: Yes, I just don't know what the future holds, but yes, I will do my best.

THE COURT: If you get to a point where you realize actually, I'm not judging these witnesses by what I'm seeing and I'm judging, based on my experience with other law enforcement in the past, would you commit to letting me know?

PROSPECTIVE JUROR: Yes, I would.

THE COURT: Okay. Any additional followup from the parties, if so, I can handle it at sidebar.

MR. HARI: No, Your Honor.

MS. ABEL: Yes, Your Honor.

THE COURT: Let me see you at sidebar on the record.

(Sidebar begins.)

THE COURT: Additional followup?

MS. ABEL: Your Honor, she also said that she felt positively about the experiences, her view of law enforcement activity in response to immigration protests.

THE COURT: Okay.

MS. ABEL: Can we follow up on that?

THE COURT: But she said, she did not respond that she cannot put that aside.

MS. ABEL: I don't think the question was ever asked.

THE COURT: I did ask that question.

MS. ABEL: I didn't have a note about that.

THE COURT: I asked for the people that had a positive opinion, nobody answered they couldn't put it aside. I asked the people that had a negative opinion, and 33 and 35 said they couldn't put that aside.

MS. NICKELL: I did not have that.

THE COURT: Any additional followup? I need you to speak into the microphone.

MS. NICKELL: Two witnesses, one law enforcement, and one not, are you saying who was more credible without hearing anything, if she has any biases to one person as more credible, just on the nature of being a law enforcement officer?

THE COURT: Okay. I feel like I have already asked that question, but I will let you handle anything in argument.

MS. NICKELL: Okay.

THE COURT: Thank you.

(Sidebar ends.)

THE COURT: Thank you. Juror 19, we will have you step outside with the other jurors.

Let me have Juror No. 8.

Juror No. 8, good to see you again.

PROSPECTIVE JUROR: Hello.

THE COURT: Juror No. 8, I just had a followup. I believe that I had a question about whether you are more or less likely to believe the testimony of a law enforcement officer just because the witness is a law enforcement officer, and I think you said, I think you answered yes to the question of you're less likely to believe the testimony of a law enforcement officer, just because the witness is a law enforcement officer; is that correct?

PROSPECTIVE JUROR: That is correct.

THE COURT: Okay. And you heard me talk about what I'm going to ask you to do as jurors, and you will get instructions that will explain to you that you are to decide the credibility of any witness, and you are to determine whether to believe all of what a witness says, part of what they say, none of what they say, and you are to make that

decision, based upon what you see and hear in the courtroom.

What they say, how they see it, their body language, how it compares with the other evidence in the case, and you are not to decide their credibility based on any preconceived notions or biases.

Do you think you will be able to put aside any preconceived notions or biases you have about law enforcement and their credibility and just decide the credibility of any law enforcement officers based upon what you see and hear in this courtroom?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you. Any additional followup needed, if so, we can handle it at sidebar.

MR. HARI: No, Your Honor.

MS. ABEL: No, Your Honor.

THE COURT: Thank you, Juror No. 8. If I could have Juror No. 7?

Juror No. 7, good to see you again. Good afternoon.

PROSPECTIVE JUROR: Good afternoon.

THE COURT: Juror No. 7, in response to one of the questions I think you answered yes, when I said are you less likely to believe a law enforcement witness than another witness simply because they are a law enforcement officer?

Do I have that correct?

PROSPECTIVE JUROR: That's correct.

THE COURT: And later on in the trial, if you are selected as a juror, you are going to get some instructions from me.

I'm going to explain that it is the juror's duty to determine the credibility of each witness.

It will be for you to decide whenever each witness testifies, do you believe everything the witness says, part of what they say, none of what they say.

And you are supposed to decide that based upon what you see and hear in the courtroom, what they say, how they say it, their body language, how it compares to the other evidence in the case.

And you are not supposed to decide their credibility and whether you believe them based upon other notions that you have about law enforcement, in general.

So do you think you will be able to follow my instructions and just decide the credibility of the law enforcement officers based upon what you see and hear in the courtroom and you will be able to put aside your preconceived notions?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. Thank you. Any additional followup needed from either side?

MR. HARI: No.

PROSPECTIVE JUROR: No.

THE COURT: That was the question for the attorneys.

MR. HARI: Nothing further.

MS. ABEL: No, Your Honor.

THE COURT: Juror No. 7. Let's have you step outside.

If I could have Juror No. 2?

Hello, Juror No. 2.

PROSPECTIVE JUROR: Hello.

THE COURT: I just wanted to follow up. You mentioned that you have had four foster children and I think you mentioned that two of them were victims of abuse, maybe all four.

PROSPECTIVE JUROR: Three for sure, the two I have adopted.

THE COURT: Yes.

PROSPECTIVE JUROR: Those were the two specifically that I was referring to.

THE COURT: So if we might just go through them one by one?

PROSPECTIVE JUROR: Yes.

THE COURT: Let's start with the oldest, how old?

PROSPECTIVE JUROR: By old, do did you mean in age, or when they came to me chronologically?

THE COURT: What is their age right now?

PROSPECTIVE JUROR: The first child who came to me

is now 18.

THE COURT: Okay. And when to your knowledge when did the abuse happen?

PROSPECTIVE JUROR: When between -- it was a little tricky with him, because he probably -- between the ages of 4 and 6.

