UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 2:25-cr-00705-MEMF-1 |
| Plaintiff, | ) | CRIMINAL |
| vs. | ) | Los Angeles, California |
| ISAIAS LOPEZ, | ) | Monday, January 26, 2026 |
| | ) | ( 8:47 a.m. to 10:18 a.m.) |
| Defendant. | ) | (10:44 a.m. to 11:26 a.m.) |

TESTIMONY OF ANTHONY SERMONS DURING JURY TRIAL - DAY 4

BEFORE THE HONORABLE MAAME EWUSI-MENSAH FRIMPONG,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff: AUSA RAHUL R.A. HARI
AUSA JULIAN JOHN XU
U.S. Attorney's Office
312 N. Spring Street
Los Angeles, CA 90012

For Defendant: DFPD REBECCA M. ABEL
DFPD KYRA KRISTINE NICKELL
Federal Public Defender's Office
321 East 2nd Street
Los Angeles, CA 90012

Court Reporter: Recorded; CourtSmart

Courtroom Deputy: Damon Berry

Transcribed by: Exceptional Reporting Services, Inc.
20079 Stone Oak Pkwy., Ste 1105-237
San Antonio, TX 78258
361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**INDEX**

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ANTHONY SERMONS | 3 | 15 | 92 | 103 |

**Los Angeles, California; Monday, January 26, 2026; 8:47 a.m.**

**(Partial transcript; Testimony of Anthony Sermons)**

**(Jurors present)**

**THE COURT:** Okay, we will get started. Jurors, you will remember that we had Inspector Sermon? Sermons.

**THE WITNESS:** Sermons.

**THE COURT:** Sermons, on the stand on Friday. Inspector Sermons, you are still under oath.

And I'll just remind you if you hear an objection then stop speaking until I tell you how to proceed, and make sure you're speaking into the microphone.

With that, Mr. Hari, you can continued your direct examination.

**MR. HARI:** Thank you, Your Honor.

**DIRECT EXAMINATION (CONTINUED)**

**BY MR. HARI:**

Q Good morning, Mr. Sermons.

A Good morning.

Q I want to cover some of the things that we had started to talk about on Friday before the weekend just to reframe where we were in the conversation.

You told us you work for FPS; is that right?

A Yes.

Q You mentioned that some of the primary responsibilities of FPS is to protect federal buildings?

A Yes.
Q Can you remind us what types of federal buildings FPS is responsible for protecting?
A All GSA, which is a General Service Administration, federally owned or leased buildings we protect.
Q Does that include buildings here in Los Angeles?
A Yes.
Q Does that include the Roybal Building we're in right now?
A Yes.
Q You mentioned that in August of last year, from July to August of last year I believe you said, you were in Los Angeles; is that right?
A Yes.
Q That's not your home office is it?
A No.
Q Can you remind us where you're based?
A Atlanta, Georgia.
Q While you were in Los Angeles what were you responsibilities?
A To provide law enforcement duties for the Edward Roybal Federal Building.
Q And you told us I believe on Friday that you were supervising other inspectors; is that right?
A Yes.
Q About how many inspectors were you responsible for

supervising while in LA?
A Fourteen.
Q And I think, correct me if I'm wrong, you told us you were responsible for supervising Inspector Leo Rango; is that true?
A Yes.
Q Does that include supervising him on August 8th, 2025?
A Yes.
Q Were you on duty on August 8th, 2025?
A Yes.
Q So let's start with your responsibilities on August 8th and then I want to talk about Inspector Rango's responsibilities on August 8th.
You described your responsibilities generally specific to that night on August 8th, what was your role as an FPS officer?
A My role was to supervise the shift for that particular day. Any issues or anything they would report to me and I would try to resolve them. That's including if there's any, you know, question about, you know, laws or our primary duties for the mission.
Q And when you say answer questions, do you mean from the inspectors you were supervising?
A Yes.
Q Where were you stationed on August 8th?
A At the Edward Roybal Federal Building outside of the loading dock.

Q Is that the building we're in now?
A Yes.
Q And was Inspector Rango on duty on August 8th?
A Yes.
Q About what time did your shift start on August 8th, 2025?
A At 3 p.m.
Q And until what time was it set to go?
A 3 a.m.
Q So 12 hours?
A It's 12 hours.
Q Was Inspector Rango's shift the same length of time?
A Yes.
Q Did you -- well we talked about your responsibilities, let's talk about Inspector Rango's responsibilities.
Specific to August 8th, 2025, what were his duties as an FPS officer?
A His duties were to, you know, enforce any laws that were committed at the federal building that's, you know, our primary duties, protect the building and its employees.
Q Were there people gathered outside of the Roybal Building on August 8th?
A Yes.
Q And at times did Federal Protective Services officers interact with those people?
A Yes.

Q In what way?

A Yeah, sometimes they would ask questions or sometimes we would tell them to, hey, you can't be on federal property, you need to back up, you know, get up -- you know, back up to the edge of the property line.

Q And what was your understanding of what the property line was?

A At the -- on the sidewalk there's a thin line and that was -- we believe that was the -- that distinguished the federal property and the city sidewalk.

Q And so on August 8th was it part of Inspector Rango's responsibility to ask people to step back to that line?

A Yes.

Q You mentioned you were stationed at the Roybal Federal Building, did you ever actually go out to the line itself?

A Yes.

Q And so was one of your responsibilities supervising inspectors in the field?

A Yes.

Q At the time of Inspector Rango's interaction with Mr. Lopez, were you stationed inside the building or outside the building?

A We were outside in the loading dock.

Q So you were on the line with Inspector Rango at the time of the interaction?

A Yes.

Q Can you describe for the members of the jury what type of clothing you were wearing on August 8th?

A Typical dark navy blue shirt that says Police, Federal Protective Service with a patch on our -- both side of the arms, left and right. Blue -- navy blue pants. Also we had a badge, you know, in front of our shirt on the left-hand side that says DHS, Federal Protective Service Police. Also we were wearing on standard duty issued uniform, including duty belts, including our Glock 40 .9 mil, handcuffs, taser, baton, or pepper spray.

Q And you said we there a couple of times. Was every Federal Protective Services officer in uniform that night?

A Yes.

Q Does that include Inspector Rango?

A Yes.

Q So you said there were people outside the Roybal Building on August 8th. Can you estimate about how many people were there at the time of the interaction between Mr. Lopez and Inspector Rango?

A Fifty to 75.

Q What were those people doing?

A They were actually engaged in a protest and they were yelling, chanting derogatory things in our direction. They had megaphones playing loud piercing music aimed in our direction,

including music, high-pitched tone. They were also coming on federal property.
Q Were they taking pictures?
A Yes.
Q Were they taking video?
A Yes.
Q Did you see the kinds of equipment they were using to take pictures or video?
A Yes.
Q Were the people present, did any of them identify themselves to law enforcement as journalists?
A I believe so, yes.
Q Were the people present on August 8th allowed to take pictures?
A Yes.
Q Were they allowed to take video?
A Yes.
Q To your knowledge was anyone arrested for taking pictures or taking video?
A No.
Q So you mentioned that FPS would at times instruct people to step back to what you believed was the federal property line. Did FPS give the people gathered instructions on where they wanted people to gather?
A Yes.

**MS. ABEL:** Objection, vague as to time.

**THE COURT:** I'll ask counsel to rephrase it --

**MR. HARI:** Will do, Your Honor.

**THE COURT:** -- with respect to time. Thank you.

**BY MR. HARI:**

Q On August 8th where there times that FPS instructed the people gathered to step back to the line?

A Yes.

Q And let me get even narrower with the time here.

At the time of the interaction with Inspector Rango and Mr. Lopez, the jury has heard that was about 8 p.m., did FPS give the people gathered instructions on where to step back to?

A Yes.

Q And did people generally follow those instructions?

A Yes.

Q When people stepped over what you believed was the federal property line, what was FPS's protocol if that happened?

**MS. ABEL:** Objection, vague as to time.

**THE COURT:** I'll ask counsel to rephrase.

**MR. HARI:** Will do, Your Honor.

**BY MR. HARI:**

Q On August 8th, APM Sermons when people stepped over what you believed to be the federal property line, what was FPS's protocol?

A Tell them to step back.

Q And what if they didn't listen?
A Well after -- we were stationed inside the loading dock and we would tell them, maybe yell it or get over our loud speaker tell them to step back, if they didn't comply we would get and walk towards them and tell them to get back.
Q And is that part of FPS's training?
A Yes.
Q I've mentioned Mr. Lopez a couple of times so far. Did you see him on August 8th, 2025?
A Yes.
Q When was the first time you saw defendant that evening?
A First time, I remember seeing him throughout the day, but a specific time I saw him, I know it was prior before the incident happened.
Q Do you remember what he was wearing when you saw Mr. Lopez?
A Yes.
Q And what was he wearing?
A Black ski mask, black shirt, and blue jeans.
Q And what was Mr. Lopez doing when you saw him?
A He was taking pictures.
Q Who was he taking pictures of?
A Every -- all the inspectors.
Q Did that include you?
A Yes.

Q And did that include Inspector Rango?
A Yes.
Q Mr. Sermons, to your understanding was Mr. Lopez arrested for taking pictures of officers?
A No.
Q To your knowledge was Mr. Lopez instructed to step back to what you described as the federal property line?
A Yes.
Q Did he follow those instructions?
A No.
Q Do you know who asked him to step back to the federal property line?
A Inspector Rango and other inspectors.
Q Do you know how many inspectors asked him to step back to the property line?
A Estimate five or more.

**MS. ABEL:** Objection, speculation.

**THE COURT:** Overruled, I'll let you lay the foundation.

**MR. HARI:** Yes, Your Honor.

**BY MR. HARI:**
Q APM Sermons, you mentioned you were out on the loading dock area at around 8 p.m., right?
A Yes.
Q Is it fair to say you saw Mr. Lopez interacting with other

officers?
A Yes.
Q Did you see, if you can, how many officers instructed Mr. Lopez to step back to what you described as the property line?
A I would say about five. We were all out there telling everybody to get back.
Q And when officers asked Mr. Lopez to step back did he follow those instructions?
A No.
Q If you had the estimate, approximately how far back from where he was were officers asking Mr. Lopez to go?
A Can you rephrase your question?
Q Sure. So I think you described that Mr. Lopez was inside what you defined as the federal property line, right?
A Yes.
Q Officers wanted him to step back to the property line; is that right?
A Yes.
Q About how far was that distance?
A Okay. About four to five feet.
Q Did Mr. Lopez do anything in response to the instructions to step back to what you defined as the property line?
A Yes.
Q And did you observe it?

A Yes.
Q What was it?
A As Inspector Rango was telling Mr. Lopez to get back and other inspectors, Mr. Lopez had his -- there's a camera in his hand taking pictures, and he shoved it in front of Inspector Rango's face hitting him on the bridge of his nose leaving a physical mark.

**MS. ABEL:** Objection, speculation.

**THE COURT:** Overruled.

**BY MR. HARI:**

Q APM Sermons, prior to the -- what you I think -- did you describe it as a push to the camera?
A Yeah, like a shove. Intentionally shove.
Q Prior to that did you observe Inspector --

**THE COURT:** I'm sorry, was that intentional shove or potential shove?

**THE WITNESS:** Oh, I'm sorry, intentionally shove.

**THE COURT:** Thank you.

**MR. HARI:** Thank you, Your Honor.

**BY MR. HARI:**

Q Prior to that shove did you see any officers strike Mr. Lopez?
A No.
Q Threaten to strike Mr. Lopez?
A No.

Q Push Mr. Lopez?
A No.
Q Even touch Mr. Lopez?
A No.
Q Thank you, APM Sermons.