But from what we understand he was more of a witness to a lot of it, and his adopted brother, he was adopted when he was a baby, I'm his second adopted mom.

Most of the abuse was targeted towards his older brother at the time, but they were both removed.

THE COURT: When this happened -- this happened when he was 4 to 6 years old. When did he start to live with you?

PROSPECTIVE JUROR: He -- it's be ten -- just over ten years now.

THE COURT: So he started to live with you when he was about eight?

PROSPECTIVE JUROR: Yes, he was eight-years-old.

THE COURT: And the nature of the abuse was it physical abuse, sexual abuse, emotional or --

PROSPECTIVE JUROR: Physical abuse, psychological abuse, neglect. I believe there was some sexual abuse during his time in foster care.

THE COURT: By somebody else other than adoptive parents?

PROSPECTIVE JUROR: Correct, by other children in the home while he was in foster care.

THE COURT: To your knowledge, all of this abuse happened before he started living with you at the age of eight?

PROSPECTIVE JUROR: Correct, he went into foster care at the age of six.

THE COURT: Remind me, did you participate or observe any court proceedings concerning the abuse?

PROSPECTIVE JUROR: No. My understanding was that charges were going to be pressed against the mother, but I don't know how that all ended up happening. To my last knowledge, things weren't going to court, or hadn't gone to court because she had some sort of health situation.

But we haven't been involved in anything legally in the last eight years. Things kind of petered out after the first couple of years.

THE COURT: Then your next child, the 18 year-old is your oldest?

PROSPECTIVE JUROR: He's the oldest of my two adopted children, yes.

So I guess age-wise, my oldest foster son is now 24.

THE COURT: I think let's go with their actual age, I think that is easier.

PROSPECTIVE JUROR: It's tricky. The two that are adopted, or my first foster child and last foster child, I have

two in the middle.

THE COURT: Your oldest child either foster or adopted is 24-years-old?

PROSPECTIVE JUROR: 24, 25.

THE COURT: Is it your belief that child was also the victim of abuse?

PROSPECTIVE JUROR: I don't know. He came to us later in his teens and was only with us for a little while.

THE COURT: And then so we got the 24-year-old, the 18-year-old who is adopted, and then the next child.

PROSPECTIVE JUROR: The 21, in between, I have 24, 21, 18, and 16 is what their ages would be now. The 21-year-old is pending adoption.

He came to us six years ago, right before high school. His was primarily physical abuse and neglect. I believe his sister had some sexual abuse, but not him, that he has disclosed.

THE COURT: Do you know whether there were any criminal charges, whether there were any court proceedings?

PROSPECTIVE JUROR: Not in regards to that. I believe his biological father has had criminal activity but he -- we haven't been a part of that at all.

THE COURT: Then the 16-year-old, that child was a foster child of yours, is not adopted?

PROSPECTIVE JUROR: Correct.

THE COURT: And is it your understanding that that child also suffered child abuse of some sort?

PROSPECTIVE JUROR: Yes. I think his was primarily neglect, but potentially some physical abuse.

There was a lot of domestic violence in the home, And he lived with us for about a year and a half.

THE COURT: At what age did he come to live with you?

PROSPECTIVE JUROR: He was six.

THE COURT: At what age did the abuse happen?

PROSPECTIVE JUROR: On and off from birth to six.

THE COURT: Okay. And is there anything about what you -- what you know or experience with -- I'm considering all four of your children.

Anything that you know or experienced with respect to them being victims of crime that is going to prevent you from being fair and impartial to both sides in this case?

PROSPECTIVE JUROR: No. I do not believe so.

THE COURT: Will you be able to set aside the fact that all of these children of yours have been the victims of crime when deciding this case and just to decide this case based on the evidence in the courtroom and the law as I give it to you?

PROSPECTIVE JUROR: Yes, I do.

THE COURT: Thank you.

Any additional followup from the parties, if so, I can hear you at sidebar.

MR. HARI: No, Your Honor.

MS. ABEL: No, Your Honor.

THE COURT: Thank you, Juror No. 2. I appreciate it. I will have you wait outside with the other jurors.

Mr. Berry, you can let the jurors know it probably will be another 20 minutes. Thank you.

MS. ABEL: Your Honor, defense did have one more I had noted and forgot to raise.

No. 3, that is the woman who is the Director of Public Safety in Malibu who oversees law enforcement.

I think one question I have, she stated that she directed them and assigned them, was responsible for providing some level of assignment to sheriff's, where they go, what they need.

I would love to understand better if that, any of that was in response to protests.

Had she had any direction of law enforcement in their responses to protestors in or -- I assume City of Malibu.

THE COURT: Mr. Berry, do you think you could get Juror No. 3?

THE COURTROOM DEPUTY: Three.

THE COURT: Juror No. 3, good afternoon, thank you.

Juror No. 3, I wanted to follow up.

You mentioned that you are the Director of Public Safety for Malibu, and as part of those duties you explained that you handle the contracts with the law enforcement you contract with.

Did you also indicate you are responsible for assigning law enforcement in terms of what duties they need to be responsible for in Malibu?

PROSPECTIVE JUROR: Just from a very minor way, for example, we recently wanted to have law enforcements presence at a school. You may know there is a no growth moratorium on sheriff's.

You can't get sheriffs to your contract. So in looking at our contract, I was able to look at one of the deputies and what they were assigned to doing and request that they be reassigned to the school.