**MR. HARI:** Your Honor, I have no further questions at this time.

**THE COURT:** Thank you. Any cross?

**MS. ABEL:** Yes, Your Honor.

**THE COURT:** Please proceed.

**CROSS EXAMINATION**

**BY MS. ABEL:**

Q Good morning.
A Good morning.
Q Do you prefer APM Sermons or Inspector Sermons?
A APM is good.
Q All right, APM. And remind the jury what that stands for exactly?
A Assessment Program Manager.
Q Thank you.
So we've learned you work for Federal Protective Services?
A Yes.
Q And FPS is part of DHS?
A Yes.
Q And DHS is the Department of Homeland Security?

A Yes.
Q And on the front of your uniform it says DHS Police, true?
A Yes.
Q Your job is to provide law enforcement on certain federal land?
A GAS owned.
Q So not all federal land?
A That's correct, not all.
Q For example, you don't provide law enforcement at national parks?
A No.
Q You have no authority to act as an law enforcement officer in a national park?
A If our assistance is required we can go out there, outside of that that falls under park police.
Q So you also don't have authority to act as a law enforcement officer on military land?
A On some bases we do have authority.
Q Only where the property is owned by GSA?
A Yes.
Q Is the Metropolitan Detention Center owned by GSA?
A That one I -- I'm not sure.
Q Do you have authority as a Federal Protective Services officer to act as a law enforcement officer at the Bureau of Prisons facility at the Metropolitan Detention Center next

door?
A Do we have authority to?
Q Act as a law enforcement officer?
A If our assistance is required, yes.
Q On the date as part of your normal duties, do you act as a law enforcement officer for the Metropolitan Detention Center?
A Inside the building we do not.
Q Okay. What about at the VA, are you a VA police officer?
A No, we're not.
Q So the VA building that's next door on the other side here you are not a law enforcement officer for the Veterans Affairs; is that correct?
A I do not work for the VA.
Q You only work for GSA property; that's right?
A Yes.
Q And this building is GSA property?
A Yes.
Q MDC, the Metropolitan Detention Center, not GSA property, true?
A I don't have an answer to that question.
Q So you don't know whether you are -- were required while you were stationed here to be a law enforcement officer at the Metropolitan Detention Center?
A I know what my primary duties were, yes, I do know.
Q And again your primary duty was only to be a law

enforcement officer at this building?

A The incident happened at this building.

Q That's not my question, sir.

Your duties were to be a law enforcement officer at this building; is that correct?

A We also did assist the federal prisons -- well the BOP a few times.

Q How about on August 8th?

A We assist them on several occasions, the exact day I don't know occasion.

Q Inspector Sermons, were you assisting the Bureau of Prisons on August 8th, 2025?

A During the incident, no, but prior --

Q Okay.

A -- dates we did assist.

Q On August 8th, 2025 --

**THE COURT:** Sorry, counsel, I don't think the witness had finished his answer.

**MS. ABEL:** I'm sorry.

**THE COURT:** Go ahead.

**THE WITNESS:** We did assist Bureau of Prisons on numerous occasions, but on the day of the incident I'm not sure if we assisted them before or after, but during the incident the incident did happen on federal property, on the GSA leased property.

**BY MS. ABEL:**

Q That -- sir, my question is, were you assisting the Bureau of Prisons to supervise the Metropolitan Detention Center as a law enforcement officer during this incident on August 8th, 2025?

A I did not work for the BOP.

Q Thank you.

How long have you worked with FPS?

A June of 2019.

Q So over five years?

A Six years and some change.

Q And you said you arrived here in Los Angeles on July 9th, 2025?

A I believe so, yes.

Q So you had been in LA about a month before this incident?

A Yes.

Q How much of that time had been spent guarding the Roybal Building?

A Every day.

Q And you were sent here to Los Angeles to respond to the ICE protesters?

A To any protesters that were protesting at the federal building.

Q And on August 8th that protest was concerning ICE immigration enforcement?

A Yes, part of the reason, yes.
Q You have since been reassigned?
A I went back home, yes.
Q So you're currently assigned in Atlanta?
A Yes.
Q And I believe you described on direct that you supervised Inspector Leo Rango on August 8th, 2025?
A Yes.
Q This building, among many of its uses, is -- does process people who are arrested?

**MR. HARI:** Objection, relevance.

**THE COURT:** I will permit it briefly.

**BY MS. ABEL:**

Q Does this building -- is this building used to process people who are arrested?
A Yes.
Q And that includes people arrested by federal agents?
A Yes.
Q Including ICE?
A Yes.
Q I'm going to show you a map of the area around this building.

**MS. ABEL:** Can we bring up previously admitted Exhibit 105? Oh, sorry. All right.

//

**BY MS. ABEL:**
Q Do you recognize this as an overhead map of this area?
A I do, yes.
Q Okay. And I'm going to draw some lines. I have made a -- two lines around what I'll ask you -- oop -- is that this building, the Roybal Building from overhead?
A Yes.
Q And I've indicated the building on the left most corner.
And then is this building, the one on the top of the frame, is that the Metropolitan Detention Center?
A Yes.
Q And then this here is Alameda Street; is that right?
A Yes.
**MS. ABEL:** Oop, it's flashing again.
**BY MS. ABEL:**
Q Is that Alameda Street, the street that we see on the frame?
A Yes.
Q And we've been talking a little bit this morning about a sidewalk, and I'm going to sort of draw a line as best as I can note it. Is that the sidewalk you've been describing?
A Yes.
Q And there's also a pavement area in front of this sidewalk; is that right?
A Yes.

Q And this incident that occurred --

**MS. ABEL:** Oop, I want to clear it, we've got too many dots.

**BY MS. ABEL:**

Q Right in that pavement area; is that a fair assessment?

A Where the cone is at on the video between the area where you drew the dot at and the cones on the video.

Q So these cones are actually in the driveway, right?

A Yeah, I can't touch. But yeah, if you draw a circle around that area that's where the incident occurred at.

Q Sure. So it occurred in this plaza area; is that right?

A If you can draw a circle a little bit further down right where the cone is at until where you first drew that dot at.

Q So these cones, sir, are they not in the driveway?

A Yeah.

Q So did this incident occur in the driveway?

A When they were on federal property they were not there.

Q Sir, I'm sorry. Did this incident occur in the driveway where the cars drive?

A The assault incident, no.

Q Okay. So the alleged incident between Inspector Rango and Mr. Lopez, did it occur on the public plaza?

A No, ma'am, it's not a public plaza.

Q Did it occur on that area that I have circled on the sidewalk -- on the map -- excuse me?

A Yes.
Q It did. Is that in the driveway?
A No, it's not.
Q Okay. Is it a walking area, an area where people can walk?
A Yes.
Q Is it an area where cars go?
A No.

**THE COURT:** Counsel, can you just make a record?

**MS. ABEL:** Certainly, Your Honor.

And for the record I have circled the area around the American flag where the darker colored sidewalk is.

**BY MS. ABEL:**

Q So you've been describing a loading dock. Is this -- and I've drawn a red line at the front of the Roybal Building -- is that the loading dock?
A Yes.
Q And the VA building, that's off this map; is that fair?
A Yes.

**MS. ABEL:** Can we bring up what's been previously admitted as Exhibit 105? And let's look at page 5 of that exhibit. Okay.

**BY MS. ABEL:**

Q So this is a -- oh, there we go -- this is a street view of this area; is that fair?

A Yes.

Q And again I'm going to identify there's entrance here that's the loading dock behind where I've made a square; is that right?

A Yes.

Q And that square is on the back of the Roybal Building where there's an entry to the garage; is that right?

A Yes.

**THE COURT:** Sorry, counsel, if you could just make a record of that before you continue.

**MS. ABEL:** Certainly, Your Honor.

That is the in the middle of the frame the entry to a parking garage that we had a square around.

**BY MS. ABEL:**

Q And one of the purposes of that loading dock is to accept entry of people who are arrested?

A Yes.

Q So people arrested by ICE can enter, do enter through that loading dock?

**MR. HARI:** Objection, Your Honor, relevance.

**THE COURT:** Overruled.

**THE WITNESS:** Yes.

**BY MS. ABEL:**

Q And that can occur in the evenings?

A Yes.

Q Can occur at any time?
A Yes.
Q So I think now we can see the VA building, and I'm going to kind of draw a square around the -- where it says VA loading docks, I've made a square around that on the left corner of the building. Do you see that?
A Yes.
Q But there -- the loading dock is not used by the VA, there's no ambulances that come in and out of there; is that right?
A Ambulances? I'm not sure.
Q You never saw one?
A Come to our building inside the loading dock, yes, but towards the VA I don't recall.
Q Right. So the VA doesn't have entry for emergency services there; is that right?
A I'm not sure.
Q Okay.

**MS. ABEL:** Can we bring up previously admitted Exhibit 145?

**BY MS. ABEL:**

Q Do you recognize this as the back of the VA building just next to the frame we were looking at before?
A Yes.
Q Do you see the red sign there?

A Yes.
Q What does it say?
A No emergency services.
Q Thank you.

**MS. ABEL:** Let's go back to 105, please, page 4. Make sure I got that right. Okay.

**BY MS. ABEL:**

Q So this here that we see in page 4 of this exhibit is that plaza area between the Roybal Building and the MDC?
A Yes.
Q What do you call that area?
A The loading dock. You mean the area where you drew a circle at?
Q Yeah. I'll draw it again here on this one just for everyone's clarity, and I'm drawing a circle here on the dark part of the sidewalk between the MDC and the Roybal loading dock. What do you call that?
A I think I would say the sidewalk leading up to the courtyard.
Q Courtyard. And when you say courtyard are you referring to the courtyard up --
A Up the steps.
Q Up the steps.
A Yes.
Q Up the steps. But this area below it, you call that the

plaza?
A Usually when we refer to the area outside a loading dock next to the guard shack.
Q Okay. So you don't have a particular name for it?
A No.
Q Is it all right with you just because we're going to talk about it that we call it the plaza?
A Yes.
Q Okay. So you mentioned before that there is -- there's a -- you described on direct, I believe you said a thin line on the sidewalk indicating what you believe is the difference between federal property and non-federal property. Do you recall saying that?
A Yes.
Q And when you say thin line, do you just mean the difference between the dark-colored sidewalk and the light-colored sidewalk?
A Yes.
Q Okay. There's no actual line other than sidewalk difference; is that fair?
A There's a line I guess when they put the concrete slabs in create a thin line along the sidewalk.
Q So the line you're describing is just where the concrete meets?
A Yes.

Q Where the dark-colored concrete meets the light-colored concrete?
A Yes.
Q Okay. There are also lighter strips of concrete that kind of go in the middle, and I've noted them by drawing my finger along the lighter colored portions of the situation. Are those lighter colored in your opinion federal property or non-federal property?
A The whole area is federal property.
Q But not the whole area, right, because you've just testified that everything -- excuse me -- well we've lost our ability to draw -- everything to the right of the sidewalk is public property, non-federal property, right? Didn't you testify to that?
A The line you drew leading up to the steps --
Q Here we go.
A No, the other line, the diagonal line leading up towards the steps.
Q Uh-huh, this one? Oop no, intermittently, intermittently. Maybe -- oh, there we go.
A Yeah.
Q Success. Go for it.
A That line from when we got here we was told that from that line on up to the loading dock was federal property -- was our property we protect.