THE COURT: Okay. And have you been responsible for doing any assignments or reassignments in relation to protests?

PROSPECTIVE JUROR: No.

THE COURT: Any additional followup from the parties, if so, I can handle at sidebar.

MR. HARI: No, Your Honor.

MS. ABEL: No, Your Honor.

THE COURT: We will let you go back to your break. It will be another 20 minutes or so. Thank you Juror No. 3.

Okay. Let me hear from the parties. Having done that

followup, let's start with the government, any additional jurors you are seeking for excuse for cause?

MR. HARI: I just had an idea that occurred to me. With regards to the interaction between Inspector Ranjo and Juror No. 14, One suggestion we would make is to also ask Juror No. 14 about what she recalls about that incident.

Since we are calling folks in and out anyway, it wouldn't look untoward to the rest of the venire if she came in and answered the Court's questions.

THE COURT: Would the defense like that?

MS. ABEL: Your Honor, only with a very firm instruction that she not discuss that in any way with any of the other jurors.

THE COURT: Yes, absolutely. We will see if we can get her back.

I told Mr. Berry to let them go for another 20 minutes. If he sees her out there, he could bring her in.

THE COURTROOM DEPUTY: They are waiting.

THE COURT: So while that is happening, if the parties can think about any additional jurors that they are seeking to excuse for cause besides the ones that the parties have stipulated to excuse for cause, and I'm including in that, 34, who is already gone.

MR. HARI: Your Honor, we would stipulate to Juror No. 47 being excused for cause.

THE COURT: Yes, and then I will hear from the defense.

MS. ABEL: I'm sorry.

THE COURT: Okay. We're back on the record with Juror No. 14.

PROSPECTIVE JUROR: Yes.

THE COURT: You can have a seat. Thank you for coming in.

Juror No. 14, so, it has come to my attention that at one of the breaks, there was a person sitting outside and you asked them to, like, watch your bag while you went to the bathroom, and I'm just wondering if there were any other jurors present when you asked him to do that.

PROSPECTIVE JUROR: I don't remember asking anybody.

THE COURT: Maybe you can then -- maybe I should have started with that. What is your recollection of what happened, if you could just speak into the microphone?

PROSPECTIVE JUROR: I just went outside and sat with the sun at my back and started eating. The only time I got up was to throw my things away, pack up, and come up here.

THE COURT: You didn't ask anybody to watch your bag?

PROSPECTIVE JUROR: I have now, but no.

THE COURT: Okay. Just this time, when you are coming in this time, okay. Thank you.

PROSPECTIVE JUROR: Okay.

THE COURT: So perhaps we need to have Inspector Ranjo come in and confirm who it is.

MR. HARI: We're fine with that. That is the individual he pointed out to me, but we can have him come up and confirm that.

THE COURT: I don't know if we need additional questions, but would you like us to have the Inspector answer the question?

MS. ABEL: Yes, Your Honor. Inspector Ranjo clearly believed a juror had told him to -- had asked him, excuse me, to watch her stuff so clearly he believed it occurred.

I'm concerned it was a different juror maybe, you just misremembered the number.

THE COURT: I think what Mr. Hari is saying that he pointed out the juror, and it was this woman; is that correct?

MR. HARI: That is correct, Your Honor.

THE COURT: Okay.

MS. ABEL: Understood, Your Honor. Again, there could be confusion as to which one he believed it to be, there are 60 of them today.

THE COURT: We can have them come up.

MR. MACKIE: Just so the record is clear, Your Honor, I don't know that Inspector Ranjo said the woman specifically asked him, perhaps he was doing a nice gesture, so

perhaps that is something to clarify with him.

THE COURT: Thank you. So you are going to get him up here? Is somebody doing that?

You are texting him?

So we will have additional questions about that.

Who is the government seeking to -- sorry, first of all, the government offered to stipulate to 47. Let me hear from defense counsel.

MS. ABEL: The defense agrees for cause for 47.

THE COURT: Okay. And anybody else that the government is seeking to excuse for cause?

MR. HARI: No, Your Honor.

THE COURT: Anybody else that the defense is seeking to excuse for cause?

MS. ABEL: Your Honor, can I have just a brief moment?

THE COURT: Yes.

MS. ABEL: Your Honor, defense would request for cause on No. 27.

THE COURT: Let me let you be heard.

MS. ABEL: That is the gentleman who insists he's elderly. When asked directly, he said he has difficulty with his memory.

The defense has substantial concerns about his ability to remember a trial over what inevitably will be a weekend.

THE COURT: Anything from the government?

MR. HARI: We have no objection to that.

THE COURT: Okay.

MR. HARI: That is Inspector Ranjo.

THE COURT: Did the parties want to put him under oath or question him orally?

MS. ABEL: Defense would request him under oath.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before the Court, shall be the truth, the whole truth and nothing but the truth, so help you God?

THE WITNESS: Yes.

THE COURT: Okay. Good afternoon Inspector, I will have you take the podium, just so you are speaking into the mic.

I understand you had an interaction with the juror you advised the AUSA of, I appreciate that. Describe for me what happened.

THE WITNESS: I was sitting outside on the bench. I was out there by myself for well over an hour or so. Then people started to file out of the room.

A woman stopped a little to my left, put her bags down, and said, I'm going to take a walk, would you mind watching these?

She looked at me and said, oh, you are not a juror. No,

I'm not a juror, I'm going to be here for a while, you can leave them there, I'm sure they will be fine.