Q Uh-huh. And everything to the right of that line is Bureau of Prisons property?
A Yeah.
Q Okay. So now the testimony is that this is Bureau of Prisons property?
A Yeah, I'm not sure if it's GSA on the lease.
Q Okay.
A But I know we would go out there and assist BOP on several occasions.
Q Okay. So your testimony is this triangle that I've drawn, which is from the light-colored part of the sidewalk all the way over to the street is now -- is Bureau of Prisons property controlled by the Metropolitan Detention Center?
A Yes.
Q And that everything to the left -- now I'm drawing dark -- a line to the left of the light-colored sidewalk going all the way out to the loading dock -- that is GSA owned property that you are a law enforcement over?
A Yeah, if they would come in that area we would tell them to get back.
Q Okay. So only to the left of the light-colored line?
A Yeah, unless BOP requested our assistance --
Q And again we've talked about it, but on August 8th --
**THE COURT:** I'm so sorry. If I could just -- you can complete this next question and then can you make a record

about what you've drawn? Thank you.

**MS. ABEL:** Certainly. Yes, I'll make the record first.

So we've drawn a line from the light-colored sidewalk closest to Alameda straight back following the light-colored line, and then we've made a triangle to follow the front of MDC building and then along the sidewalk line, and then -- that's on the right side.

And then we have a separate shape which again goes along the light-colored portion of the sidewalk from the street back to the stairs and then covering all of the dark-colored sidewalk over to the left side loading dock.

**BY MS. ABEL:**

Q So there's in fact many types of property on the plaza?

A You said many types of property?

Q Many types, BOP property, GSA property, there's differently owned and controlled property. Is that you understanding?

A I'm not sure if BOP is owned by -- leased by GSA.

Q Okay. So you're just not sure what is or is not property controlled by GSA in this area?

A Only with the BOP.

Q I'm sorry?

A With the BOP I'm not sure.

Q Okay. So what about your role, are you familiar with your

responsibilities?
A Yes.
Q Okay. And is then my understanding of your testimony is your responsibilities is only to police, absent being asked by BOP, which you were not asked on August 8th, that your role is only to police the shape that I have drawn to the left? And I'm going to make it more clear.
We're doing straight back along the light-colored sidewalk, then we're covering the dark-colored sidewalk and around all the way up to the sidewalk along Alameda. That area is what you as an FPS police officer are responsible for?
A That's part of the area.
Q I'm talking only about the plaza, I'm sure there are -- I'm sure the building and other areas, we're just -- we're focused on the plaza because that's what this is about.
A Yes.
Q Okay. So then there are some concrete pillars. Do you see those?
A The bars, yes.
Q Yeah. Some of them appear to be on the light-colored sidewalk in the front. Do you see that?
A Yes.
Q Is there any sign indicating that this strip of sidewalk closest to Alameda Street, the light-colored sidewalk closest to Alameda Street, is you believe to be public property?

A Sign, no.
Q I want to talk again about your gear, your equipment, and I want to talk about what was available to you on August 8th, 2025.
So I think you testified on direct that you were carrying a firearm; is that right?
A Yes.
Q And all of the officers on your team that day carried a firearm?
A Yes.
Q That includes Inspector Rango?
A Yes.
Q On August 8th you were carrying a taser?
A Yes.
Q And all of the officers on your team that day carried a taser?
A Yes.
Q On that day you were carrying OC spray?
A Some people were, some were not.
Q What about you?
A No.
Q You don't, but other members of your team were?
A Yes.
Q You're familiar with OC spray?
A Yes.

Q Is another word for that Mace?
A Yeah, uh-huh.
Q On that day you were carrying a flashlight?
A Yes.
Q And you were wearing a helmet?
A Yes.
Q And you were wearing a Kevlar vest?
A Yeah, uh-huh.
Q All the members of your team have the Kevlar vest?
A Yes.
Q What is a Kevlar vest?
A Just we call it an outer carrier vest, with --
Q For the laypersons like myself and maybe some of the jury, what does that mean?
A We have two types of vests, inside, which is inside a shirt, will maybe see the vest, you see like a regular shirt. The outer carrier, the Kevlar vest, so you put over the uniform.
Q And what is it made of?

**THE COURT:** I'm sorry, outer carrier?

**THE WITNESS:** Yes, outer carrier.

**THE COURT:** Okay. Like to carry something?

**THE WITNESS:** It's called an outer carrier vest. Outer carrier.

**THE COURT:** Okay. Is it -- could you spell that?

**THE WITNESS:** O-U-T-T-E-R (sic), outer carrier.

**THE COURT:** Okay. Carrier is C-A-R-R-I-E-R or is it a brand name?

**THE WITNESS:** No that's what we call it. Either wear your internal carrier or the outer carrier.

**THE COURT:** Got it. Thank you. Okay, please proceed, counsel.

**BY MS. ABEL:**

Q And what exactly -- what is it made of?

A The actual bullet proof part is actual Kevlar.

Q Kevlar. So it's thick?

A Yeah, uh-huh.

Q It's heavy?

A Yes.

Q And one thing you did not have that day was body worn camera; is that right?

A Correct.

Q And that's because none of the FPS officers on August 8th hat body worn camera?

A Correct.

Q Let's talk specifically about 8 p.m. on August 8th, 2025. I believe you testified on direct that there was an immigration related protest along Alameda Street here?

A That was part of the protest, yes.

Q And I'm going to show you a video that's already been

admitted.

**MS. ABEL:** Can we bring up Exhibit 1? Oh, I don't think we're seeing it. Oh, thank you. Okay. And I'm going to play the first 13 seconds of Exhibit 1.

**(Video played)**

**BY MS. ABEL:**

Q And this video is surveillance video taken from a camera on the side of this building?

A Yes.

Q And during this portion of the video where were you standing?

A We were inside the loading dock.

Q So you were at the loading dock entrance?

A Yes, observing the crowd.

Q And could you see the -- this area from where you were standing?

A Yes.

Q Okay. There were protesters along the street here?

A Yes.

Q They were carrying signs?

A Yes, some were.

Q Some were waving flags?

A Yes.

Q From what we just saw here at this point most of them were standing pretty still? Happy to show it to you again if you'd

like.

A Yeah, show it to me again if you don't mind.

Q Sure, of course.

**MS. ABEL:** From the beginning to 13 seconds, please.

**(Video played)**

**BY MS. ABEL:**

Q So most of the people they're standing pretty still?

A Yes.

Q Okay. They're pretty spread out?

A Yes.

Q Now, let's focus on this area we've been talking about all morning, the plaza area that we've been discussing.

A Yes.

Q In that plaza area there's an American flag; is that right?

A Yes.

Q And that's this pole? I'm drawing a line along the pole in the middle of the plaza. Is that the pole that has the American flag on top?

A Yes.

Q And you said I think on direct that there were about 50 to 75 people there; is that right?

A Yes.

Q And when you're talking about that you're talking about all the people all across Alameda Street there; is that right?

A All across and also across the street.
Q Across like on the other side of Alameda Street?
A Yes.
Q Fair. You weren't limiting your description to this plaza area that we see on the screen right now at 14 seconds were you?
A The description of the protesters?
Q How many.
A No, just also on the side, in the front, and on the other side of the street.
Q Okay. But in this area, the plaza area that we're talking about right here, maybe 10 to 15; is that a fair statement, at most, people?
A On this side? Yes.
Q Yeah.
A Uh-huh.
Q Okay. You testified that there was some yelling and chanting?
A Yes.
Q And you said there were some derogatory statements made; is that right?
A Yes.
Q At this moment did you hear those derogatory statements?
A They were being said every minute of the day just about towards us.

Q I guess I'm asking, did you hear any derogatory statements made at -- during this portion of the video when the -- leading up to the time that the incident with Mr. Lopez occurred?
A The correct way to answer the question was almost every minute was getting yelled derogatory things.
Q Sir, I guess it's not really an answer to my question.
In the moment right here and all the way up to the time of the incident with Mr. Lopez did you hear any derogatory statements made to you or your fellow officers?
A I'm sure I did, yes.
Q Okay. Do you remember what they were?
A Sure, I can name quite a few statements.
Q You remember specific statements that were made to you?
A Yes.
Q Okay. Well we'll watch the video and you let me know when you hear them.
So we see in the portion of the video there's two people standing -- I'm going to circle them -- there's what appears to be a man and a woman standing on the plaza area. Do you see them?
A Yes.
Q They were both filming?
A From this angle I'm not sure what they're doing.
Q Okay. Were they causing a disturbance?
A I can't say right now.

Q Were they being violent?
A I can't say if they were yelling right now or it doesn't appear that they were throwing anything right now, so I will say that.
Q I'm sorry, I just didn't understand. Sorry.
A It doesn't appear that they're throwing any objects in our direction from this video, so I would say no --
Q Okay.
A -- as far as there being violence.
Q Okay. So your answer is no, they were not being violent?
A At this moment --
Q Okay.
A -- at this time, correct.

**MS. ABEL:** Let's continue to play to 25 seconds.

**(Video played)**

**BY MS. ABEL:**

Q So now we can see them a little closer, they -- do you see the man on the right with a beard?
A With a hat, yes.
Q Yeah, and the hat, yep. And a woman on the left. Do you see them both?
A Yes.
Q Okay. And some officers, members of your team approach them; is that right?
A Yes.

**MS. ABEL:** Let's continue to 42 seconds.

**(Video played)**

**BY MS. ABEL:**

Q So at this point there are one, two, three, four FPS officers out on the plaza area?

A Yes.

Q And this one is Inspector Rango -- and I've circled the officer to -- all the way to the right -- is that Inspector Rango?

A I believe so.

Q Okay. And the two people we saw earlier, the man with the hat and the woman, they've backed up some?

A Yes.

Q But they're still on the dark part of the sidewalk; would you agree with that?

A Yes.

Q In fact now they're on the what you've described as BOP controlled property, Bureau of Prisons controlled property; is that right?

A Yes.

Q You'd agree that at this point there's still not really more than 20 to 25 people here in this plaza area?

A Yeah, 25 maybe --

Q Okay.

A -- 30. I mean you see people walking across the street

over -- coming over.
Q Okay.
**MS. ABEL:** And let's continue to 1:08.
**(Video played)**
**BY MS. ABEL:**
Q So now two more FPS officers on your team have joined the group?
A Yes.
Q And now there are six officers?
A Yes.
Q And the group on the public plaza still around 20, 25 or so?
A Yes.
**MS. ABEL:** Let's continue to 1:27, please.
**(Video played)**
**BY MS. ABEL:**
Q Sir, is this -- oh, intermittent functionality here. Oh, yea.
I have circled the officer lower right-hand corner, one from the right, so the first one in on the left, is that you?
A Yes.
Q Okay. And there -- the officers on the plaza, they lined up; is that fair?
A Yes.
Q Okay.

**MS. ABEL:** Let's continue to 1:43.

**(Video played)**

**BY MS. ABEL:**

Q Sir, this -- I'm circling the man in the back, three in from the left -- is that Mr. Lopez?
A Right now I don't know who that is.
Q You don't know who that is.
A No, I'm -- I don't think I'm looking in that direction, but --
Q Okay. So you don't know when Mr. Lopez arrived?
A The time he arrives, I know he was -- he's been I guess --
Q On August 8th --
A Uh-huh.
Q -- what time did he arrive?
A I'm not sure.
Q Okay. So you don't know if that's him or not?
A No.
Q Okay. We talked about how the officers are standing in a line. Is that something you're trained to do, to stand in a line to move people back?
A Yes.
Q Okay. And you train your officers to do that?
A Yes, we're to stand in line to push the crowd back.
Q Uh-huh. I'm going to have you focus on the movements of the person that you don't know. Can you watch where that

person goes from here?
A Sure.
**MS. ABEL:** Let's continue to play to 2:02, please.
**(Video played)**
**BY MS. ABEL:**
Q Were you able to follow the movements of the person I directed you to?
A Yes.
Q And is it all right if I refer to that person as Mr. Lopez?
A Yes.
Q And that person is the defendant. Is it all right if I acknowledge that?
A Yes.
Q Okay. And that person that we were looking at, Mr. Lopez, did he ever step behind any of the officers?
A Yeah, he's behind a couple of guys to your far left.
Q So I'm going to show it to you again. We talked about how they're in a line. Did he ever step behind the line of officers?
A Show it to me again?
Q Sure, of course.
**MS. ABEL:** Let's start at 1:43, please.
**(Video played)**
//

**BY MS. ABEL:**

Q And just because you're not familiar --

**MS. ABEL:** Oh, can you pause it right there?

**BY MS. ABEL:**

Q Just so that we all are focused on the right thing, do you see that person?