She said, okay, thank you, and started to walk around the area outside.

THE COURT: What did she look like?

THE WITNESS: She was probably in her 60's, I guess. A woman, not really sure, I think she had kind of light hair or gray hair maybe.

THE COURT: Did you see her number?

THE WITNESS: I think she was 14, I didn't see that at first.

THE COURT: You saw her later and you saw that that was her number?

THE WITNESS: Yes.

THE COURT: Do you remember if there were any other jurors around when you had that conversation with her?

THE WITNESS: There were a few other people out there. I don't know who were out there, though.

THE COURT: Okay. Any additional followup from the parties, if so, I would like to address it at sidebar.

MS. ABEL: Yes, Your Honor.

THE COURT: Okay.

(Sidebar begins.)

THE COURT: Yes.

MS. ABEL: Rebecca Abel for the defense.

THE COURT: Make sure you are speaking into the microphone.

MS. ABEL: He said there were a few other people, I want to clarify. I believe I understood him to say those were the people who came out of this courtroom, and he may or may not have seen their juror numbers, but to clarify, they were people exiting from this room and were gathered there, were people in the area in which he was standing at the time the interaction occurred who had just exited the courtroom.

THE COURT: Anything else?

MS. NICKELL: Kyra Nickell. The length of time that interaction was, and when the juror returned, was there any conversation and was anybody present when the juror returned?

MR. HARI: And how far they were from him at the time.

THE COURT: Okay. Thank you.

(Sidebar ends.)

THE COURT: So the others that were present when the first interaction happened, were they all people that had also come out of the courtroom?

THE WITNESS: Yes, they were.

THE COURT: And how many people would you say that was?

THE WITNESS: Total came out of the courtroom?

THE COURT: At the time you are having this

conversation about she's going to go for a walk, you will watch her bags?

THE WITNESS: I would say there was probably maybe five people close around to us.

THE COURT: Okay. And how close were they to you? Were they close enough to hear you?

THE WITNESS: I don't think so, no.

THE COURT: Can you estimate how far away they were?

THE WITNESS: I would say the closest one was maybe about ten feet.

THE COURT: And how loud were you and the juror speaking?

THE WITNESS: Just as loud as I'm speaking now. Normal tone.

THE COURT: But the closest person, you don't think they could have heard what you said based upon the volume and how far they were?

THE WITNESS: I don't think so.

THE COURT: Okay. And then when she came back from her walk or the bathroom, was there another conversation?

THE WITNESS: So I was informed there was a room I could sit in, behind me to the right over here.

THE COURT: Yes.

THE WITNESS: And --

THE COURT: Mr. Hari, Mr. Mackie.

THE WITNESS: These two, yes, this woman asked me to watch her stuff, I'm going to leave it here, so I saw her walking around still, and she was starting to come back and I said I have go in. And that was it, then I went in.

THE COURT: And when you said that to her, were there others around, other jurors?

THE WITNESS: I believe there was probably the same amount of people, yes.

THE COURT: Some of them were close enough to hear you, some of them were further than her?

THE WITNESS: Correct. She was a little bit further away, she wasn't right there.

THE COURT: Sorry, I should have asked it this way: Some of them were closer to you than she was when you said: Hey I have got to go in?

THE WITNESS: That's correct.

THE COURT: Any additional followup from parties?

MS. ABEL: Just confer for a brief moment.

THE COURT: Yes.

MS. ABEL: Your Honor, we do have one supplemental question.

THE COURT: We will handle it at sidebar.

MS. ABEL: Thank you.

(Sidebar begins.)

THE COURT: Go ahead.

MS. ABEL: It wasn't clear to me, how long he was sitting there watching her stuff.

THE COURT: Okay.

MS. ABEL: The duration of time with her belongings.

THE COURT: Yes.

(Sidebar ends.)

THE COURT: Okay. How long was the first conversation that you had with her, how long would you say that was?

THE WITNESS: Two to three sentences.

THE COURT: So, a minute, two minutes, five minutes?

THE WITNESS: A minute, max.

THE COURT: And how long after that one-minute conversation, were you sitting there watching her bags before Mr. Hari grabbed you to come inside?

THE WITNESS: I would say somewhere between five and 10 minutes.

THE COURT: Okay. Any additional followup?

MS. NICKELL: We have one more, Your Honor.

THE COURT: Yes.

(Sidebar begins.)

THE COURT: Go ahead.

MS. NICKELL: We would be interested in learning whether anyone from the government, the attorneys, or the agents interacted with him from the beginning of this meeting

up until he was brought into the conference room by Mr. Hari.

So, like, the agent, whether he interacted with him, he was watching her stuff or he was sitting there by himself.

THE COURT: I'm sorry. The question is whether government counsel was talking to them while he was watching the bag?

MS. NICKELL: Any other agents or officers.

THE COURT: During the time?

MS. ABEL: During the time in which he was out there and jurors were there, if at any point a juror could have witnessed him interact with government counsel?

THE COURT: Okay. Not just during the time he was watching the bag?

MS. ABEL: Yes, okay.

THE COURT: Thank you.

(Sidebar ends.)

THE COURT: Okay. What time did you get here this morning?

THE WITNESS: I believe I arrived somewhere around 1:30-ish, maybe a little after that.

THE COURT: Okay. And when you arrived, you had been mostly waiting outside in the hallway, yes?

THE WITNESS: That's correct.