A Yes.

Q And I'm directing you to the line of officers that I believe is sort of right there. Is that a fair -- I've drawn a line across the backs of the officers, and I've circled the person three in from the left. Is that fair to describe the line of officers that -- the line that I've drawn?

A Yes.

Q So what I'm asking is, did he ever step behind that line?

A Can you play it?

Q Yeah, of course?

**MS. ABEL:** And we're going to play to 2:02, please.

**(Video played)**

**BY MS. ABEL:**

Q So now that you've had a chance to see it again, did Mr. Lopez ever step behind the line of officers that I indicated?

A He's right there in front of the officers to your right, their face.

Q Sir, I'm sorry, but the question is just probably a yes or

no answer, but please answer it to the best of your ability.

Did he ever step behind the line of officers that I indicated?

A I want to say yes because the officers to your left they moved up a little bit and he stepped behind those.

Q Would he have seen those officers behind him?

A It's a possibility.

Q It's a possibility that he saw --

A Yeah.

Q -- behind himself?

A He could have.

Q Okay.

A I'm not sure.

Q Is he wearing a mask, sir?

A Yes.

Q Okay. And he doesn't have eyes in the back of his head?

A No, but his head does turn around --

Q Okay.

A -- left and right.

Q You testified on direct that Mr. Lopez stepped in front of Inspector Rango; is that what I heard?

A Yes.

Q Okay.

**MS. ABEL:** Let's go back to 1:59, and you can hold it right there.

**BY MS. ABEL:**

Q I'm going to circle the officer in the middle wearing the baseball cap. Do you see that?

A Yes.

Q Do you recognize that as Inspector Rango?

A Yes.

Q Okay. And then I'm going to circle the person we've been talking about the whole time, Mr. Lopez, over here, and he has on the mask and has some stripes along his sleeve. Do you see that?

A Yes.

Q Okay. I want you to focus on the interactions between those two people, all right?

**MS. ABEL:** Go ahead and play to 2:02.

**(Video played)**

**BY MS. ABEL:**

Q So in fact it was Inspector Rango who walked toward Mr. Lopez; is that right?

A Can you continue playing the video?

Q Sure.

**MS. ABEL:** Let's continue to 2:05.

**(Video played)**

**BY MS. ABEL:**

Q So Rango is stepping in front of him; is that fair?

A Yeah, he's directing -- I'm sure he's directing him to

get --

Q Sir, I don't need you to speculate, I just asked the question. Did Inspector Rango step in front of Mr. Lopez?

A Yes.

Q Thank you.

In those few seconds that we just watched, that's when the alleged incident occurred, right?

A Yeah.

Q Okay. And where are you, sir?

A I believe I'm to the far left.

Q Is this you?

A I believe so.

Q Okay. So -- and I have circled the person -- I'm trying to figure out how to describe -- the person that we can see, the yellow police most clearly on the back of your uniform, I'd say maybe the first officer in from the right behind another officer. And so I've circled you, and then this is the incident; is that right?

A Yes.

**THE COURT:** Sorry, counsel, just I'm going to add to the record that you made the first circle identifying the individual that the witness thinks may be him is looking from the left of the photograph, the first person that we see where the police on the back of the uniform is clearly visible to the right of a few people, maybe three people taking cell phone

video.

**MS. ABEL:** Thank you, Your Honor.

**THE COURT:** Thank you.

**BY MS. ABEL:**

Q And then I've also circled the same person with the mask and the three stripes, and I believe you just testified that that is the time and place of the incident; is that right?

A Yes.

Q And there's another inspector, at least one inspector between you and the alleged incident?

A Yes.

Q So I want to focus on for a second the amount of time that the person we've identified as Mr. Lopez was present on -- in and around the public plaza area. First I just want to clarify something.

**MR. HARI:** Objection, Your Honor, to the form of the question, defense counsel called it the public plaza, which the witness has said is not the accurate definition.

**THE COURT:** Okay, counsel, I'll ask you the rephrase.

**MS. ABEL:** No problem.

**THE COURT:** Thank you.

**MS. ABEL:** No problem.

**BY MS. ABEL:**

Q I will start first actually by identifying that change in sidewalk color is -- have I drawn an approximate line where the

sidewalk changes color?
A You may be off a few --
Q You know fair enough, I will give it another go. Better?
A Yeah, that seems better.
Q Okay. And it's your understanding -- it's your opinion that the people on the light-colored part of the sidewalk are on public property; is that right?
A Yes.
Q And it's your opinion that the people on the dark-colored part of the sidewalk are actually on Bureau of Prisons land?
A From this angle, no.
Q No? Why not?
A From right here they are on what we consider our property.
Q But this is that light-colored sidewalk. Do you recall that other piece of light-colored sidewalk that you testified distinguished the difference between GSA is BOP land?
A Okay, I'm sorry.
Q No, I understand --
A Okay.
Q -- fair enough.
A Yeah.
Q So the officers, their feet appear to be on Bureau of Prisons land; is that fair?
A Yeah.
Q Okay. And the crowd, the vast majority of it is on what

you've described as public property?

A Yes.

Q Okay. And again I want to draw our attention to the amount of time that Mr. Lopez was on the plaza area.

**MS. ABEL:** Let's go back to 1:42, please.

**(Video played)**

**MS. ABEL:** A few, maybe a few frames -- a half a second later. There we go. Oh, can we go one or two frames just to make it slightly more clear?

**UNIDENTIFIED SPEAKER:** Forward?

**MS. ABEL:** Forward, yeah. Thank you. There we go. Much clearer.

**BY MS. ABEL:**

Q Okay. So this is the person we've been describing as Mr. Lopez; is that fair?

A Yes.

Q And at that moment he's just stepped onto the sidewalk area; is that fair?

A Yes, uh-huh.

Q Okay. So we're going to make note of that time, it's actually 1:43. Can we make note of that?

A Yes.

Q Okay.

**MS. ABEL:** And then let's play all the way through to the moment when the alleged incident occurs. And I would say

that's about 2:05, but you'll tell me if I'm wrong. So let's continue to 2:05, please.

**(Video played)**

**MS. ABEL:** You can pause it right there.

**BY MS. ABEL:**

Q Is that approximately where the alleged incident occurs?

A Yes.

Q So we started at 1:42 and now we're at 2:05, so the entire thing from the moment he steps onto the sidewalk to the moment of the incident, 22, 23 seconds; is that fair?

A Yes.

**MS. ABEL:** I'm going to bring up a previously admitted video, Exhibit 119.

**BY MS. ABEL:**

Q Okay. Do you recognize this as the loading dock?

A Yes.

Q Okay.

**MS. ABEL:** And let's play it from the beginning to 16 seconds, please.

**(Video played)**

**BY MS. ABEL:**

Q So this is where the officers are coming out of the loading dock?

A Yes.

Q And I've circled the officer in the middle of the three,

that's Inspector Leo Rango?

A Yes.

Q That's the man you were supervising that day?

A Yes.

Q Did you hear any obscenities during that time?

A During this clip?

Q Yeah.

A I heard the drum in the background as the inspector talking.

**THE COURT:** And I'm sorry, is the question about what he heard that day or what he heard this -- in listening to the video today?

**MS. ABEL:** I'll clarify. Thank you, Your Honor.

**THE COURT:** Okay, thank you.

**BY MS. ABEL:**

Q During that portion of the video that we just watched, did you hear any obscenities? Happy to play it again.

A No, as of right now listening to it, no.

Q Okay. What about derogatory language, did you hear any?

A During the short time frame, no.

Q Okay. And again, I'm going to keep playing this video. If at any point you hear derogatory language or obscenities please let me know. I'll check in with you about it, but if you hear it you let me know.

A Okay.

**MS. ABEL:** Let's continue to 21 seconds.

**(Video played)**

**BY MS. ABEL:**

Q I do hear a drum. Do you hear that drum?

A Yes.

Q Is that what you meant by music?

A They would play music and actual (indisc.) music through megaphones.

Q Okay. Do you recognize this woman that we see here in the frame as the woman that we saw from the other -- from the surveillance video?

A Yeah.

Q The woman with the blue Lanyard?

A Yes.

Q Okay. She was one of the two people standing on the plaza?

A Yes.

Q Okay. She's holding up her iPhone filming?

A Yes.

**MS. ABEL:** Let's continue to 36 seconds.

**(Video played)**

**BY MS. ABEL:**

Q So this officer here, I'm sorry, I don't know his name, do you happen to know his name?

A Yes.

Q Okay. Would you mind telling it to us?
A Inspector -- well his name is Gary Wilson.
Q This man right here? Sorry, my apologies.
A Oh, him, I'm sorry. I thought you meant that.
Q No, I did a bad job, and I'm circling the face in the top right corner. Do you know that man's name?
A Yeah, I know it, but --
Q No worries. No worries. I just was trying to make it clear for the record.

But that man, the man that we've circled in the top right corner, was asking the woman with the blue Lanyard to step back?
A Yes.
Q And she is holding up her press badge to the officer?
A Yes.
Q Okay.
A I'm not sure it's a press badge, but she's holding something up to him.
Q Fair enough.

**MS. ABEL:** Let's continue to 42 seconds, please.

**(Video played)**

**BY MS. ABEL:**

Q Do you recognize this as Inspector Rango? And I've circled the first officer from the left.
A Yes.

Q Okay. And he's directly in front of a woman with a white shirt?

A Yes.

Q That woman has a megaphone?

A Yes.

Q And we can hear her describing her opinion that this is public property?

A Yes.

Q That woman is also filming Inspector Rango with a phone?

A Yes.

**MS. ABEL:** Let's continue to 56 seconds.

**(Video played)**

**BY MS. ABEL:**

Q Inspector Rango continues to stand in front of the women in the white shirt until she walks away?

A Can you go back a few seconds?

Q Of course, sure, yeah.

**MS. ABEL:** Can we go back to say 48 seconds to 52? Oh, to 56, excuse me.

**(Video played)**

**BY MS. ABEL:**

Q Did he continue to stand in front of her until she walked away?

A Yes.

Q Okay.

**MS. ABEL:** Let's continue to one minute and nine seconds.

**(Video played)**

**BY MS. ABEL:**

Q The inspectors and the people in the plaza are disagreeing about whether they have a right to be there; is that fair?

A Yes.

Q Okay.

**MS. ABEL:** Let's continue to 1 minute and 15 seconds.

**(Video played)**

**BY MS. ABEL:**

Q We can now actually see you in the frame. Is -- well sometimes, sometimes. I'm going to have the magic touch, hold on. Is that you, sir?

A Yes.

Q Okay. And so you're walking in from the loading dock toward the plaza?

A Yes.

Q And this -- and I'm circling now, occasionally -- the -- will point you to the person in the baseball hat. Do you see that man?

A Yes.

Q That's Inspector Rango?

A Yes.