THE COURT: While you had been in the hallway have you been -- you have told us about the time Mr. Hari grabbed

you to come inside.

Besides that time, did you have any other interactions in the hallway with government counsel or any other government representative, so there is the time that Mr. Hari grabbed you, I think there was -- yeah, besides that time.

THE WITNESS: No, not at all.

THE COURT: So you were just waiting out there, you had this interaction with this woman, you watched her bag for five to 10 minutes, and then the first time you had an interaction with Mr. Hari or Mr. Mackie in the hallway was at the end of that period?

THE WITNESS: Correct.

THE COURT: Any additional followup needed?

MS. ABEL: Nothing further.

THE COURT: Thank you. We will have you step outside as well. Don't talk to anybody or you will go to whatever floor they send you to, or this little room here, and we will let you know what is next.

Thank you so much.

THE WITNESS: Thank you, Your Honor.

THE COURT: Okay. Well, we will get to that in just a moment.

Any other jurors that the defense is seeking to excuse for cause?

MS. ABEL: Yes, Your Honor. Teresa Flores.

THE COURT: Let's use their numbers.

MS. ABEL: Thank you, Your Honor, 25. The "do my best." Her further elaboration left her without a firm statement that she can judge a law enforcement officer by the same standard as any other witness.

THE COURT: Anything else on Juror No. 25?

MS. ABEL: Specifically, she said her friendship with an LAPD officer is, quote, going to influence my decision.

THE COURT: I don't recall her saying that, but anything else?

MS. ABEL: No, Your Honor.

THE COURT: Anything from the government?

MR. HARI: Yes, Your Honor. We don't believe there is cause to strike Juror No. 25.

First, what she described was that she would be bringing her experience in the courtroom as jurors are expected to, but in followup to the Court's questions: One, she indicated that she was not talking about a commitment to not be fair or impartial now, but that she could not predict future conduct.

She did indicate she would make a commitment to be fair and impartial, and critically when the Court asked, would she let the Court know if she couldn't be fair and impartial or was no longer able to be fair and impartial, and she indicated that she would.

Given that record, we don't believe there is cause to

strike Juror No. 25.

THE COURT: Any other jurors the defense is seeking to strike for cause?

MS. ABEL: Yes, Your Honor, No. 36.

THE COURT: Let me have you be heard.

MS. ABEL: That was the juror who has the hardship for work and will not be able to sleep.

He did indicate that he would need to perform that work and that he would -- he needs to do so for his ability to earn a living.

Given that he needs to perform the work, and that he confirmed he would have very little sleep, the defense has substantial concerns regarding his ability on focus and paying attention to the evidence at trial.

THE COURT: Let me hear from the government.

MR. HARI: Your Honor, we don't believe there is cause to strike 36 either. I don't believe he ever indicated he wouldn't be able to pay attention.

I think he was comfortable with the schedule. His concerns seem to be, one, maybe a little bit more focused on the fact that his girlfriend's birthday was coming up, that seemed to be, at least, the most he discussed what his conflict would be.

He did mention bills briefly, but again, he indicated what his schedule was and his ability to go to work with the

schedule that the Court has proposed.

We don't believe there is cause for Juror No. 36.

THE COURT: Okay. Any other jurors that the defense is seeking to go strike for cause?

MS. ABEL: No. 41, Your Honor. That is the juror whose father suffered an attack.

He said he is going to go be thinking about that during the trial.

When asked, he said he feels it's an experience he cannot set aside.

He said it happened to us now, I know how it feels when specifically asked about whether he could judge this case fairly and impartially, and he did not say that he could set it aside ever with a firm statement.

He was at best, equivocal, and I think much further than that in terms of the effect of that assault.

Also, when discussing "serious", it was a moving target, at best, in terms of whether blood was -- he couldn't say what would or would not constitute "serious".

Of course, the Court cannot tell him what is or is not "serious." Defense has substantial concerns given we don't know where the line for serious is.

This one may be serious, and if it is, he has made it very clear he could not be fair and impartial.

THE COURT: Let me hear from the government.

MR. HARI: We would stipulate to Juror 41, Your Honor.

THE COURT: Anybody else?

MR. HARI: Not from the government.

THE COURT: We kind of need to move.

MS. ABEL: Understood. Your Honor, can we clarify for the record if 28 is still a juror?

My note is equivocal.

THE COURT: I don't have any notes.

MS. ABEL: That means she is?

THE COURT: Yes.

MS. ABEL: I don't believe any further for causes.

THE COURT: Thank you.

So the ones that I need to rule on are 25 and 36.

With respect to 25, as indicated, I don't believe that I heard the testimony -- the answer you indicated.

I questioned her based upon everything that I heard from her, her body language, it was clear to me she's committed to judge all witnesses by the same standards and to put aside her experiences with her friend.

It seems clear to me she's -- just some jurors just have difficulty saying some things very unequivocal, because they feel like to be honest they need to allow for the possibility of something changing.

And, so based upon the questioning, I am not concerned

that she cannot be fair and impartial and that she cannot set aside the potential influence of her friend, which was very inchoate to the point she committed to let me know if she says she is not able to do that.

So that cause challenge is denied.

Then Juror No. 36.

It did occur -- it appears to me that this job, as he indicated, is something he is really looking forward to, he said he needs it to pay his bills, he is willing to continue to serve and do the job.

But it does seem it would be a hardship for him to not take the job.