Q Okay. And he's directly in front of the woman in the

white shirt?
A Yes.
Q That's that same woman we saw before; is that right?
A Yes.
Q And he has his left arm up and he's pointing?
A Yes.
**MS. ABEL:** Let's continue until 17 -- 1 minute and 17 seconds.
**(Video played)**
**BY MS. ABEL:**
Q Inspector Rango pushes the woman in the with white shirted back with his body?
A I don't see a push, he's walking forward and she's standing in front of him. I don't see like a push.
Q Okay. Does Inspector Rango walk into the woman with the white shirt?
A Yeah, he's trying to direct her --
Q Does Inspector Rango walk into the woman with the white shirt?
**MR. HARI:** Objection, Your Honor, I just ask that the witness be allowed to finish his answer.
**THE COURT:** Thank you. You can complete your answer.
**MS. ABEL:** I believe he's trying to direct her beyond the property line and she's standing in his -- she's directly in front of him and he's telling her to move back and she's not

complying.

**BY MS. ABEL:**

Q His vest is touching her body?

A That part that's touching her is like a medical kit he carries.

Q Okay. So he's very close to her?

A Yes.

Q What is this yellow thing right there that I've just circled?

A Taser.

**MS. ABEL:** Let's continue to 1 minute and 20 seconds.

**(Video played)**

**BY MS. ABEL:**

Q Did you see a woman pull the woman in the white shirt away?

A Yes.

**MS. ABEL:** Let's continue to 1 minute and 33 seconds, please.

**(Video played)**

**BY MS. ABEL:**

Q Is this you, sir?

A Yes.

Q I've circled the inspector one in from the right.

**MS. ABEL:** Let's continue to 1 minute and 37 seconds.

**(Video played)**

**BY MS. ABEL:**

Q Do you recognize this person as Mr. Lopez?

A Yes.

Q Does he appear to be taking photos?

A Yes.

Q He's carrying a camera?

A Yes.

Q Camera is black?

A Yes. Black and red.

Q Black or red?

A And red.

Q And red?

A Yeah.

Q Do you see red on the camera?

A Like a red I believe circle around the camera.

Q You mean like in the lens?

A Yeah, something --

Q Just like a -- I'm going to let you explain. What do you mean by red?

A Yeah, there's a red accent on the camera. So it's black with a little bit of red accent.

Q Okay. Fair enough.

And he is, I think you testified, photographing the first officer in the line?

A Yes.

Q Okay. He's about a foot or two away?
A Yes.
**MS. ABEL:** Let's -- can we go forward just one or two frames, if you don't mind? Okay, perfect. Thank you.
**BY MS. ABEL:**
Q And now Mr. Lopez appears to be photographing you; is that fair?
A Yes.
Q Okay. And the officer here --
**MS. ABEL:** Actually let's take it specifically to -- can we go directly to 1:37, just because I think it it'll give us a clear shot. Okay, perfect. Thank you.
**BY MS. ABEL:**
Q I've just gone back one second so we can clarify. This right here that I've circled, it's a yellow contraption. What is that?
A It's called a pepper ball gun.
Q Can you tell us what that does?
A It shoots little balls and once it hit the ground it will disperse pepper spray, Mace.
Q Okay. Thank you.
**MS. ABEL:** Let's go forward continuing just to 1:38 and we can play it or just do a few frames, because I know it's very close.
**(Video played)**

**MS. ABEL:** Keep going, please.

**(Video played)**

**BY MS. ABEL:**

Q And we understood that he was photographing you at that moment?

A Yes.

Q He's about at least two feet from your face?

A Yeah.

Q Thank you.

**MS. ABEL:** Let's play 1:37 to 1:42. Thank you.

**(Video played)**

**BY MS. ABEL:**

Q So you tell Mr. Lopez to go back to the sidewalk?

A Yeah, uh-huh.

Q And he moves away from you?

A Yes.

Q In the direction of Alameda Street?

A I believe it was to my right, yes.

Q In the direction of Alameda Street?

A Uh-huh.

Q That's also in the direction of the sidewalk?

A It's towards the black -- towards -- yeah.

Q Do you want me to ask the question again, sir?

A Yeah, I was trying to describe the black placard, you know --

Q The signage?
A Yeah.
Q And is that closer to the sidewalk than where you are?
A Yeah, uh-huh.
Q So he moved closer to the sidewalk?
A Yes.

**MS. ABEL:** Let's continue to 1:47.

**(Video played)**

**BY MS. ABEL:**

Q In the background here -- and I'm going to circle the person wearing the blue jeans, the black shirt holding a camera, wearing a mask -- we see Mr. Lopez photographing other officers; is that right?
A Yes.
Q Compared to where you're standing -- and I'm going to circle you, you're the officer all the way on the right side -- those officers are closer to the sidewalk?
A Yes, uh-huh.
Q And I'm going to circle the officer in the baseball cap, that's Inspector Rango; is that right?
A Yes.

**MS. ABEL:** Let's continue from I believe you're at 1:47; is that right? Let's continue from 1:47 to 1:54 at half speed.

**(Video played)**

**BY MS. ABEL:**

Q These are the few seconds where the incident occurred; is that right?

A Yes.

Q This is you?

A Yes.

Q And this is the incident?

A Yes.

Q This officer is between you and the incident, true?

A I believe he's to my left.

Q Okay. You did not hear Mr. Lopez say fuck you?

A No.

Q Let's switch to a different angle. I'm going to bring up what's been previously admitted as Exhibit 129.

Okay. So we've reoriented ourselves to the other side. Does that make sense?

A Yes.

Q Okay. And here I'm circling Mr. Lopez, the man with the camera. Do you see that?

A Yes.

Q And here I'm circling the inspector with the baseball hat, that's Inspector Rango; is that right? Okay.

And then I believe -- excuse me -- I believe this one is you, and I've circled the officer directly to the right of Inspector Rango. Is that you?

A Yes.

Q Okay.

**MS. ABEL:** Let's play from zero to six seconds at regular speed, please.

**(Video played)**

**BY MS. ABEL:**

Q You're not in this frame are you?

A I can see my helmet, so --

Q Sorry, maybe I'm wrong.

A Yes.

Q Is that you, is that the tip of your helmet, and that helmet is one in from the right?

A Yes.

Q And you're -- you've walked away, you're walking away from Inspector Rango and away from Mr. Lopez?

A Yeah, uh-huh.

Q When you asked Mr. Lopez to get back on the sidewalk that was just a few seconds before this; is that fair?

A Yes.

Q And you did not physically touch Mr. Lopez?

A No.

Q You did not push Mr. Lopez back with your hands?

A No.

Q You did not hit Mr. Lopez?

A No.

Q Even though he took your picture?
A No -- yes, correct.
Q You agree that you did not hit him for taking your picture?
A Yes, correct.
Q Thank you. Just for the record.

**MS. ABEL:** Let's play from six to nine seconds at half speed.

**BY MS. ABEL:**

Q And I want you to focus on this officer, and I've circled the officer one in from the left, that's Inspector Wilson; is that right?
A Yes.
Q Okay. And I want to focus on him as we're watching the next three seconds at half speed.

**(Video played)**

Q Inspector Rango approached Mr. Lopez as he was photographing Inspector Wilson; is that right?
A Yes.
Q You are over here on the -- you're the -- in this frame all the way to the right; is that true?
A Yes.
Q Okay. At the time Mr. Lopez was photographing Inspector Wilson there was distance between Mr. Lopez and Inspector Wilson?

A Yes.
Q A foot or two?
A Uh-huh, correct.
Q Okay. And Inspector Rango approaches from Mr. Lopez's right side; is that fair?
A Yes.
Q And when he approaches Mr. Lopez takes a step back; is that fair?
A Yes.

**MS. ABEL:** Let's continue from 9 to 11 seconds at half speed.

**(Video played)**

**BY MS. ABEL:**

Q Inspector Rango advances on Mr. Lopez in every frame we just watched?
A Yeah, he's telling him probably to get back.
Q Did Mr. -- did Inspector Rango advance on Mr. Lopez in every frame?
A What do you mean by advance?
Q Walk forward.
A Yes.
Q Inspector Rango moved forward in every frame of the video we just watched?
A Yes.
Q Mr. Lopez during every frame of the video we just watched

was backing up?
A Yes.
Q Inspector Rango uses his right hand and slaps Mr. Lopez and his camera?
A Can you go back a few seconds?
Q Of course we can.

**MS. ABEL:** Let's do 9 to 11 seconds again at half speed.

**(Video played)**

**BY MS. ABEL:**

Q Do you want me to repeat the question?
A Slaps or redirected his hands.
Q You would like to change slap to redirected his hands?
A Sure.
Q Inspector Rango used his right hand to redirect the hands and camera of Mr. Lopez?
A Yes.
Q Okay. And Mr. Lopez shirks?
A Shirks?
Q Lifts his shoulders?
A Yeah, okay.
Q He drops his camera?
A He drops --
Q Well do you see the camera right at this moment?
A Yeah, I think I see maybe the microphone.

Q Okay. It's no longer up at his eyes?
A Yes.
Q It's down lower?
A Yes.
Q You are standing back here?
A Yes.
Q You are looking away?
A No, I can see out my peripheral vision, so I can see what is, you know, to my left or right and directly in front of me.
Q Is your focus on the interaction between Mr. Lopez and Inspector Rango?
A Yes.
Q Your focus is on him at this moment?
A I'm able -- I was able to see the incident.
Q Sir, why don't we go back, and we'll start at 8 seconds, let's do 8 seconds, to 11 seconds at half speed, and I want you to focus on you. Is that all right, sir?
A Yeah.
**(Video played)**
Q Is your focus on Inspector Rango and Mr. Lopez?
A Yes, you can see out the peripheral vision --
Q So you're seeing it on the side?
A Yes.
Q Out of the corner of your eye?
A Yes. I'm able to move my eyes left or right, also able to

see.
Q Understood.
A Yes.
Q Thank you.
**MS. ABEL:** Let's continue to 13 seconds, please.
**(Video played)**
**BY MS. ABEL:**
Q At that moment Mr. Lopez pushes Rango back?
A Yes.
Q And Rango points at Mr. Lopez?
A Yes.
Q You are standing back here?
A Yes.
Q Would you agree that this officer is in front of you?
A He's not blocking my view, no.
Q Sir, I'm sorry, the question is, would you agree that this officer, the one directly in front of you, is in front of you?
A He's not directly in front of me.
Q Okay. You're at least seven feet away from Mr. Lopez?
A A little bit closer than seven feet.
Q I'm sorry, what'd you say?
A A little bit closer than seven feet.
Q Six feet?
A Maybe five.
Q Okay.

**MS. ABEL:** Let's go back to the other angle, and that's Exhibit 119, to see kind of what happens next. And we're going to start at 1:54 at regular speed. Go ahead.

**(Video played)**

**BY MS. ABEL:**

Q And we've stopped at 1:57. Inspector Rango pushes people out of the way?

A Yes.

Q Inspector Rango lungs for Mr. Lopez?

A Yes.

Q He grabs Mr. Lopez by the right arm?

A Yes. That was after their assaults.

Q Sir, I'm just asking you if at this -- at this moment he grabbed him by the right arm?

A Yes.

Q Okay. And he pulls --

**MS. ABEL:** Let's continue for three or four seconds, please.

**(Video played)**

**BY MS. ABEL:**

Q He pulls Mr. Lopez into the plaza?

A Yes.

**MS. ABEL:** Let's continue for another four or five seconds, please.

**(Video played)**

**BY MS. ABEL:**

Q And Inspector Rango pushes Mr. Lopez down to the ground?

A It's not a push. Whenever we go make an arrest, you know, due to momentum of people, people will trip and usually the rest will end up on the ground, but it's never -- it wasn't a -- he wasn't thrown to the ground.

Q So your testimony is that Mr. Lopez tripped?