In the alternative, where he has proposed he is not sleeping at all, he looks young to me, I don't know if he is young. He thinks he can do it, but I don't think -- I don't think he's able to serve, so even if it would not be a hardship for him, I don't think he's a juror that is able to serve because he is not going to be sleeping for days at a time.

So, I will be excusing Juror No. 36 for cause.

So let me review with the parties, who is being excused for cause.

We will put them on the chart and then we will have the parties exercised.

Mr. Berry, if you could hand the government this and then that other one is for the defense. We will handle your

blind strikes.

So I have the following stipulations for cause.

Juror Number 9.

Juror Number 11.

Juror Number 12.

Juror Number 13.

Juror Number 14.

Juror Number 16.

Juror Number 20.

Juror Number 21.

Juror Number 23.

Juror Number 25. There was a question for hardship, which was denied.

Juror Number 27.

Juror Number 30.

Juror Number 32.

Juror Number 33.

Juror Number 34 has already been excused for cause.

Juror Number 35.

Juror Number 36, I granted the defense's challenge for cause.

Juror Number 38.

Juror Number 41.

Juror Number 45.

Juror Number 47.

Juror Number 48.

Juror Number 50.

Juror Number 52.

Juror Number 57.

And Juror Number 58.

Okay. Any other jurors that the parties are aware have been excused or stipulated to?

Okay. With that, we will take a brief recess for the parties to determine who they are seeking to use their peremptories on for the main panel.

After we seat the main panel, then we will use your peremptories on -- the one peremptory you have on the alternate.

Let's go off the record.

(Pause in the proceedings.)

THE COURT: One more minute, counsel.

MS. ABEL: Your Honor, I'm sorry, this is our few minutes to fill out the form?

THE COURT: Yes.

MS. ABEL: I thought we were doing that outside the courtroom. My misunderstanding.

THE COURT: The jury is outside of the courtroom while you are doing it.

MS. ABEL: I thought the Court was going to take a recess while we did that.

THE COURT: This is a recess, you can go to the room if you want to.

MS. ABEL: It wasn't clear to me that was the case.

THE COURT: Okay. And maybe I should do this because it's not clear to you.

So we're just picking the 12 jurors. Then we will pick the alternates in just a moment.

The jurors that are in the box. The following are being excused for cause, 9, 11 and 12.

So Juror Numbers 13 and 14 are also being excused for cause.

I'm filling the box, Juror Number 15 is going into seat 9.

Juror Number 16 is being excused for cause.

Juror Number 17 is going into seat 11, and Juror Number 18 is going into seat 12.

So right now in the box, we have 1, 2, 3, 4, 5, 6, and then we have 7, 8, 15, 10, 17 and 18. That is who is in the box and the box will continue to be filled in order.

You can use your peremptories against any one of the 60 jurors.

MS. NICKELL: I'm sorry, Your Honor, what happened to 10. I thought we had 10?

THE COURT: Yeah, 10 is still in the box. Should I repeat who is in the box?

MS. NICKELL: If you don't mind.

THE COURT: One in seat 1, 3 in seat 3, 4 in seat 4, 5 in seat 5, 6 in seat 6, 7 in seat 7, 8 in seat 8, 15 in seat 9, 10 in seat 10, 17 in seat 11, and 18 in seat 12.

MS. NICKELL: My mistake. I see what happened. Thank you.

THE COURT: Are we almost done? We're keeping everybody late.

MS. NICKELL: Almost there, Your Honor.

THE COURT: Okay. Okay, counsel, I'm going to need to ask you to wrap it up.

I will give you one more minute, but we have got to move.

MS. ABEL: We're just signing it, Your Honor.

THE COURT: If the government could pass their sheet to Mr. Berry. This is just for the 12. We will do the alternates in just a moment.

Okay. The government is seeking to strike the following: 7, 8, 6, 10, 29, and 31.

Again, that is 7, 8, 6, 10, 29 and 31. Any Batson and Wheeler challenges by the defense?

MS. ABEL: Just one moment. As we were saying it I'm writing it.

THE COURT: And just so the government can start thinking about it, the defense is seeking to go strike

Jurors 1, 2, 3, 19, 22, 25, 28, 18, 37 and 43.

That is 1, 2, 3, 19, 22, 25, 28, 18, 37 and 43.

Anybody Batson Wheeler challenges from the government?

MR. HARI: No challenges from the government, Your Honor.

THE COURT: Thank you.

MS. ABEL: None from the defense, Your Honor.

THE COURT: Thank you.

Okay. So with that, the following jurors are being stricken: 7, 8, 6, this is out of order, but I'm going to refill them in order, 10, 29 -- let me do that over again.

So 7, 8, 6, 10, 29, and 31, and then from the defense, we have 1, 2, 3, 19, 22, 25, 28, 18, 37, and 43.

Okay. So in the box, I'm going to now fill the box in order and I will ask my law clerk to put this on the Elmo so we're all clear.

Juror Number 24 is going to go in seat one.

Juror Number 26 is going in seat two.

Juror Number 39 is in seat three.

Juror Number 4 is in seat four.

Five is in seat five.

Juror Number 40 is in seat six.

Juror Number 42 is in seat seven.

Juror Number 44 is in seat eight.

Juror Number 15 as indicated earlier is in seat -- I'm

sorry, nine. Juror Number 15 is in seat nine.

Juror Number 46 is in seat ten.