A Yeah, due to the momentum of the crowd almost every arrest end up on the ground because people will trip over each other and as you're trying to pull somebody closer to you to get them arrested with handcuffs on usually this will happen and it would go to the ground.

Q You do agree though that Inspector Rango pulled him by the arm -- pulled Mr. Lopez by the arm?

A Yes.

Q And he was pulling him toward the plaza?

A Yes.

Q Your testimony is that he tripped and fell face down onto the pavement?

A Due to the momentum people -- the arrest will end up on the ground. As we're trying to bring people in sometimes they want to go down their butt and sit down or you would trip over -- I may trip on another inspector's foot or the suspect's foot, usually that would happen, you know, during the arrest.

**MS. ABEL:** Let's go back to 1:54. Let's play -- I'm

sorry - 1:54, is that 1:54? Let's -- actually let's do 1:58 then. I'm sorry. I must have the wrong number. Okay. And then let's play 1:58 to 2:04 at half speed, please.

**(Video played)**

**BY MS. ABEL:**

Q Did you see Inspector Rango pushing on Mr. Lopez's upper left shoulder?

A You see Inspector Rango trying to gain control and he ends up falling along with another inspector, also Mr. Lopez.

Q Did you see Inspector Rango pushing on Mr. Lopez's upper left shoulder?

A To gain control.

Q Did you see Inspector Rango pushing on Mr. Lopez's upper left shoulder?

A Inspector Rango was attempting to gain control of the subject, not a push.

Q I still don't believe you've answered my question.

Did you see Inspector Rango push on Mr. Lopez's upper left shoulder?

**MR. HARI:** Objection, Your Honor, asked and answered.

**THE COURT:** Sustained.

**BY MS. ABEL:**

Q Up until -- actually I'm sorry, let's -- this is you; is that right, sir?

A Yes.

Q Up until this moment you did not touch any of the protesters?
A Correct.
Q During that entire period we just watched you did not touch any of the journalists?
A Correct.
Q And you're the supervisor on scene?
A Yes.
Q And it's consistent with your training not to start by touching?

**THE COURT:** Not to what?

**MS. ABEL:** Start by touching.

**THE COURT:** I'm going to ask counsel to rephrase --

**MS. ABEL:** Sure.

**THE COURT:** -- because I'm not clear on the question.

**BY MS. ABEL:**

Q As a supervisor you're familiar with the training given to your officers?
A Yes.
Q You've been given that training?
A Yes.
Q And you've reinforced that training with all the members of your team?
A Yes.
Q And Inspector Rango was one of the members of your team?

A Yes.
Q And I want to focus on some of the actions you took that are consistent with that training.
Based on what we've seen this morning you are acting in a professional and courteous manner; do you agree?
A Yes.
Q You're speaking politely?
A Yes.
Q You're calm?
A Yes.
Q You're moving slowly?
A Yes.
Q You gave a verbal warning?
A Yes.
Q The warning was to get back on the sidewalk?
A Yes.
Q You repeated the warning as necessary?
A Yes.
Q You gave Mr. Lopez and the other protesters time to comply with your warning?
A Yes.
Q Giving people time to comply with your instructions is consistent with your training?
A Yes.
Q It took all of the protesters and journalists on the plaza

that night some time to understand the instructions and to back up where you wanted them to?
A Yes.
Q They didn't all immediately retreat to the light part of the sidewalk?
A Yes.
Q Even at this moment right here, at least this man in the white shirt, is still standing on the dark part of the sidewalk?
A Yes.
Q And even though some of the protesters were disagreeing with your directions to get off the plaza, you did not touch them in any way?
A Yes.
Q During this entire time you did not get close to any of the protesters' faces?
A No.
Q That's consistent with your training in de-escalation?
A I was trying to just supervise the officers, you know, so a lot of times I would maybe sit back a little bit and observe them.
Q You're part of the team though, right, sir?
A Yeah, uh-huh.
Q So your duties are to carry out and enforce the same laws you understand them -- as you understand them to be?

A Yes.
Q So if you think something needs to be done you'll do it?
A Yeah, uh-huh.
Q And one important part of your training, especially when it comes to dealing with protesters, is de-escalation; is that right?
A Yes.
Q And in your de-escalation training you learn to slow down a situation; is that fair?
A If the circumstances allow it, yes.
Q Sure. And in your de-escalation training best practice is to reduce the intensity of a situation; is that fair?
A If it's feasible.
Q Right. You don't want to ratchet things up --
A Yeah.
Q -- is that fair? I'm sorry, I spoke over you. Is that fair?
A Yes.
Q Thank you.
And just to be clear, you did not strike any of the protesters when they did not immediately comply with your warning to get back on the sidewalk?
A That's correct.
**MS. ABEL:** Let's -- and can you tell me what second we're on right now, please. 2:03? Okay. Let's go back to 2

minutes of Exhibit 119 and we'll play at half speed to 2:05, please.

**BY MS. ABEL:**

Q And if possibly while watching try and focus on your actions.

A Okay.

**(Video played)**

Q At this point Mr. Lopez is on the ground?

A Yes.

Q And I count one, two, three officers are on top of him; is that fair?

A Yes.

Q And one of those officers -- and I'm going to circle if I -- which is to the -- immediately to the right of the pinky of the person holding the phone -- that's Inspector Rango?

A Yes.

Q And this person here -- and you are the officer all the way to the right -- that is you?

A Yes.

**MS. ABEL:** Let's continue from a different angle that we have already admitted in evidence, that's Exhibit 118. And we're going to pick up as close to this point as we can at 1 minute and 51 seconds. All right. And we're going to play to 1 minute and 58 seconds at half speed.

**(Video played)**

**MS. ABEL:** Apologies for dinosaur sounds.

**BY MS. ABEL:**

Q Mr. Lopez is laying flat on the ground at this point?
A No, he's not flat on the ground.
Q He is closest to the pavement of the group we see?
A He's on the ground, but he's not laying flat out.
Q Okay. He's -- fair clarification. He is on the ground at this moment; is that true, Mr. Lopez?
A Yes.
Q Okay, thank you.
And you are at his head?
A Yeah, uh-huh.
Q Okay. And Inspector Rango is at his feet?
A Yes.
Q Okay.

**THE COURT:** And counsel, it's about the time that we need to take our morning break.

**MS. ABEL:** Sure.

**THE COURT:** Is this a good time?

**MS. ABEL:** Perfect. Thank you, Your Honor.

**THE COURT:** Okay.

Okay. Jurors, we're going to take a 15-minute recess at this time. Please remember, do not make up your minds about the case, do not discuss the case, do not research the case. We'll see you in 15 minutes jurors.

**THE CLERK:** All rise.

**(Jury out at 10:17 a.m.)**

**THE COURT:** I'll ask the witness to step outside the courtroom. Thank you.

And then I'll just address the parties briefly before you have your break.

**(Recessed at 10:18 a.m.; reconvened at 10:44 a.m.)**

**(Jurors present)**

**CROSS EXAMINATION (CONTINUED)**

**BY MS. ABEL:**

Q APM Sermons, we were talking about the camera that Mr. Lopez had before. Do you recognize this, and I'm happy to bring it to you, as the camera that Mr. Lopez had?

A Yes.

Q Okay. And then, just for the sake of the jury, the red that you're referring to is that just this sort of ring around the lens there?

A Yes.

Q Okay, But otherwise the camera is black?

A Yes.

Q Okay. And it has a strap on it. Do you see --

A Yes.

Q -- that? And it has a hole in it such that one could strap it around a wrist. Do you see that?

A Yes.

Q Okay. And all of that looks familiar and consistent with the way it appeared on August 8, 2025?
A Yes.
Q Let's go back to talking about the arrest of Mr. Lopez.
**MS. ABEL:** And I believe we were looking at a video that's already been admitted, Exhibit 118, at one minute and 58 seconds. Thank you.
**BY MS. ABEL:**
Q And the orientation of this video is a little -- it's a vertical video so we're going to focus our eyes on the top portion of the video. And maybe we could --
**MS. ABEL:** Could we zoom in just a tad bit so we can focus? All right. There we go. And can we go frame to forward, just so we can clear this so it's more -- there we go. Oh.
**BY MS. ABEL:**
Q And I believe we were just talking about how you were the officer all the way on the right. This -- all the way on the right, is that you, sir?
A Yes.
Q And Inspector Ranjo is the one all the way on the left or on the ground all the way on the left?
A Yes.
Q Okay.
**MS. ABEL:** And let's play at half speed, one minute

and 58 seconds to two minutes and six seconds.

**(Video played)**

**BY MS. ABEL:**

Q Inspector Ranjo --

**MS. ABEL:** Can we go back just a few frames so that it's a little more clear in the -- Thank you. All right. Can we actually un-zoom, that might solve a little bit of it. There we go.

**BY MS. ABEL:**

Q Inspector Ranjo and the two other officers have their weight on top of Mr. Lopez? Happy to show it to you again, if you're not sure.

A You mean like sitting on top of him?

Q No, just that they have their weight placed on him.

A I wouldn't say all their body weight, no, maybe a portion of their weight.

Q Okay. Some of their weight is on Mr. Lopez. And you, sir, are up at the top here. Are these your hands in the upper right hand corner?

A Yes.

Q Okay. And you appear to have handcuffs in your hands.

A Yes.

Q And you also appear to be holding on to this. Is that fair?

A Uh --

Q I think we can see here the top of the --

**THE COURT:** And just for the record, what this is?

**MS. ABEL:** Yup, thank you. Sorry, this is Exhibit 20.

**BY MS. ABEL:**

Q The camera that Mr. Lopez was holding. I think we can see it here.

A I see the cuff of my hand, but it's the camera, I'm not sure.

Q Okay. Yeah, this right here. You don't recognize that as the top of the camera?

A It could be but (inaudible) handcuff.

Q Okay. And you appear to be pulling, does that seem consistent? Happy to show it to show it to you again, if it helps.

A Pulling? Yeah, if you want to show it.

Q Okay, sure.

**MS. ABEL:** Let's go 158 to 209. Let's do the 209 also at half speed.

**(Video played)**

**MS. ABEL:** We've stopped at 209, yup, we've stopped at 209.

**BY MS. ABEL:**

Q Did you see yourself pulling on Mr. Lopez's right arm?

A The video looked like he was holding on to something,

Mr. Lopez. And I was trying to, I guess pull it away. I'm not sure if there's a camera on my hand cuffs from this angle.

Q Okay. So he could have been holding on to his camera and you might have been pulling it away?

A It's possible.

Q Okay.

A I'm sure.

**MS. ABEL:** And let's go back just to 206 and play to 209.

**BY MS. ABEL:**

Q And again, I want you to focus on your actions.

**MS. ABEL:** Just those three seconds at half speed, please.

**(Video played)**

**BY MS. ABEL:**

Q You pulled on Mr. Lopez's arm hard enough that it dragged him forward a few inches?

A Yeah. According to the video where I'm looking at now, he has something in his hand. I'm not sure if I'm trying to take it away or maybe trying to secure him in handcuffs. But I can see myself, you know, extend his hand, yes.

Q Okay. And when you say he has something in his hand, based on the videos we've watched and your recollection of the event, he did in fact, prior to this moment, have a -- this Exhibit 20 camera in his hand, is that true?

A From this angle, I see my handcuffs, he could have a camera. But I'm just not really sure right now.
Q But prior to this moment, he did --
A Yes.
Q -- have the camera?
A Yeah, uh-huh.