Juror Number 17 is in seat 11.

Juror Number 49 is in seat 12.

Okay. Any objections at this point?

MS. ABEL: To the issue on which we have venired Ranjo, that is -- I would like to be heard on it when the appropriate time comes.

THE COURT: Let's do that.

MS. ABEL: Right now. I thought we were bringing the jury back in urgently.

So, Your Honor, I will be heard if the Court would like me to.

THE COURT: Yes.

MS. ABEL: It's very clear from Inspector Ranjo that an interaction with the juror occurred.

It also seems quite clear that that juror was not 14 because 14 came and told us it didn't happen.

Therefore, we know the interaction occurred and have no idea which juror it was.

It well could have been any of the jurors that we placed in the box, and we would not have any way of knowing that, absent further investigation.

Given that we know an interaction between the juror and the complaining witness in this case occurred, that interaction

was not momentary, it was prolonged in -- it's late in the evening, and my articulation is less than ideal.

However, it was in the nature of a favor, in fact a specific request for the complaining witness to help her.

And he did so. In fact, he volunteered to do so.

THE COURT: Just in view of the time, what are you asking for?

MS. ABEL: At this point, we would ask that the venire be struck.

We know he had this interaction with the juror. We don't know which one, at least five other jurors were present. He was speaking at a normal volume of which all of us could hear, given that at least other five jurors witnessed the interaction, and that interaction went on for five to ten minutes.

THE COURT: Well, the five to ten minutes was the period of time he is watching the bag.

MS. ABEL: There was the initial interaction.

THE COURT: It was a maximum of one minute.

MS. ABEL: Then the interaction at the conclusion. I think it's a reasonable inference for one of the five potential jurors, and who knows, if it was the same five at the beginning of the five minutes, or at the end of the five to ten minutes.

However, the many number of jurors who could have

witnessed this interaction would have witnessed it as a interaction between what they all will learn was a complaining witness and the member of the venire of a positive nature.

If it were negative, we would have the same complaint, although, perhaps it would be from the government.

I do think that witnessing that interaction and witnessing his speaking with her, ongoing watch of her stuff present in the area in which other jurors were for an extended period of time, and then an interaction with the prosecutor and that person.

That person will come back to this Court in one to two days and testify on the stand presumably in a suit much like the one he was wearing today.

I do think it's very reasonable to assume, in fact very likely, that five of those five people, one of them is one of the many who is placed in the box, and for that reason, and with great regret, but belief it is necessary that the defense would ask to strike the venire.

THE COURT: Is your argument dependent upon whether it was Juror 14, or not, meaning, even if was Juror 14, you would have the same arguments?

MS. ABEL: Your Honor --

THE COURT: Because for what it's worth, I think it was 14, and I think she is sort of misremembering, and to her, it wasn't very significant.

That is what I'm thinking happened, but I want to be clear on if it was 14, do you have the same arguments or are your arguments based on the fact that it was somebody else?

MS. ABEL: Your Honor, the Court's inference is directly contrary to what she stated and what he stated.

THE COURT: My question is --

MS. ABEL: Understood. I take issue with the premise of the question. It's fair enough.

THE COURT: You can do that, just answer the question.

MS. ABEL: Certainly. I do believe that we would have the same concern, even if it were 14, given the number of other people who witnessed the interaction that we cannot identify who they were.

THE COURT: Understood. Let me hear from the government. Thank you.

MR. MACKIE: Your Honor, not to add any further confusion to what has already taken place, I think the Court is right about memories.

I do want to correct something that the witness did say. When I saw him out in the hallway, I said hello to him on my way back in, as he was sitting out there.

THE COURT: Okay.

MR. MACKIE: It's likely that he doesn't remember that.

I want to make sure the record is crystal clear that I did greet him.

THE COURT: Okay.

MR. MACKIE: With respect to the position that defense counsel has taken, I think a cured instruction like the one the Court had suggested earlier is enough.

There is a lot of speculation about what people said and what people heard.

The witness did say no one was within ear shot. The closest person, at least when he was asked to watch the bag, and he agreed was ten feet away.

I think the Court could remind the jury not to be influenced by anything.

Perhaps, if the Court was willing to ask the jury if they had seen anything that sort of influenced them in any way, that might be appropriate.

MS. NICKELL: If I may, Your Honor.

THE COURT: Yes.

MS. NICKELL: At his testimony, he did admit that when he said he told this woman whose bag he was watching, I got to go in, he said that juror was behind other jurors when he made that statement.

He was unable to identify those other jurors or he did not identify those other jurors. So it's more than the juror whose bags he was watching, assuming it was Juror 14, or

otherwise, we noted there are several others, at least who have witnessed him doing, executing this favor for this woman, and then also going inside of this courtroom with government counsel.

So it leads a reasonable juror to believe this is someone associated with the government and I'm just going on with my co-counsel's prior arguments.

THE COURT: Okay. Let me take a brief recess, and I will come back and make my ruling.

I will come back in a few minutes.

THE COURTROOM DEPUTY: This Court is in recess.

(Brief recess.)

THE COURT: Okay. We are back on the record.

Okay. So I have heard the arguments of counsel, I believe that it was Juror No. 14, and she is not remembering what happened.

However, I do have concerns that it's my understanding that the officer was advised not to have any contact with any jurors, and apparently he did.