**MS. ABEL:** Let's continue to 223.

**(Video played)**

**BY MS. ABEL:**

Q At this moment you are at Mr. Lopez's head, is that right?
A Yes.
Q That is Mr. Lopez's head?
A Yes.
Q Your hand is placed on the upper back neck area of Mr. Lopez?
A Yeah, close to his back and neck, yes.
Q That's your right hand that we can see here in the frame, close to his neck?
A Yes.
Q His face is on the pavement of the plaza?
A Pavement where the black thing is on the ground.
Q Okay. The sidewalk, the --
A Yeah.
Q -- stones, I'm not sure. The -- his face is up against the asphalt. Maybe that's the --

A Yes.

Q -- best term. Is that true?

A Uh-huh, yes.

**MS. ABEL:** Let's continue to play from where we've stopped, which I believe is 223, two minutes and 23 seconds to two minutes and 46 seconds. But we can do it at regular speed.

**(Video played)**

**BY MS. ABEL:**

Q You are stand -- sorry, you place cuffs on Mr. Lopez?

A Yes.

Q You roll him from his stomach to his back?

A Yes. Me and the inspectors.

Q Yep. And then you and the other inspectors sit him up?

A Yes.

Q And in fact, I think we hear you give instructions to tuck his legs in. Is that true?

A Yes.

Q And that's you directing the other inspectors?

A That's me directing Mr. Lopez, so he can -- we can assist him to his feet.

Q I think you said tuck his legs in. Is that a fair statement?

A Yes.

Q So you're talking to your fellow inspectors?

A Okay, yes.

Q Okay. And you're standing behind him. I believe we can see you right there directly behind Mr. Lopez, is that true?

A Yes.

Q Okay. And at this moment his hands are cuffed behind his back?

A Yes.

Q And this is about a minute after the alleged incident between Mr. Lopez and Inspector Ranjo?

A Yes.

Q And from the moment after the alleged interaction to this moment, the officers including yourself have been physically handling Mr. Lopez?

A What do you mean by physically handling?

Q Putting hands on him.

A To arrest him, yes.

Q This is a stressful situation for everyone involved?

A We are +trained to handle these types of incidents in stressful situations.

Q What about Mr. Lopez, does it appear to you that Mr. Lopez is distressed?

A I can't speak for him. I'm not sure.

Q Okay.

**MS. ABEL:** Let's play the rest of the video to the end at regular speed, please.

**(Video played)**

**BY MS. ABEL:**

Q You hear Mr. Lopez say to Inspector Ranjo, you pushed me first.

A I didn't hear in this video. If you don't mind playing it back.

Q Of course. Of course.

**MS. ABEL:** Let's go back just to 246, please, two minutes and 46 seconds to the end, regular speed.

**(Video played)**

**BY MS. ABEL:**

Q Did you hear it that time, you pushed me first?

A Yes.

Q And Mr. Lopez is saying that to Inspector Ranjo, who's directly in front of him?

A I believe, yes.

Q So now we've watched a lot of the video of this incident, several different ones. And you never stopped me to let me know that you heard any derogatory language or profanities, did you?

A They were being made. I'm --

Q Did you --

A -- I did not stop him, no.

Q -- did you hear any derogatory language in the videos that we've watched?

A Yes, you can hear some after the arrest. I believe you

can hear people, you know, saying profanity towards us, yes.
Q After the arrest?
A Yes.
Q What --
A Before the arrest --
Q Yes.
A -- they were threats being made. I'm not sure if someone may have edited out of the video. I'm not sure. But they were being made all day long at us.
Q So now your testimony is that every single video that we've watched this afternoon has been edited to remove the profanities?
A Now I'm not sure. But --
Q So you're not sure if every single video has been edited to remove the profanities?
A Yeah, I know sometimes there were videos that were edited.
Q These videos that have been entered into evidence, your testimony is that all -- I believe we've watched, four have been edited to remove the profundities. Is that true?
A I'm not sure. Example, when you play the video and you slowed it down, you hear that dinosaur noise. I'm not sure what they're saying then or during that timeframe, but they're apparently saying something, you just can't --
Q Sure, we can absolutely watch the video from the beginning up to the incident in real time, and you can let me know if you

hear any profundities. Would you like to do that?
A You don't have to, but they were using profanity at us during that timeframe.
Q But we don't -- we have not heard it on any of the videos?
A You may not have here at the -- on the video, but us on the ground, you know, we're hearing it in all different directions.
Q Okay. So if you heard it, none of these videos captured it?
A I think we all heard people using profanity at us, every inspector, I'm going to say.
Q I'm not asking you to speak for what other inspectors may or may not have heard, I'm just asking you to speak to what you heard. And I don't believe that you're saying that you heard any profanities in any of these videos. Is that true?
A From the segments we've watched during the arrest you can hear profanity. Prior to the arrest, just the ones we watched, no, you didn't hear it.
Q Okay. And again, I'm happy to play the video from the beginning up to the incident, if you'd like to hear it again. Would you like to do that?
A I -- yes, sure, why not?
Q Okay. Let's do Exhibit 119. And this captures right from the moment you're coming out of the loading dock. Is that true?

A Yes.

Q Okay. And let's play just to 154 at real time. And again, please raise a hand, let me know, stop me at any time if you hear any profanity or derogatory language directed at an officer.

A Okay.

**(Video played)**

**THE COURT:** Sorry, the objection is?

**MR. HARI:** Relevance and best evidence.

**THE COURT:** The best evidence being?

**MR. HARI:** The video itself, Your Honor, it's in evidence. It speaks for itself.

**THE COURT:** Thank you. Overruled.

**MS. ABEL:** We're going to continue, please.

**(Video played)**

**BY MS. ABEL:**

Q So we played the whole video up until the time of the incident. Did you hear any profanities being directed at the officers?

A I can describe what I hear. On the video you can hear multiple people talking on bull horns, people playing the drums. So at that time on this video, you may not have -- you may not have picked it up, but when we're on scene, you know, some things are clear, as far as someone using profanity. But due to, you know, the different sounds people are making,

drums, music, whatever, you can't really hear it, you know, in this video.

Q Okay. So your testimony is, you heard it, but the video didn't capture it?

A Yes, it was -- there was -- that's correct.

Q If a protester did use profanity, that would not be a basis to arrest them?

A No, we would not arrest them for profanity, no.

Q If a protester did use derogatory language directed at you, that would not be a basis to arrest them?

A Correct, we would not.

Q If a protester uses derogatory language, that's not a reason to touch their body?

A Correct.

Q If a protester uses derogatory language, that's not a reason to strike them?

A Correct.

Q On August 8, 2025, you did not hear Mr. Lopez use any derogatory language?

A I did not.

Q On August, 8, 2025, you did not hear Mr. Lopez use any profanities?

A No, I did not.

**(Pause)**

**MS. ABEL:** May I have just one moment, Your Honor?

Nothing further, Your Honor.

**THE COURT:** Thank you. Any redirect?

**MR. HARI:** Yes, Your Honor.

**THE COURT:** Please proceed.

**(Pause)**

**REDIRECT EXAMINATION**

**BY MR. HARI:**

Q APM Sermons, I want to follow up on some of the things you talked about with Defense Counsel. I want to start by talking about the scope of your responsibilities while you were here in Los Angeles. Do you remember some questions on direct examination regarding the scope, I think of the plaza, what you were responsible for versus MDC, versus what was public property?

A Yes.

Q So let's focus on that. I want to pull up first Exhibit 21 which is in evidence. Do you see that on your screen in front of you, APM Sermons?

A Yes.

Q Are you familiar with this sign?

A Yes.

Q Was this sign in front of the Edward Roybal Center?

A Yes.

Q And do you see that that's what's written at the top here?

A Yes.

Q And that center that's defined at the top there, the Edward Roybal Center Federal Building, is that what you were responsible for?
A Yes.
Q And you can see on the sign here, does it say that -- does it list the U.S. Courts and the Metropolitan Detention Center?
A Yes.
Q There were some questions on direct, excuse me, on cross examination about whether or not the VA ambulances came in through the loading dock area. Do you remember those questions?
A Yes.
Q This sign here, I'm zooming in here at the bottom, it may be a little bit difficult to see, but you've seen the sign in person. Is that right?
A Yes.
Q On the portion I've zoomed in on, do you see at the top it says Alameda?
A Yes.
Q Are you able to read the next three lines that are written there?
A Staff parking only, VA, I think it says ambulance, and loading dock.
Q Opposing Counsel I think asked you in that plaza area there were, "many types of property". Do you remember that

question?
A Yes.
Q To be clear, was it all federal property?
A Yes.
Q And on August 8th of last year, were your responsibilities to get people across that GSA MDC line, or was it to get people onto the public sidewalk?
A Get people onto the public sidewalk.
Q And specifically Inspector Ranjo, were his duties to get people onto the MDC side of the line, or was it to get people onto the public sidewalk?
A The public sidewalk.
Q Okay. I want to next ask you some questions about Inspector Ranjo's interaction with Mr. Lopez. And I'm pulling up Exhibit 129. Do you remember going over this video at least in part with Ms. Abel?
A Yes.
Q Okay. I'm going to move the video forward to about eight seconds. On your screen, do you see the Inspector all the way in the back who's holding a yellow object?
A Yes.
Q On cross examination, you told us that was a pepper ball gun, right?
A Yes.
Q That gun was never used on August 8th, right?

A Right, it was not used.
Q Defense Counsel also circled a yellow object on Inspector Ranjo's belt. Do you remember that?
A Yes.
Q And you told us that was a taser. Is that right?
A Yes.
Q That was never used on August 8th, right?
A That's correct.
Q Opposing Counsel asked you some questions about how you interacted with protesters. Do you remember those questions?
A Yes.
Q She asked you if you were professional, right?
A Yes.
Q She asked you if you told people to move back to the sidewalk?
A Yes.
Q She asked you if you touched any protesters. Is that right?
A Yes.
Q Prior to the interaction between Mr. Lopez and Inspector Ranjo, did you see Inspector Ranjo touch any protesters?
A No.
Q Okay. So let's watch the interaction between Inspector Ranjo and Mr. Lopez. I'm going to play the video here and then ask you some questions about it.

**MR. HARI:** So we're starting at eight seconds, Exhibit 129 and let me make sure my volume is on. Okay. So for the record this video does have sound. I'm playing it without sound at the moment.

**(Video played)**

**MR. HARI:** Pausing the video at about nine and a half seconds.

**BY MR. HARI:**

Q APM Sermons, on cross examination, Defense Counsel asked you if Inspector Ranjo moved towards Mr. Lopez. He does, right?

A Yes.

Q All right. Does Mr. Lopez then move his camera into Inspector Ranjo's face?

A Yes.

Q And to be clear, when Inspector Ranjo walked towards Mr. Lopez, was that part of his duties that day?

A Yes.

Q When Inspector Ranjo points back towards the direction of the public sidewalk, was that part of Inspector Ranjo's duties that day?

A Yes.

**MR. HARI:** Let's keep playing. And I'm playing this frame by frame, we're starting at where we were about nine and a half seconds.

**(Video played)**

**MR. HARI:** Okay. I'm pausing the video at about 10.3 seconds.

**BY MR. HARI:**

Q APM Sermons, on cross examination Defense Counsel asked you that during this portion of the clip, at all times was Inspector Ranjo moving towards Mr. Lopez. Do you remember that question?

A Yes.

Q And he is? Right, we see that in the video.

A Yes.

Q Was that part of Inspector Ranjo's responsibilities that day?

A Yes.

Q We see in the video that the entirety of this time Mr. Lopez is walking backwards, right?

A Yes.

Q But at any point in the video clip you just watched, did Mr. Lopez move his camera out of Inspector Ranjo's face?

A No.

Q And from what you see, how close is that camera to his face?

A Pretty close, you know, within six inches.

Q Could it be touching his face?

A Yes.