And I'm concerned that when I asked him if he had had any interactions with anyone else from the government team, he said he had not, and it appears that he did have an interaction with Mr. Mackie.

It's unclear to me what jurors who didn't see the first interaction would read from the second interaction.

But there is enough of a concern, and given what I understand to be the evidence in the case, and what the arguments of the parties are making, I am concerned that the nature of this contact is such that there are going to be some questions about whether the jurors saw something they shouldn't have seen and will read something into that.

And I don't think there is a way for me to ask about it without creating an issue.

So I am going to grant the defense request to excuse the venire.

I don't know when we can get another panel, and I have conflicts, the parties might have conflicts, so I'm not sure we can start this trial tomorrow.

And so, let's just -- apparently, we also have a mutiny of the jurors in the hallway, because they will be held much longer than they were told.

So I'm going to excuse the jurors at this time and then we can talk about whether we are proceeding tomorrow or what we're doing.

Does either party need to be heard further before we do that?

MR. MACKIE: No, Your Honor, nothing from the government.

THE COURT: So, Mr. Berry, if you could have the jurors come in. They don't need to take their seats, they can

sort of stand around gathered, and I will address them.

THE COURTROOM DEPUTY: All rise.

(The jury panel enters the courtroom at 5:34 p.m.)

THE COURT: You can take your original seat or stand and this will be very quick, as you will hear in a moment, that is irrelevant.

All the jurors are in the courtroom. We have all of our remaining jurors with the exception of Juror No. 34.

Jurors, I want to thank you for your patience. I told you that my highest priority, besides my oath to the constitution, is your time. But unfortunately, something happened, an interaction between one of the jurors and a party involved in this case, and it took a lot of time to resolve.

Because of that interaction, we will not be able to proceed with any of you, so all of you are excused from serving as a juror at this time.

I thank you for your time that you spent with us today, your candor, none of us take that for granted, but nevertheless, as I told you, my first oath is to the Constitution and fairness of this trial, and something happened which means we cannot proceed.

So, I believe that Mr. Berry, they need to go down stairs to the jury assembly room.

THE COURTROOM DEPUTY: Yes.

THE COURT: I see, there is a question. Juror

number -- what is your number? Number 57.

I will repeat what you say for the reporter, go ahead.

PROSPECTIVE JUROR: I wanted to take the time to state your consideration for us, and you have been really wonderful.

THE COURT: Okay. Thank you. I will definitely repeat that for the reporter. She said I was wonderful.

On your way out, please leave your number badges in the basket.

I hope this experience has not soured you on jury selection.

Please know, I did not come to this decision lightly, and all the best to you and happy holidays to all of you.

You are excused.

You are now free to talk about the case with anyone.

(Jury panel exits the courtroom at 5:36 p.m.)

THE COURT: We are back on the record.

I inquired of the jury department if we can get an additional set of 60 jurors by tomorrow. The answer is yes, and essentially no, in that we can get 60 jurors by tomorrow, but we cannot get a truly random selection because they have already advised the subsistence jurors, the ones that came from far, they have already advised them that they are not to come in, so I don't think we can proceed tomorrow.

I don't know if there is time to start on Friday.

And if we were to start on Friday, that runs into certain conflicts that the Court has next week.

So it sounds like we can't get a true random jury selection.

Mr. Berry has just advised me we cannot get a true random selection until Monday.

And the Court has a number of conflicts and then we also have the week of Thanksgiving.

So, I think what we should do is I will let the -- we can't -- I will let the parties be heard, but my determination is that we should not and cannot proceed tomorrow or Friday.

We cannot proceed until we have a truly random selection.

And so I would have the parties come in tomorrow to be heard as to when we should start the trial.

You can, perhaps, meet and confer with respect to a new date or if you want to be heard further.

Let me just inquire of Mr. Berry, our calendar tomorrow, I think I can probably -- let me have the parties come in at 10:00. That is what I'm inclined to do because I think we have an 8:30 and 9:00.

Okay. So with that, do the parties wish to be heard further this evening or can you come in tomorrow at 10:00 to be heard?

MR. HARI: 10:00 a.m. works for the government.

MS. ABEL: 10:00 a.m. works for the defense.

THE COURT: Thank you, Mr. Lopez. Well, you saw everything that happened, so, we're all disappointed but I have to do what I have to do.

So have a good night. Be safe, and we will see everybody tomorrow at 10:00.

I will ask the parties to either meet and confer this evening or tomorrow morning with respect to how to proceed, given that we cannot get a true selection until Monday.

The Court has a conflict, at least on Friday, maybe on Thursday, and the week of Thanksgiving.

With that, I do want to thank the parties. I would ask the government to have another conversation with Officer Ranjo, as to what happened.

A lot of time was wasted that was not necessary.

And so please, have a conversation with him and with all of your other witnesses to be clear on -- yeah, I don't think it needs further clarification.

And if you could also -- I think the only potential defense witness is someone who is not around, so that's not an issue there, but I would also ask the defense to have that conversation with any of their potential witnesses who might be in the courthouse.

With that, thank you.

MR. HARI: Thank you, Your Honor.

THE COURT: Thank you, everybody. Thank you to our staff for staying extremely late.

(The proceedings concluded at 5:42 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES )
)
STATE OF CALIFORNIA )

I, TERRI A. HOURIGAN, Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.

Date: 25th day of December, 2025.

/s/ TERRI A. HOURIGAN
________________________________________
TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
Federal Court Reporter