**MS. ABEL:** Objection. Speculation. Move to strike.

**THE COURT:** I will ask Counsel to rephrase.

**MR. HARI:** Will do, Your Honor.

**BY MR. HARI:**

Q Based on what you see in front of you --

**THE COURT:** Sorry. The jury will disregard the last question and answer.

**BY MR. HARI:**

Q Based on what you see in front of you, APM Sermons, could it be touching his face?

A Yes.

Q And to be clear on August 8th, did you see it at some point touch Inspector Ranjo's face?

A Yes.

**MR. HARI:** Okay. I'm continuing to play from about 10.3 seconds.

**(Video played)**

**BY MR. HARI:**

Q Can you describe what you just saw, and I'm pausing it at what's about 11 seconds.

A What I saw, it appears the camera was directly into Inspector Ranjo's face. And he went to direct the camera away from his face.

Q Based on your experience, can an officer execute his duties with a camera on his face like that?

**MS. ABEL:** Objection. Speculation.

**THE COURT:** Overruled. You may answer.

**BY MR. HARI:**

A No, it will obstruct his view.

Q And is that dangerous?

A Yes.

Q Why?

A Because you know, he's not able to see what's front of him. Threats may be coming from behind him, left or right, and its put his self in harm's way if he's not able to see the full view -- his full view.

**MR. HARI:** Let's keep playing, starting at 11 seconds --

**(Video played)**

**MR. HARI:** Pausing at 11.6 seconds, approximately.

**BY MR. HARI:**

Q Where did Inspector Ranjo's hand go that he used to move the camera out of the way?

A Down to his side.

Q Does he pull it up in a fist?

A No.

Q Did he go to push Mr. Lopez with it?

A No.

Q After redirecting the camera, it goes down to his side?

A Yes.

Q Does he continue moving towards Mr. Lopez?
A Yes.
Q And was that part of his responsibilities that day?
A Yes.

**MR. HARI:** Continuing to play from 11 seconds. This is at half-speed.

**(Video played)**

**MR. HARI:** Pausing the video. At about 12.3 seconds, oops, and I just moved it. Okay, so at about 12.3 seconds.

**BY MR. HARI:**

Q Can you describe what you just saw, APM Sermons?
A Mr. Lopez hit Ranjo on his chest with his right hand, and Inspector Ranjo, pushed it away.
Q Did Inspector Ranjo move backwards, as a result of the push?
A Yes.
Q And based on what you just observed, comparing the movement -- the redirection of the camera with the shove backwards, did Mr. Lopez use more force in pushing Inspector Rancho back?

**MS. ABEL:** Objection. Speculation.

**THE COURT:** Overruled. You may answer.

A Yes, the force pushed Inspector Rancho back, he stepped back.
Q On cross examination, Opposing Counsel compared some of

your actions with some of Inspector Ranjo's actions. I want to compare Inspector Ranjo's actions with other inspectors' actions on that day. So I'm closing this exhibit. I'm pulling up Exhibit 3, and I'm starting it at zero seconds. I'm playing it at half speed, and then I'm going to ask you some questions about it.

**(Video played)**

**MR. HARI:** I've just paused the video at 1.2, 1. 3 seconds.

**BY MR. HARI:**

Q Do you recognize the inspector on the -- all the way on the right side of the screen?

A Yes.

Q And who is that?

A Inspector Raleigh.

Q All right. And did you see that he was making contact with the person, the protester who's there in white?

A Yes.

Q What's he doing?

A Telling the protesters to get back.

Q And that contact where he has his hand on the person's chest, is that within that officer's duties?

A Yes.

Q Why is that?

A This guy wouldn't move, so if they're not able to move,

sometimes that -- if they're not willing to move, then the inspector will have got them back to where they're supposed to be at.

Q Opposing Counsel asked you about your training when it comes to de-escalation. Do you remember those questions?

A Yes.

Q If someone doesn't react to officer presence, doesn't respond to being asked, doesn't respond to being told, are officers allowed to make contact with that individual?

A Yes, it's called a soft technique.

Q And, I'm sorry, say that again, it's called a --

A Oh a soft technique.

Q Soft technique. Based on what you've seen in all of the videos we've watched and what you saw on August 8th, 2025 was Inspector Ranjo acting within the scope of his duties, in your opinion, as his supervisor?

A Yes.

Q Thank you.

**MR. HARI:** No further questions, Your Honor.

**THE COURT:** Any recross?

**MS. ABEL:** Briefly, Your Honor.

**THE COURT:** Thank you.

//

//

//

**RECROSS EXAMINATION**

**BY MS. ABEL:**

Q I'm going to bring up the video we keep circling back to Exhibit 129.

**MS. ABEL:** Thank you.

Q Do you recall this video?

A Yes.

Q And before this trial, you had never seen this video?

A I've seen a lot of videos. But this one in particular, I've seen a bunch of them.

Q When you were preparing for your testimony, did the Government show you this video?

A When the incident first happened, I was able to pull up a lot of video surveillance from social media and also through the camera system. So I've seen numerous videos, even prior to preparing for Court.

Q But you don't recall whether this was or wasn't one of them?

A Yeah, I'm not sure.

Q That's okay.

**MS. ABEL:** Let's go to nine seconds, please. And actually, let's go back just a few frames, if you don't mind. There we go.

Q Okay, so we talked about how it was Inspector Ranjo who came over to Mr. Lopez, right?

A Yes.
Q Okay. And Mr. Lopez did not initiate confrontation with Inspector Ranjo?
A What do you mean by confrontation?
Q Mr. Lopez did not go up to Inspector Ranjo?
A Inspector Ranjo's job was to have Mr. Lopez move back.
Q Did Mr. Lopez walk up to Inspector Ranjo?
A No.
Q Okay. And so he comes off from his right. Is that right, Mr. Lopez's right?
A Yes.
Q And when he does, he -- Mr. Lopez is wearing a mask?
A Yes.
Q And Mr. Lopez is -- appears to be looking in the view finder of his camera?
A Yes.
Q And Inspector Ranjo approaches him and steps directly in front of him, correct?
A Yes.
Q Okay.

**MS. ABEL:** Let's play it just until that moment, so it's just a few frames forward. Keep going, keep going.

**(Video played)**

**MS. ABEL:** Okay, we can stop.

Q Would say right now Inspector Ranjo is almost in front of

Mr. Lopez?
A Yes.
Q And let's just --

**MS. ABEL:** Can you tell me the exact time stamp right there, please? 09, so this is 9.5 seconds. And then I want to play in real time to the moment that Inspector Ranjo -- oh, I'm going to forget your words, moves the camera out of his way. And we'll stop it, which I believe is about 11 seconds, but we'll look in real time. Go ahead.

**(Video played)**

**MS. ABEL:** Okay. Right there. Can you go back, there was a few frames before, just so we get it exactly right. Okay. And can you tell us that timestamp? Eleven exactly.

Q So this moment is 11 seconds, and before the moment was 9.5 seconds, is that right?
A Yes.
Q So that entire interaction was 1.5 seconds, is that fair?
A Fair.
Q Would you describe that as a very short amount of time?
A Yes.
Q A short amount of time for anyone to react?
A Yes.
Q Whether that be in Mr. Lopez -- short amount of time for Mr. Lopez to react?
A Yes, could be.

Q Okay. I want to talk about the man in the white shirt that you were just talking about.

**MS. ABEL:** Let's go back to Exhibit 3 at 1.3 seconds. Oh, I think it's one second and three and change. So just -- yeah, perfect. Okay.

Q So do you recall that the Government asked you some questions about this man in the white shirt?

A Yes.

Q And the Inspector, I'm sorry, can you remind me of his name?

A Raleigh.

Q Inspector Raleigh's interactions with him?

A Yes.

Q Okay. And Inspector Raleigh did not push anything out of the way, did he?

A No, he didn't push, but, you know, he did -- got the gentleman back.

Q So Inspector Raleigh did not push the man in the white shirt?

A It's not a push as like a shove, like he shoved him a little bit, he did -- got him back.

Q Okay. And he didn't -- Inspector Raleigh did not swing his arm?

A Correct.

Q I believe you testified way back on direct that at the

moment of the incident between Mr. Lopez and Inspector Ranjo, Mr. Lopez was four to five feet inside what you believe is the federal property line?
A Yes.
Q So four to five feet. Pretty close to the sidewalk?
A Yes.
Q Okay. And Inspector Ranjo, we saw him in the other video. He's pointing that way. Is that a fair and -- I'm -- I don't know what -- is that a northward direction, I believe he's pointing northward. Is that fair?
A That's fair.
Q But the sidewalk is just like, maybe two steps to his right?
A Yes, fair.
Q Okay. And then the last thing is, you talked about what you called a soft technique. So that's one of the levels of force that you're trained on, is that fair?
A Yes.
Q And you're also familiar with hard techniques?
A Yes.
Q Those are more severe levels of force?
A Yes.
Q And striking a person with your arm is a hard technique?
A Striking or redirecting?
Q Is striking a person with an -- with your arm a hard

technique?

A It depends on the circumstances.

Q You don't know whether striking a person with your arm is a hard technique?

A I can give some examples. But it's all how you trying to define it.

Q Okay.

**MS. ABEL:** Just one moment, Your Honor.

**(Pause)**

Q Sir, you're a supervisor, right?

**(Inaudible response)**

Q You got to say it into the mic.

A Oh yeah, yes for sure.

Q And you -- you've been trained on all the levels of force that are available?

A Yes.

Q Okay. And so you are familiar with what is a soft technique?

A Yes.

Q And some examples of a soft technique would be an escort position?

A Yes.

Q A come along hold?

A Yes.

Q Can you tell me what that is?

A You grab a person, but you grab underneath the arm and just walk in the direction you want to take them.

Q And this push tap here of the man in the white shirt that we see here in Exhibit 3, what would you describe that as?

A Soft.

Q Soft technique?

A Yes.

Q Okay. And is your testimony that striking with a hand is not a hard technique?

A It depends on the circumstances. I can give you example if, you know --

Q I'm sorry. I'm just asking, is it your -- do you know if striking with a hand is a hard technique?

A In this incident, no, it's not.

Q I'm just asking if you know if striking with a hand is a hard technique?

**MR. HARI:** Objection, Your Honor. Asked and answered.

**THE COURT:** I will allow the Counsel to ask -- rephrase the question and ask it one more time. Thank you.

**BY MS. ABEL:**

Q When an officer strikes another person with their hand, are they using a hard technique?

A If you're redirecting someone's hand, it's not a hard technique.

Q And is that because we're disagreeing about the language, whether it's a strike or a redirect?
A I consider -- based on this incident, I would say it's a soft technique.
Q Okay. I just want to make sure. I understand the disagreement we may or may not be having. I'm saying strike and you're saying redirect?
A Yes.
Q Okay. So if it's a redirection, then it could -- then it's a soft technique, is your opinion?
A Yes.
Q But if it's a strike is it a hard technique?
A If it's a punch, yes.
Q If it's a strike.
A If it's a -- you say a strike to a chest, yes, can be a hard technique.
Q Okay.

**MS. ABEL:** Nothing further.

**THE COURT:** Thank you. May the witness be excused?

**MR. HARI:** Yes, Your Honor.

**THE COURT:** Is he subject to recall?

**MS. ABEL:** No, Your Honor.

**THE COURT:** Okay. You are excused. Thank you.

Let me ask the Government to call its next witness.

**MR. HARI:** Your Honor, the Government has no further

witnesses at this time.

**(Requested transcription concluded at 11:26 a.m.; proceeding continued))**

**CERTIFICATION**

**I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.**

**April 5, 2026**

**Signed** **Dated**

***TONI HUDSON, TRANSCRIBER***